# EXHIBIT G



Not Reported in F Supp 2d

2004 WL 2451416 (D Del )

**(Cite as: 2004 WL 2451416 (D.Del.))**

Page 1

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available

United States District Court,
D Delaware.
James C BELL, Plaintiff,
v.
WASTE MANAGEMENT, INC , a Delaware
corporation, Defendant
**No. Civ.A. 03-992-KAJ.**

Oct 29, 2004

William D. Fletcher, Jr , Noel E Primos,
Schmittinger & Rodriguez, Dover, Delaware, for
Plaintiff

Barry M Willoughby, Young, Conaway, Stargatt
& Taylor, LLP, Wilmington, Delaware, for
Defendant

MEMORANDUM OPINION

JORDAN, J

I INTRODUCTION

\*1 This is an employment discrimination action
brought pursuant to Title VII of the Civil Rights Act
of 1964, Americans with Disabilities Act of 1990,
42 U.S.C. § 12101 *et seq*, with certain state law
claims also being alleged. Presently before me is a
Motion for Summary Judgment (Docket Item
["D.I."] 58) and Motion to Dismiss Plaintiff's Lost
Earning Claims (D.I 59) filed by the defendant,
Waste Management, Inc ("Waste Management" or
"Defendant"). Jurisdiction is proper under 28
U.S.C §§ 1331, 1367. For the reasons set forth, the
Motion for Summary Judgment will be granted and
the Motion to Dismiss Plaintiff's Lost Earnings
Claims will be denied as moot

II BACKGROUND

The plaintiff, James C Bell ("Bell"), is a black
male who began working for Waste Management in
August of 2002, when he was 34 years old (D.I 61
at A2). Waste Management is in the business of
waste removal and Bell was hired to work as a
refuse truck driver (D.I 2 at § 8) Bell worked as
an active employee for Waste Management for
approximately three months, until November 4,
2002 (D.I 61 at A13, A27-29, A138)

Bell alleges that, while he worked at Waste
Management, white co-workers were given favored
treatment over black co-workers (*See* D.I 75 at
B27-28, B41, B76) Bell states, for example, that
during work hours a white co-worker was permitted
to stop and pick up his personal vehicle (*Id* at
B27-28) Bell admits, however, that he knows of no
similar instance where a black employee was not
given the same opportunity (*Id*) A white co-worker
was permitted to use a company owned truck to take
his Commercial Driver's License exam, while a
black co-worker was not permitted the same
opportunity (*Id* at B41) Additionally, when Bell
and another black employee went to help a white
co-worker complete his route, that white co-worker
left the route to "goof off" by conversing with his
supervisor while still on the company's time (*Id* at
B76; D.I 61 at A33) Bell alleges that there was an
occasion when a black co-worker injured his knee
and, despite several calls by Bell, none of the
managers came to investigate (D.I 61 at A34) As
a result of his co-worker's injury, Bell was forced to
complete the refuse collection route by himself (*Id*)

Bell also contends he was unfairly disciplined
based on his race On one occasion during his three
months on the job, his immediate supervisor, Chris
Weller ("Weller"), followed him throughout his
route in a vehicle with its flashers on (D.I 75 at
B29-30) Bell admits that he does not know if this is
standard practice (*Id* at B77-78) On another

© 2005 Thomson/West No Claim to Orig U S Govt Works

Not Reported in F.Supp.2d

Page 2

2004 WL 2451416 (D.Del.)

**(Cite as: 2004 WL 2451416 (D.Del.))**

occasion, Bell alleges that his truck was not operating properly, so he called headquarters to alert them of his problem and was told to wait for someone to come help him. (*Id.* at B36-37.) He was eventually ordered to return to base and was, he claims, wrongly disciplined (*Id.*) Bell also contends that he was given a warning for missing a scheduled trash pick-up, despite the fact that the customer had not placed the trash outside before the scheduled pick-up. (*Id.* at B32.) He says that he was given a written warning for failing to attend a required safety meeting, even though a white employee was allowed to miss a safety meeting without being disciplined (*Id.* at B37.) Bell believes that the reason the white employee was not disciplined was that he is the cousin of his supervisor (*Id.* at B37.)

**\*2** Shortly after Bell was hired, he requested a permanent route but instead that route was given to an even newer employee who is white. (D.I. 61 at A33.) Bell had previously worked that route prior to Waste Management's assigning it to the white employee. However, Bell admits that the reason that the route was assigned to the white employee was not racially motivated, but, rather, a conscious decision to have a younger, more physically fit employee complete the route alone, instead of using two people on the route, as had been the case when Bell worked it (*Id.* at 163-64.)

Bell accuses Waste Management of not giving him proper training for his job (*Id.* at B73; D.I. 61 at 73.) Bell also testified, though, that he trained with Hank Thompson ("Thompson") for three weeks (D.I. 61 at A182.) For the first week, Thompson showed Bell the route and how to operate the truck (*Id.* at A184-86.) For the remaining time, Thompson rode with Bell and assisted him with his route. (*Id.*) In addition to the on the job training Bell received, he was also required to watch a number of videos and attended orientation meetings (*Id.* at A106-11.)

Bell also complains that after he mentioned the difficulty of his route to one of Weller's supervisors, Ray Moore ("Moore") (*id.* at B37-38), Weller called Bell on the radio and asked if he got the "monkey off [his] back," regarding his unhappiness

with his route. (*Id.* at B37-38.)

In October, 2002, there was a meeting of the employees and senior management to discuss job performance issues involving Weller and Shane McCarty ("McCarty"), Weller's supervisor. (*Id.* at A35.) In his complaint, Bell alleges that this meeting was in response the harassment of black drivers by those individuals. (*Id.* at A34-35.) Moore, however, says that the meeting was called at the behest of a white employee to deal with general employee concerns about Weller and McCarty's management style (*Id.* at A192-94.) Bell himself admits that the substance of the meeting dealt with issues relevant to all employees (*Id.* at A121.)

On Bell's last week as an active employee at Waste Management, a particularly serious incident is alleged to have occurred. (*Id.* at B31, 61.) On October 29, Bell was informed that he needed to be back at the company's headquarters by 4:30 pm because he was approaching the 60 hour maximum work-hour limit set by the Department of Transportation ("DOT"). (D.I. 61 at A125.) DOT mandates that commercial drivers may not drive more than 60 hours in any seven day period (*Id.* at A3.) On the day in question, Bell returned with his truck at approximately 4:35 pm. (*Id.* at A102-03.) Upon arriving, Weller confronted him about his tardiness. (*Id.* at A25-26, A102-03.) The two exchanged words, and Bell alleges that Weller angrily called him "nigger." (Id.)

The following day, Bell returned to work. After work, McCarty, called Bell into his office and told him that he was suspending him for one day because of the disrespect he showed toward Weller (*Id.* at A71, A127-28.) Bell admits that he did not inform McCarty that Weller had used a racial epithet. (*Id.* at A21, A165.) On Friday, November 1, Bell returned to work after his one day suspension. (*Id.* at A153.) After work he called his doctor, a lawyer, and the Delaware Department of Labor (*Id.* at A132-34.) Bell later visited a doctor for treatment of his alleged disability and was given medication, although the exact type is not identified. (*Id.* at A140.) The doctor gave him a referral to a psychiatrist (*Id.*) Bell visited that

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F Supp 2d

2004 WL 2451416 (D Del )

**(Cite as: 2004 WL 2451416 (D.Del.))**

psychiatrist within one or two days and was given additional medication, although he cannot recall what medication he was given (*Id*) As a result of his encounter with Weller, Bell now claims that he is permanently disabled and cannot work as a driver (*Id* at A143 )

**\*3** On either November 1 or 2, 2002, Bell called Moore, a manager who routinely handled employee complaints, and left a message detailing the events of October 29, 2002 (*Id* at A129-30, A195 ) Upon returning from vacation on Monday, November 4, Moore contacted Bell and asked him to come down to the office so they could get to the bottom of what happened (*Id* at A135-36 ) Despite agreeing to meet with Moore, Bell did not go to meet him (D I 75 at B48 ) Bell testified that he could not meet with Moore because he was on medication (*Id* ) Moore tried to contact Bell after Bell did not appear for the appointment (D I 61 at A143 ) After several attempts, Moore finally reached him, and Bell reportedly said, "Why are you harassing me? I mean, what can I do? I mean, you all hurt me enough What can I do? Why do you keep calling me?" (*Id* ) Moore responded by saying that he was sorry and that when Bell felt belter he should come back to work (*Id* )

After the call with Bell, Moore continued his investigation into the incident (*Id* at A196-99 ) Moore interviewed Weller, who denied that he had used the epithet (*Id* at A199 ) Moore then interviewed other drivers and found that none were aware of the incident (*Id* ) It appears that Moore did not interview an employee who was with Bell at the time of the alleged incident (*Id* at A198 ) Moore stated that the employee in question had little ability to speak English, making communication very difficult (*Id* at A198 )

In his complaint, Bell alleges that Moore informed him that he was going to fire Weller, demote McCarty, and transfer the dispatcher (*Id* at A36 ) Moore testified that those employment decisions were based on poor job performance (*Id* at A201-06 )

On Monday, November 4, 2002, Bell faxed to

Waste Management a doctor's note titled "Permission to Return to Work," written by the first doctor he visited (*Id* at A18 ) The note stated that Bell had been under this Doctor's care from June 04, 2002 (*Id* ) Bell admits that the "illness or injury" section and the "able to return to work" section in the note, as faxed to Waste Management, were illegible (*Id* at A18, A139-40 ) Moore testified that he thinks someone at Waste Management once tried to follow up with the doctor to clarify the contents of the note (*Id* at A200 )

Bell testified that, approximately two months after he stopped working, he received a letter stating that he had been terminated (D I 75 at B49 ) Waste Management claims its records indicate that the termination letter was sent in November of 2003, one year after Bell stopped actively working at the company; however, it has not produced those records (D I 61 at A200 ) After stopping work for Waste Management and filing this law suit, Bell worked as a contract worker for Tilcon, driving his personal truck, until his license was suspended (*Id* at A74-75, A87-90 ) After that, Bell went to work as a custodian (*Id* at A75-77 ) Bell alleges that he stopped working as a custodian because of the "racial incident, the hostile, the environment, what happened at Waste Management, I just couldn't concentrate " (D I 75 at B17 ) Consequently, he says, his doctor had to take him out of work (*Id* )

III STANDARD OF REVIEW

**\*4** Pursuant to Federal Rule of Civil Procedure 56(c), a party is entitled to summary judgment if a court determines from its examination of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," that there are no genuine issues of material fact and that the moving party is entitled to judgment as a matter of law Fed R Civ P 56(c) (2004) In determining whether there is a triable dispute of material fact, a court must review the evidence and construe all inferences in the light most favorable to the non-moving party *Goodman v. Mead Johnson & Co*, 534 F 2d 566, 573 (3d Cir 1976) However, a court should not make credibility determinations or weigh the evidence

© 2005 Thomson/West No Claim to Orig U S Govt Works

Not Reported in F Supp 2d

2004 WL 2451416 (D Del )

**(Cite as: 2004 WL 2451416 (D.Del.))**

*Reeves v Sanderson Plumbing Prods, Inc*, 530 U S 133, 150 (2000)

To defeat a motion for summary judgment, Rule 56(c) requires that the non-moving party "do more than simply show that there is some metaphysical doubt as to the material facts" *Matsushita Elec Indus. Co., Ltd v. Zenith Radio Corp.*, 475 U S 574, 586-87 (1986) (internal citation omitted) The non-moving party "must set forth specific facts showing that there is a genuine issue for trial " Fed R Civ P. 56(c) (2004) "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita Elec Inds Co , Ltd.*, 475 U S. at 587 (internal citation omitted) Accordingly, a mere scintilla of evidence in support of the non-moving party is insufficient for a court to deny summary judgment *Anderson v. Liberty Lobby, Inc.*, 477 U S 242, 252 (1986)

IV DISCUSSION

Bell has asserted four claims against Waste Management: disparate treatment, hostile work environment, violation of the Americans with Disabilities Act; and intentional infliction of emotional distress. (D I 61 at A31-47 ) None of these claims bear scrutiny and, consequently, Waste Management's Motion for summary judgment will be granted

A. *Disparate Treatment*

The United States Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U S 792, 802 (1973), set forth a three-step burden shifting analysis for Title VII employment discrimination claims First, the plaintiff has the initial burden of establishing a *prima facie* case of discrimination *See McDonnell Douglas Corp .*, 411 U S at 802 This is done by showing that the plaintiff: 1) is a member of a protected class; 2) was qualified for the position; 3) suffered an adverse job action; and 4) was treated differently than employees who are not members of his protected class The Supreme Court has defined an adverse employment action as a "significant change in employment status, such as hiring, firing,

failing to promote, reassignment, or a decision causing a significant change in benefits " *Burlington Indus. Inc. v. Ellerth*, 524 U S 742, 749 (1998) Whether the plaintiff has established a *prima facie* case of employment discrimination is a question of law for the court. *Sarullo v. United States Postal Service*, 352 F 3d 789, 797 (3d Cir 2003)

*5 If the plaintiff establishes a *prima facie* case of discrimination, the burden shifts to the defendant-employer to articulate a legitimate, nondiscriminatory reason for the employment decision. *McDonnell Douglas Corp.*, 411 U S at 802. "The employer satisfies its burden of production by introducing evidence which, taken as true, would permit the conclusion that there was a nondiscriminatory reason for the unfavorable employment decision." *Fuentes v. Perskie*, 32 F 3d 759, 763 (3d Cir 1994) If the employer meets its "relatively light" burden by articulating a legitimate reason for the employment decision, the burden shifts back to the plaintiff to show "by a preponderance of the evidence" that the nondiscriminatory reason offered by the employer was a mere pretext for racial discrimination *Id.*

In the instant action, the two main questions with respect to creating a prima facie case of disparate treatment are: 1) did Bell suffer an adverse job action; and 2) was Bell treated differently than employees who are not members of his protected class The only action that can be seen as materially affecting Bell's terms of employment is the termination letter he received [FN1] The question thus becomes whether, with regard to his termination, Bell was treated differently than employees outside of his protected class That question must be answered in the context of the specific factual background of the alleged adverse employment action. *See, e.g., Hotchkins v. Fleet Delivery Serv.*, 25 F Supp 2d 1141, 1147 (D Or 1998) (holding that failure to show that other employees who failed to report for work were treated more leniently than plaintiff resulted in failure to establish a *prima facie* case of discrimination)

FN1 The reprimands Bell received prior

© 2005 Thomson/West No Claim to Orig U S Govt Works

Not Reported in F Supp 2d

2004 WL 2451416 (D Del )

**(Cite as: 2004 WL 2451416 (D.Del.))**

to being fired (D I 74 at B35-38) did not create a significant change in employment status, and, consequently, were not adverse employment actions *See Weston v Pennsylvania,* 251 F 3d 420, 430-431 (3d Cir 2001) (holding two written reprimands, temporary in nature and not affecting duties, hours, pay, or status, are not adverse employment actions) The bar for showing an adverse employment action requires a "significant change in employment status, such as hiring, firing, failing to promote, reassignment, or a decision causing a significant change in benefits," which, aside from his termination letter, Bell has failed to show *Burlington Indus ,* 524 U S at 749;

In this case, Bell failed to return to work after an alleged racial incident with his immediate supervisor (D I 61 at A135-37 ) He faxed a note from his doctor to Waste Management with two sections illegible, namely the "able to return to work" and "illness or injury" sections (*Id* at A18, A139-40 ) Additionally, when contacted by a Waste Management supervisor to determine what had transpired between Bell and his immediate supervisor, Bell insisted that Waste Management not contact him again (*Id* at A143 )

Bell proffers no evidence that, following these events, he was treated differently than other employees under even remotely similar circumstances It strains credulity to argue that a white employee engaging in the same conduct would not also have been terminated Although pertinent to his hostile work environment claim, the factors that Bell says motivated him to stop reporting for work do not support his disparate treatment claim Because he has failed to provide any evidence of a difference in the way he was treated and the way in which white employees would be treated if they refused to report for work and refused to even discuss why they refused to report for work, Bell's disparate treatment claim cannot stand

B *Hostile Work Environment*

*\*6* "In order to establish a claim for employment discrimination due to an intimidating or offensive work environment, a plaintiff must establish, by the totality of the circumstances, the existence of a hostile or abusive environment which is severe enough to affect the psychological stability of a minority employee. *Aman v. Cort Furniture Rental Corp ,* 85 F 3d 1074, 1081 (3d Cir 1996) (internal citations omitted) To establish the existence of such an environment, Plaintiff must show: "(1) that he or she suffered intentional discrimination because of race; (2) the discrimination was pervasive and regular; (3) the discrimination detrimentally affected the plaintiff; (4) the discrimination would detrimentally affect a reasonable person of the same race in that position; and (5) the existence of respondeat superior liability " *Id* (internal citations omitted)

The Supreme Court has stated that "whether an environment is 'hostile' or 'abusive' can be determined only by looking at the circumstances These may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance " *Harris v. Forklift Systems, Inc ,* 510 U S 17, 23 (1993)

Plaintiff lists several complaints against Waste Management to show a hostile work environment *See supra* at 2-3 Looking at his allegations singly or collectively, however, only one of them can fairly be said to be in the range of something severe enough to affect a reasonable person of the Plaintiff's race That is the incident when Weller allegedly directed a virulent racial epithet at Bell [FN2] "Nigger" is a word so fraught with an infamous history of racial animus and abuse as to be unacceptable in civilized discourse, including discourse in the work place The question before me, however, is not whether that epithet is morally repugnant It is whether the conduct of Waste Management's employees created an abusive environment so pervasive as to violate Title VII *See Aman,* 85 F 3d at 1081

© 2005 Thomson/West No Claim to Orig U S Govt Works

Not Reported in F Supp 2d

2004 WL 2451416 (D Del )

**(Cite as: 2004 WL 2451416 (D.Del.))**

FN2. Aside from that incident, Bell has not even produced evidence that any of the incidents he described to the court was racially motivated *See Seabrook v Gadow,* 2003 U S Dist LEXIS 10096 at *24-25 (D Del June 10, 2003) Bell argued that the use of the phrase "get the monkey off your back" is racially charged (B37-38); however, the Ninth Circuit has held, and I agree, that the word "monkey" in such a context, is not a racial epithet, but rather refers to passing responsibilities to others *Gregory v Widnall,* 153 F 3d 1071, 1074-1075 (9th Cir 1998) (holding that a "single drawing of a monkey on a memo circulated to senior NCOs, accompanied by the verbal explanation that it was intended to remind officers not to "get the monkey off their back" by passing their responsibilities to others, is not sufficient to raise a jury question") Even if the tone or context were such as to give credence to the Plaintiff's allegation that the comment was meant as a slur, the total number of incidents which can be characterized as racially motivated, given the evidence, would then be two, which is not pervasive

The case law makes it clear that the single use of a racial epithet, no matter how egregious, is not pervasive and therefore does not, in isolation, create a hostile work environment. *See, e g , Hibbler v Reg'l Med Ctr at Memphis,* 2001 U S App LEXIS 13323 at *4-5 (6th Cir June 12, 2001) (holding that supervisor's single use of a racial epithet did not create a hostile work environment as defined under Title VII); *Daso v Grafton Sch , Inc ,* 181 F Supp 2d 485, 493 (D Md 2002) (holding that although "no single act can more quickly alter the conditions of employment and create an abusive working environment than the use of an unambiguously racial epithet … [a single] use of this language by the supervisor is not sufficient to satisfy the hostile work environment test because it is not sufficiently pervasive"); *Cf Paris v Christiana Care Visiting Nurse Ass'n,* 197 F Supp 2d 111, 118 (D Del 2002) (holding that "[i]n order to be actionable, harassment must be so

severe or pervasive as to alter the conditions of the victim's employment and create an abusive working environment)

**\*7** Because Bell has cited only a single circumstance when he was subjected to a racial epithet, and because the other matters he complains of do not constitute a hostile work environment, his hostile work environment claim fails as a matter of law

### C  *Americans with Disabilities Act*

The Americans with Disabilities Act (the "ADA") does not cover people who are totally disabled and thus unable to work *See, e g , Weyer v Twentieth Century Fox Film Corp ,* 198 F 3d 1104, 1108-09 (9th Cir 2000) Bell asserts that he is totally disabled and unable to work (D I 74 at 16 ) Consequently he is not a qualified individual under the ADA Further, Bell has not requested any accommodations as is required under the ADA. *Jones v UPS,* 214 F 3d 402, 408 (3d Cir 2000)

### D  *Intentional Infliction of Emotional Distress*

Bell has conceded that he cannot pursue a claim for intentional infliction of emotional distress based upon Waste Management's hostile work environment (D I 74 at 20 ) Therefore, that claim too cannot stand

### V  CONCLUSION

Accordingly, the Defendant's Motion for Summary Judgment (D I 58) will be granted, and its Motions to Dismiss (D I 59) and to Strike Disclosure of Experts (D I 62) will be denied as moot Plaintiff's Motion to Consolidate Cases (D I 48) will be denied as moot An appropriate order will issue

2004 WL 2451416 (D Del )

**Motions, Pleadings and Filings (Back to top)**

- 1:03CV00992 (Docket)

(Oct 29, 2003)

© 2005 Thomson/West No Claim to Orig U S Govt Works

Not Reported in F Supp 2d

2004 WL 2451416 (D Del.)

**(Cite as: 2004 WL 2451416 (D.Del.))**

END OF DOCUMENT

© 2005 Thomson/West  No Claim to Orig  U S  Govt  Works

2001 U.S. Dist. LEXIS 17904, *

LEXSEE 2001 US DIST LEXIS 17904

**ELLIS BENJAMIN, Plaintiff, v. E.I. DUPONT DE NEMOURS & CO., Defendant.**

**Civil Action No. 01-303-SLR**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE**

**2001 U.S. Dist. LEXIS 17904**

**October 22, 2001, Decided**

**DISPOSITION:** [*1] Defendant's motion to dismiss complaint for failure to file timely charge of discrimination with Equal Employment Opportunity Commission was denied.

**LexisNexis(R) Headnotes**

**COUNSEL:** ELLIS BENJAMIN, plaintiff, Pro se, Port Deposit, MD.

For E.I. DUPONT DE NEMOURS & COMPANY, defendant: Evelyn Hassinger Brantley, E.I. duPont de Nemours & Co., Inc., Wilmington, DE.

**JUDGES:** Sue L. Robinson, United States District Judge.

**OPINIONBY:** Sue L. Robinson

**OPINION:**

### MEMORANDUM ORDER

#### I. INTRODUCTION

On March 30, 2001, plaintiff Ellis Benjamin filed a complaint in the Superior Court of Delaware alleging violations of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621, et seq., and the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101, et seq. (D.I. 1, Ex. A) On May 8, 2001, defendant E.I. Dupont de Nemours & Co. removed the action to this court pursuant to 28 U.S.C. §§ 1331 and 1441(a) (D.I. 1) Currently before the court is defendant's motion to dismiss the complaint for failure to timely file a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") (D.I. 2) For the following [*2] reasons, defendant's motion is denied.

#### II. BACKGROUND

Plaintiff was born on May 25, 1946. (D.I. 1, Ex. A) Plaintiff was hired by defendant's Agricultural Products Division in April 1988 and was terminated from his position as Senior Assistant Chemist on October 31, 1999. (Id.)

Plaintiff alleges that he noticed a "distinct change" in his female supervisor's attitude toward him around April 1, 1999, from "helpful, supportive and congenial" to "petty harassment, accusations, criticism and demeaning treatment." (Id.) According to plaintiff, the Agricultural Products Division was notified on July 1, 1999 of an impending reduction in personnel, and plaintiff's supervisor was "tasked" to terminate either plaintiff or another "much younger" employee. (Id.) Plaintiff further alleges that, "because of his age and recent time missed for surgery, [he] was intentionally subjected to a humiliating and demeaning course of conduct" used to create inferior performance appraisals to justify his termination. (Id.) Plaintiff claims that the alleged discriminatory conduct began on April 1, 1999 and continued through August 31, 1999. (Id.)

Plaintiff alleges that he filed [*3] a charge of discrimination with the EEOC on or about January 13, 2000. (Id.) Plaintiff received a Notice of Right to Sue from the EEOC on January 2, 2001. (Id.)

#### III. STANDARD OF REVIEW n1

n1 Lack of exhaustion and timeliness in

2001 U S Dist LEXIS 17904, *

discrimination cases are "in the nature of statutes of limitation" and not jurisdictional bars, therefore, they must be reviewed under Federal Rule of Civil Procedure 12(b)(6) and not 12(b)(1) Anjelino v New York Times Co , 200 F.3d 73, 87 (3d Cir 1999)

In analyzing a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), the court must accept as true all material allegations of the complaint and it must construe the complaint in favor of the plaintiff. See Trump Hotels & Casino Resorts, Inc v Mirage Resorts, Inc , 140 F.3d 478, 483 (3d Cir 1998) "A complaint should be dismissed only if, after accepting as true all of the facts alleged in the complaint, and drawing all reasonable inferences in the plaintiff's [*4] favor, no relief could be granted under any set of facts consistent with the allegations of the complaint " Id Claims may be dismissed pursuant to a Rule 12(b)(6) motion only if the plaintiff cannot demonstrate any set of facts that would entitle him to relief See Conley v Gibson, 355 U S 41, 45-46, 2L Ed 2d 80, 78 S Ct 99 (1957) The moving party has the burden of persuasion See Kehr Packages, Inc v Fidelcor, Inc , 926 F 2d 1406, 1409 (3d Cir 1991)

## IV. DISCUSSION

To state a viable claim of discrimination based on age or disability in Delaware, an aggrieved party must file a charge of discrimination with the EEOC within 300 days of the last alleged unlawful employment practice. See 29 U S C § 626(d)(2); 42 U S C § 12117(a); Davis v Calgon Corp , 627 F 2d 674, 677 (3d Cir 1980) (per curiam) (holding that plaintiff in deferral state, such as Delaware, is entitled to 300-day filing period, regardless of whether he has filed state administrative complaint within 180 days after alleged discrimination occurred).

In the case at bar, plaintiff claims that [*5] he filed a handwritten charge of discrimination on or about January 13, 2000, which was later "perfected" on August 21, 2000 Accepting plaintiff's allegations as true, the court finds that plaintiff provided adequate notice of his claims within 300 days of the last alleged discriminatory occurrence and, therefore, fulfilled the EEOC filing requirement

## V. CONCLUSION

Therefore, at Wilmington, this 22nd day of October, 2001;

IT IS ORDERED that:

1 Defendant's motion to dismiss (D.I. 2) is denied.

2. All motions to join other parties and amend the pleadings shall be filed on or before **December 21, 2001**

3. All discovery shall be completed on or before **January 21, 2002**

4. All dispositive motions shall be filed on or before **February 21, 2002** Responses shall be filed on or before **March 7, 2002** Reply briefs may be filed on or before **March 21, 2002**.

Sue L Robinson

United States District Judge



Slip Copy

2004 WL 2980727 (D Del )

**(Cite as: 2004 WL 2980727 (D.Del.))**

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available

United States District Court,
D. Delaware.
Melvin E. BOARDLEY, Plaintiff,
v.
FIRST CORRECTIONAL MEDICAL, Dr
Hofferman, John Doe, Nurse Kim, and Nurse
Ashton Defendants.
**No. Civ.A.03-343-KAJ.**

Dec 21, 2004.
Melvin E Boardley, Smyrna, DE, pro se.

Steven F Mones, McCullough & McKenty, P A ,
Wilmington, DE, for defendants

*MEMORANDUM ORDER*

JORDAN, J.

I INTRODUCTION

*1 Before me is a Motion to Dismiss (Docket item
["D I."] 17) filed by First Correctional Medical, Dr.
Hofferman, John Doe, Nurse Kim, and Nurse
Ashton (collectively "Defendants") For the reasons
that follow, Defendants' Motion is granted

II BACKGROUND

Melvin E Boardley ("Plaintiff") is a *pro se* litigant
incarcerated at the Delaware Correctional Center
("DCC") in Smyrna, Delaware (D I. 2 at 3 ) On
March 18, 2003, Plaintiff commenced this action by
filing a Complaint under 42 U.S.C. § 1983, alleging
that First Correctional Medical ("FCM"), the
healthcare provider for DCC, and certain FCM
employees [FN1] (collectively "Defendants") were

negligent and violated Plaintiff's rights (D I. 2; D I.
22 ) Specifically, Plaintiff alleges that Defendants
violated his 8th Amendment right to be free of cruel
and unusual punishment, and that they are liable for
medical malpractice in connection with treatment of
his two ingrown toenails (D I 2 ) Plaintiff alleges
that he developed complications after undergoing
surgery on his right toe on August 27, 2002, and his
left toe on September 9, 2002, and that Defendants'
continually failed to give Plaintiff the proper
medical care to correct the complications (*Id*.) As a
result, Plaintiff alleges, he lacked mobility and
suffered from severe pain and discomfort. (*Id*.)

> FN1 Dr. Hofferman is apparently Dr
> Hoffman, a former employee or agent of
> FCM (D I. 2; D I. 22.) Nurse Kim is
> apparently Kim Brown, an FCM
> employee, and Nurse Ashton is apparently
> Ashton Pyne, also an FCM employee (*Id*.)
> It is assumed that John Doe is an employee
> or agent of FCM (D I 22.)

II STANDARD OF REVIEW

In deciding a motion to dismiss pursuant to Federal
Rule of Civil Procedure 12(b)(6), the factual
allegations contained in the complaint must be
accepted as true. *Cruz v. Beto*, 405 U.S. 319, 322,
92 S Ct 1079, 31 L Ed 2d 263 (1972) (*per curiam*
) A *pro se* complaint can only be dismissed for
failure to state a claim if it appears "beyond doubt
that a plaintiff can prove no set of facts in support
of his claim which would entitle him to relief."
*Conley v. Gibson*, 355 U S. 41, 45-46, 78 S Ct 99,
2 L. Ed 2d 80 (1957)

III. DISCUSSION

*A. Exhaustion of Administrative Remedies*

The Prison Litigation Reform Act of 1996, codified
at 42 U S C. § 1997e, provides:

© 2005 Thomson/West. No Claim to Orig U S. Govt. Works

Slip Copy

2004 WL 2980727 (D.Del.)

**(Cite as: 2004 WL 2980727 (D.Del.))**

No action shall be brought with respect to prison conditions under section 1979 of the Revised Statutes of the United States (42 U.S.C 1983), or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted

The Supreme Court has held that an "inmate seeking only money damages must complete a prison administrative process that could provide some sort of relief on the complaint stated, but no money." *Booth v. Churner*, 532 U.S. 731, 733- 734, 121 S.Ct. 1819, 149 L.Ed.2d 958 (2001).

The Delaware Department of Correction administrative procedure provide that medical grievances be submitted to the [Inmate Grievance Chair], who will forward the grievance to the medical service contractual staff for review. The medical service contractual staff will attempt informal resolution fo the matter. If such resolution fails, a Medical Grievance Committee ("MGC") hearing will be conducted, which hearing will be attended by the grievant and the [Inmate Grievance Chair]. If the matter is resolved at that stage, the case is closed; otherwise, the grievant is directed to complete the MGC Appeal Statement section of the written grievance and forward it to the [Inmate Grievance Chair] ..

**\*2** *Smullen v. Kearney*, C.A. No. 02-082-SLR, 2003 U.S. Dist. LEXIS 10097, at \*9 (D.Del. April 19, 2003) (quoting Department of Correction Policy 4.4) [FN2]

> FN2. Neither party has submitted the exact appeal procedure used by the DCC; however, the above procedure is taken from Judge Robinson's opinion dealing with a similar motion to dismiss.

According to Plaintiff's Complaint, on September 27, 2002, he filled an initial grievance with the Inmate Grievance Office (the "IGO") [FN3] (D.I. 2 at 2; D.I. 26 at 2.) In the IGO's response, Plaintiff was ordered to seek an evaluation from a medical doctor. (*Id*) Plaintiff did in fact seek and receive an evaluation, but complains that a doctor was unavailable to perform the necessary surgery. (D.I.

2, Attch at 4) Plaintiff is now demanding $2 million in money damages. (*Id*) He also is seeking further medical treatment on his toes. (*Id*)

> FN3. Plaintiff also states that he filed a grievance with F.C.D. (D.I. 2 at 2.) It appears that F.C.D. refers to Federal Correction Medical, as Plaintiff states in his Opposition to the Motion to Dismiss that he filed a grievance with Federal Correction Medical (D.I. 26 at 2.)

As Plaintiff is seeking further medical treatment, in addition to money damages, there is an administrative process available to him that "could provide some sort of relief on the complaint stated." *Booth*, 532 U.S. at 733-734. For example, Plaintiff could request further surgery through an MGC hearing and an MGC Appeal Statement *Smullen*, 2003 U.S. Dist. LEXIS 10097, at \* 9 Consequently, Plaintiff has failed to exhaust the administrative process available to him, and, therefore, he is bared from bringing suit under § 1983. *See* 42 U.S.C. § 1997e; *Smullen*, 2003 U.S. Dist. LEXIS 10097, at \*9; *Booth*, 532 U.S. at 733-734.

B. *42 U.S.C. § 1983*

Beyond Plaintiff's procedural failure in this case, Plaintiff's legal contentions are without merit. In the instant case, Plaintiff appears to allege that Defendants are liable for the medical treatment performed on two ingrown toenails on August 27 and September 9, 2002, and for failing to perform surgery to correct the problem that resulted from that surgery (D.I. 2 at 5-8.)

The Supreme Court has held that "deliberate indifference to a prisoner's serious illness or injury states a cause of action under § 1983." *Estelle v. Gamble*, 429 U.S. 97, 105, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). However, allegations of medical malpractice do not alone state a claim under § 1983, because mere negligence does not amount to a violation of the Constitution, *id.* at 106, and such a violation is required to establish a § 1983 claim.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works

Slip Copy

2004 WL 2980727 (D Del )

**(Cite as: 2004 WL 2980727 (D.Del.))**

Page 3

Plaintiff alleges that Dr Hoffman did not have Plaintiff sign a consent form before performing the surgery, as he had on prior surgeries, and after the surgery the toenail grew back into the skin, as it had after previous surgeries (D I 2 at 5 ) As to the surgery performed by Dr Hoffman, Plaintiff has alleged no facts that could amount to more than simple negligence Consequently, Plaintiff's § 1983 must fail with respect to the ingrown toenail surgeries performed on August 27 and September 9, 2002

Plaintiff has admitted that he has a problem with reoccurring ingrown toenails and that he has had surgery performed on the toes four times Now Plaintiff argues that further delay on a fifth surgery to his toe or toes is a violation of his constitutional rights and a violation of § 1983 Plaintiff alleges that the delay in performing the required surgery is hindering his mobility, but this does not amount to a serious injury as required under § 1983 *See Estelle,* 429 U S at 106; *Monmouth County Corr. Inst. Inmates v Lanzaro,* 834 F 2d 326, 347 (3d Cir 1987) ("where denial or delay causes an inmate to suffer a life-long handicap or permanent loss, the medical need is considered serious") Consequently, Plaintiff has failed to plead facts that would support his allegations that Defendants were deliberately indifferent to a serious injury

C *The State Negligence Claims*

**\*3** The Plaintiff has also alleged state claims for negligence (the "State Claims") (D I 2 at 4 ) The only basis to consider those claims in this court is the supplemental jurisdiction provided in 28 U S C § 1367 Since I have decided that the Plaintiff's Federal Claims must be dismissed, it is within my discretion whether to retain jurisdiction over the State Claims See 28 U.S C § 1367(c)(3) ("The district courts may decline to exercise supplemental jurisdiction over a claim .. if .. the district court has dismissed all claims over which it has original jurisdiction. "); *Queen City Pizza, Inc. v. Domino's Pizza, Inc,* 124 F 3d 430, 444 (3d Cir 1997) (decision to exercise supplemental jurisdiction "is committed to the sound discretion of the district court"). The parties have not invested significant

resources in litigating the State Claims in this forum It is therefore neither wasteful nor unfair to decline to exercise supplemental jurisdiction in this matter *Queen City Pizza,* 124 F 3d at 444 (district court's decision to decline the exercise of supplemental jurisdiction was proper since it "would not be unfair to the litigants or result in waste of judicial resources") Accordingly, the State Claims will be dismissed without prejudice

IV CONCLUSION

Accordingly, it is hereby ORDERED that Defendants' Motion to Dismiss (D I 17) is GRANTED with prejudice

2004 WL 2980727 (D Del )

**Motions, Pleadings and Filings (Back to top)**

• 1:03CV00343 (Docket)

(Apr. 01, 2003)

END OF DOCUMENT

© 2005 Thomson/West No Claim to Orig U S Govt Works



Slip Copy

2005 WL 83598 (D Del )

**(Cite as: 2005 WL 83598 (D.Del.))**

Page 1

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available

United States District Court,
D Delaware.
Augustine CARRION, Plaintiff,
v.
CITY OF WILMINGTON, a political subdivision
of the State of Delaware, and
Monica Gonzalez-Gillespie, in her individual and
official capacity, Defendants.
**No. Civ.A.03-613-KAJ.**

Jan. 7, 2005
Gary W. Aber, Aber, Goldlust, Baker & Over,
Wilmington, Delaware, for Plaintiff

Alex J. Mili, Jr, Assistant City Solicitor, City of
Wilmington  Law  Department,  Wilmington,
Delaware, for Defendants

MEMORANDUM OPINION

JORDAN, J.

I INTRODUCTION

**\*1** Before me is a Motion for Summary Judgment
(Docket Items ["D I."] 71; the "Motion") filed by
the City of Wilmington (the "City") and Monica
Gonzalez-Gillespie, in her individual and official
capacities  ("Gonzalez-Gillespie")  (collectively
"Defendants") Augustine Carrion ("Plaintiff"), a
former equipment operator for Wilmington, brought
this suit against the Defendants pursuant both to the
Americans with Disabilities Act, 42 U S C §§
12101, et seq. (the "ADA"), and to 42 U S C § 1983
; he also asserts various state law claims I have
jurisdiction pursuant to 28 U S C §§ 1331 and 1367
 For the reasons that follow, the Motion is granted

II BACKGROUND [FN1]

> FN1 The following rendition of the
> background information is cast in the light
> most favorable to the non-moving party
> and does not constitute findings of fact

Plaintiff was hired as an equipment operator by the
City in 1990 (D I 1 at ¶ 6) In 1993, Plaintiff
transferred to the City's Department of Public
Works (Id at ¶ 7) From 1993 through 1996,
Plaintiff was, at various times, out of work on
disability (Id at ¶ 8) During that period, Plaintiff
underwent surgery on his neck to repair a cervical
disk (Id at ¶ 9) On May 14, 1998, Plaintiff
injured his neck on the job and, on November 4,
1999, again underwent cervical disc surgery (Id at
¶ 12) From at least January of 1999, Plaintiff was
unable to return to his former position because of
his physical condition (See D I 75 at A-43 )

In March 2002, the City informed Plaintiff that he
was terminated because, it said, he repeatedly
refused to cooperate in providing information on his
medical condition (Id) The Plaintiff then filed a
discrimination  complaint  with  the  Equal
Employment Opportunities Commission through the
Delaware Department of Labor, asserting that the
City had violated the ADA (D I 1 at ¶ 17-18 )
Shortly thereafter, on or about April 15, 2002, the
City rescinded its termination letter, citing as its
reason the Plaintiff's beginning to cooperate in
providing medical information (See id. at ¶ 19;
D I 75 at A-47 ) The City then scheduled an
appointment for the Plaintiff to meet with its
recruiting coordinator to assist in finding a job that
would be suitable for the Plaintiff (See D I 75 at
A-47.) On April 23, 2002, that meeting took place
and the Plaintiff was given a list of jobs to consider,
including, among others, electronics technician,
sanitation worker, and another equipment operator
position (D I 75 at A-139-A-140; A-147e.)
Plaintiff never responded to that list of options (Id

© 2005 Thomson/West No Claim to Orig U S Govt Works

Slip Copy

2005 WL 83598 (D Del.)

**(Cite as: 2005 WL 83598 (D.Del.))**

at A-140, A-143 ) On June 13, 2002, through certified mail, Plaintiff was offered the job of school crossing guard (*Id* at A-50 ) Plaintiff did not respond to the City's offer and, on August 19, 2002, the City again terminated Plaintiff's employment (*Id* at A-53 )

During the time Plaintiff was on disability, the City paid Plaintiff the difference between his worker's compensation pay and his previous salary, as required under Section 40-80(h) and Section 9 8 of the Union Contract governing Plaintiff's employment relationship with the City (D I 1 at ¶ 29 ) After his termination, Plaintiff no longer received those supplemental payments (*See id* at ¶ 31 )

III STANDARD OF REVIEW

*2 Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment shall be entered if "there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law " "[T]he availability of summary judgment turn[s] on whether a proper jury question [has been] presented " *Anderson v. Liberty Lobby, Inc*, 477 U S 242, 249 (1986) "[T]he judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial " *Id* In making that determination, the Court is required to accept the non-moving parties' evidence and draw all inferences from the evidence in the non-moving parties' favor *Id* at 255; *Eastman Kodak Co v. Image Technical Servs, Inc*, 504 U S 451, 456 (1992) Nevertheless, the party bearing the burden of persuasion in the litigation, must, in opposing a summary judgment motion, "identify those facts of record which would contradict the facts identified by the movant " *Port Authority of New York and New Jersey v. Affiliated FM Ins Co*, 311 F 3d 226, 233 (3d Cir 2002) (internal quotes omitted)

IV DISCUSSION

In Counts I and II of the Complaint, Plaintiff alleges that Defendants terminated his employment

in violation of the ADA In his Answering Brief in Response to Defendants' Motion for Summary Judgment ("Answering Brief"), however, Plaintiff does not respond to any of the arguments made by Defendants in support of their assertion that they did not violate the ADA (D I 80 ) Furthermore, in a letter to the court from Plaintiff's counsel, Plaintiff acknowledges that he did not respond with respect to those claims and that he informed defense counsel that he was amenable to a dismissal of them (D I 88 ) Therefore, I will dismiss those claims with prejudice

In Counts III and IV, respectively, Plaintiff alleges that Defendants Gonzalez-Gillespie and the City violated his constitutional rights and are liable under 42 U S C § 1983 As with Counts I and II, Plaintiff did not respond to any arguments made by Defendants with respect to Count IV (D I 80 ) Also as with Counts I and II, Plaintiff has stated that he agrees that Count IV should be dismissed (D I 88 ) Consequently, I will dismiss Count IV with prejudice

The only remaining federal claim is Count III In Count III, Plaintiff alleges that Gonzalez-Gillespie's "actions in depriving Plaintiff of his employment, and the attendant benefits, amounts to a deprivation of his property rights without due process of law in violation of this United States Constitution subjecting her to liability under 42 U S C § 1983 " (D I 1 at ¶ 52 )

Plaintiff has not responded to any of the arguments made by Defendants on the lawfulness of the termination of his employment Therefore, Plaintiff has conceded there is no liability on that basis and judgment in favor of the Defendant is appropriate on that aspect of Count III *See* Fed R Civ P 56 (stating that "when a motion for summary judgment is made and supported [by sworn affidavits], an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response must set forth specific facts showing that there is a genuine issue for trial If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party")

© 2005 Thomson/West No Claim to Orig U S Govt Works

Slip Copy

2005 WL 83598 (D Del )

**(Cite as: 2005 WL 83598 (D.Del.))**

**\*3** There is a second aspect of Count III, however, which Plaintiff addresses at length, namely the question of whether he had a constitutionally protected property interest in receiving the supplemental payments that made up the difference between his workers compensation benefits and his former salary [FN2] In that regard, Defendants argue that "Plaintiff's bargained-for due process rights are exclusively set forth in Article IV of his union's collective bargaining agreement." (D I. 73 at 30; D I. 75 at 1-15, 19 ) Section 4.16 of that agreement authorizes the union to grieve any employment decisions, an avenue the Plaintiff did not elect to pursue (D I. 73 at 30; D I. 75 at A-4 ) Additionally, a copy of the termination letter was sent to the head of Plaintiff's union, who also did not initiate a grievance on Plaintiff's behalf. (See D I. 73 at 30; D I. 75 at A-53-A-54 ) Plaintiff has not responded to the Defendants' argument and evidence, thus failing in his obligation to "set forth specific facts showing that there is a genuine issue for trial." See Fed R Civ P 56 Because Plaintiff has not rebutted in any way the argument and evidence presented by Defendants to show that his due process rights were not violated, judgment for the Defendants is also warranted on this aspect of Count III [FN3]

> FN2 For purposes of this decision, I will assume that Plaintiff has a protectable property interest in the supplemental payments; however, I need not and do not decide that such is the case

> FN3 In Plaintiff's Answering Brief, he also argues that the City violated the constitutional prohibition against the impairment of contracts (D I. 80 at 18-22 ) Such a claim was never raised in the Complaint, and any attempt to now amend the Complaint is inappropriate See *Fatir v. Dowdy*, C A No 95-667-GMS, 2002 U S Dist LEXIS 16480 at \*23 (D Del Sept 4, 2002) ("[B]elated attempts at amendment are disfavored with good reason If parties were allowed to repeatedly amend their complaints, even after summary judgment motions had been

filed, not only the opponent, but the courts, would be prejudiced by the never-ending litigation") The argument is not properly before the court and justifies no further consideration

The last two claims in the Complaint, Counts V and VI (the "State Claims"), are State law claims for wrongful termination and violation of the contractual provision requiring the City to supplement Plaintiff's pay The only basis for me to consider those claims is the supplemental jurisdiction provided in 28 U S C 1367 Since I have decided that the Plaintiff's federal claims must be dismissed, it is within my discretion whether to retain jurisdiction over the State Claims See 28 U S C 1367(c)(3) ("The district courts may decline to exercise supplemental jurisdiction over a claim if the district court has dismissed all claims over which it has original jurisdiction "); *Queen City Pizza, Inc v Domino's Pizza, Inc.*, 124 F 3d 430, 444 (3d Cir 1997) (decision to exercise supplemental jurisdiction "is committed to the sound discretion of the district court")

To the extent any resources have been invested by the parties in developing the record regarding the State Claims, that investment will not be lost simply because the issues are to be addressed in a state court of competent jurisdiction It is therefore neither wasteful nor unfair to decline to exercise supplemental jurisdiction in this matter *Queen City Pizza*, 124 F 3d at 444 (district court's decision to decline the exercise of supplemental jurisdiction was proper since it "would not be unfair to the litigants or result in waste of judicial resources") Declining jurisdiction allows the Plaintiff's claims under Delaware law to be addressed, as is proper, by the courts of Delaware Accordingly, the State Claims will be dismissed without prejudice

V CONCLUSION

**\*4** Accordingly, Counts I, II and IV of the Complaint will be dismissed with prejudice; summary judgment for Defendants will be entered on Count III; and Counts V and VI will be dismissed without prejudice An appropriate order

© 2005 Thomson/West No Claim to Orig U S Govt Works

Slip Copy

2005 WL 83598 (D Del )

**(Cite as: 2005 WL 83598 (D.Del.))**

will follow

*ORDER*

For the reasons set forth in the Court's Memorandum Opinion of today's date in this matter,

IT IS HEREBY ORDERED that Defendants' Motion for Summary Judgment (D I.71) is GRANTED in part, to the extent that judgment is hereby entered for Defendants and against Plaintiff on Count III of the Complaint (D I 1); it is further ORDERED that Counts I, II and IV of the Complaint are dismissed with prejudice, and Counts V and VI are dismissed without prejudice

**Motions, Pleadings and Filings (Back to top)**

- 1:03CV00613 (Docket)
                          (Jun 26, 2003)

END OF DOCUMENT

© 2005 Thomson/West No Claim to Orig U S Govt Works



Slip Copy

Page 1

2005 WL 196577 (D Del )

**(Cite as: 2005 WL 196577 (D.Del.))**

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available

United States District Court,
D Delaware
Godwin J IGWE, Plaintiff,
v
E I DU PONT DE NEMOURS AND CO , INC ,
Defendant
**No. Civ.A. 03-839 JJF.**

Jan 26, 2005
Darryl K Fountain, Wilmington, Delaware, for
Plaintiff

Wendy K Voss, and Suzanne M Hill, of Potter
Anderson & Corroon LLP, Wilmington, Delaware.
Evelyn H Brantley, of E I Du Pont De Nemours
and Company, Wilmington, Delaware for
Defendant

*MEMORANDUM OPINION*

FARNAN, J

**\*1** Presently before the Court is Defendant E I
DuPont de Nemours & Company Incorporated's
("DuPont") Motion for Summary Judgment
(D I 23) For the reasons discussed, the Court will
grant DuPont's motion

BACKGROUND
Plaintiff Godwin J Igwe, an African-American
male of Nigerian descent, began his work with
DuPont as a Senior Research Engineer in March of
1992 In January of 1998, DuPont eliminated Mr
Igwe's position and transferred him to its Corporate
Information Science Group ("CIS") There, Mr
Igwe became a Senior Information Scientist, a job
which required him to learn new skills, but kept him

at the same salary level

At CIS, Mr Igwe reported to Marsha Lee, who
eventually became dissatisfied with Mr Igwe's
work performance In September of 1999, Ms Lee
expressed to Mr Igwe her disappointment and
placed him on Written Corrective Action Ms Lee's
dissatisfaction continued and on March 3, 2002, she
placed Mr Igwe on probation Mr Igwe was
informed that the probationary period would extend
for up to twelve months, and that he would be
terminated if, during that time, he failed to
demonstrate improvement A few days later, on
March 7, 2002, Mr Igwe injured his neck in
DuPont's library and left work on disability leave
Mr Igwe was eventually approved for permanent
disability status and, in October of 2002, DuPont
terminated his employment DuPont continues to
pay Mr Igwe disability compensation and provide
him benefits programs

On August 26, 2003, Mr Igwe filed his Complaint
against DuPont (D I 1) On March 3, 2004, Plaintiff
filed his Amended Complaint (D I 3, 4) The
Amended Complaint states four causes of action
Count I alleges discrimination on the basis of race
and national origin in violation of Title VII of the
Civil Rights Act of 1964 and 42 U S C § 1981
Count II alleges retaliatory demotion in violation of
Title VII Count III alleges violation of the
Thirteenth Amendment Count IV alleges
defamation in violation of Delaware state law

STANDARD OF REVIEW
Rule 56(c) of the Federal Rules of Civil Procedure
provides that a party is entitled to summary
judgment if a court determines from its examination
of "the pleadings, depositions, answers to
interrogatories, and admissions on file, together
with the affidavits, if any, that there are no genuine
issues of material fact and that the moving party is
entitled to judgment as a matter of law "
Fed R Civ P 56(c)

© 2005 Thomson/West No Claim to Orig U S Govt Works

Slip Copy

2005 WL 196577 (D.Del.)

**(Cite as: 2005 WL 196577 (D.Del.))**

To defeat a motion for summary judgment, Rule 56(c) requires the non-moving party to show that there is more than "some metaphysical doubt as to the material facts. In the language of the Rule, the non-moving party must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (quoting Fed.R.Civ.P. 56(c)). However, the mere existence of some evidence in support of the nonmovant will not be sufficient to support a denial of a motion for summary judgment; there must be enough evidence to enable a jury to reasonably find for the nonmovant on that issue. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). Thus, if the evidence is "merely colorable, or is not significantly probative," summary judgment may be granted. *Id.*

DISCUSSION

A. Claim One: Employment Discrimination

**\*2** In Title VII employment discrimination actions, courts apply the *McDonnell Douglas* burden shifting analysis. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Under *McDonnell Douglas*, a plaintiff has the initial burden to establish a prima facie case of discrimination. *Id.* at 802. Once a plaintiff succeeds in establishing his or her prima facie case, the burden shifts to the defendant employer to proffer some legitimate non-discriminatory rationale for his or her action. *Id.* If the employer provides the court with a non-discriminatory rationale for his or her employment decision, the burden again shifts to the plaintiff to demonstrate, by a preponderance of the evidence, that the employer's rationale is pretextual. *Id.* at 804.

The Third Circuit has recognized that the elements of the prima facie case will vary from case to case because of differing fact scenarios. *Pivirotto v. Innovative Sys., Inc.*, 191 F.3d 344, 352 (3d Cir.1999) (citing *McDonnell Douglas*, 411 U.S. at 802 n.13, 93 S.Ct. 1817). In the instant action, to establish his prima facie case of discrimination, Mr. Igwe must provide evidence that (1) he is a member of a protected class; (2) he is qualified for the

sought after position; (3) he suffered adverse employment action; and (4) similarly situated non-members of the protected class were treated more favorably than he, or the circumstances of his termination give rise to an inference of race discrimination. *Pivirotto*, 191 F.3d at 356.

*1. Member of a Protected Class*

It is not disputed that Plaintiff, an African-American male of Nigerian descent, is a member of a protected class.

*2. Qualified*

Mr. Igwe contends that he was qualified for a promotion, a transfer, and a bonus or raise. He contends he was qualified for a promotion because (1) he worked at DuPont for over ten years and received "glowing evaluations and award nominations" (D.I. 28, Ex. 1, at 1) and (2) DuPont promotion guidelines required that he receive a raise. Mr. Igwe contends he was qualified for a transfer because "[h]e applied for more than a dozen other postings in the company...." *Id.*

In response, DuPont contends that Mr. Igwe's only evidence in support of his right to a promotion are two documents which do not apply to his job classification. Further, DuPont contends that Mr. Igwe fails to allege specific facts to support his arguments for a transfer, bonus, or raise.

The Court concludes that Mr. Igwe has failed to set forth specific facts showing he was qualified for the sought after positions. Mr. Igwe's contentions consist almost entirely of unsupported, conclusory arguments. Mr. Igwe fails to identify any specific, available opportunities for a promotion, transfer, bonus, or raise. Mr. Igwe's only specific facts are two documents outlining promotion guidelines for research and development professionals. (D.I. 26 at A518-19.) Mr. Igwe, however, was a CIS employee, not a research and development professional, and thus the promotion guidelines were inapplicable. For these reasons, the Court concludes that Mr. Igwe has not met his burden and thus does not present a genuine issue for trial with respect to the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy

2005 WL 196577 (D.Del.)

**(Cite as: 2005 WL 196577 (D.Del.))**

second prong of the prima facie case

*3. Adverse Employment Action*

**\*3** Mr Igwe contends that he was subject to three types of adverse actions: (1) denial of a promotion, transfer, bonus, or raise; (2) disciplinary probation for up to twelve months (D.I. 26 at A509-12); and (3) his original transfer to CSI, which he contends limited his abilities (D.I. 28, Ex. 2, at 2 ¶ 7) In response, DuPont contends that these actions did not cause a significant change in Mr. Igwe's employment status

The United States Supreme Court has defined an adverse employment action as a "significant change in employment status, such as hiring, firing, failing to promote, reassignment, or a decision causing a significant change of benefits." *Burlington Indus. Inc. V. Ellerth,* 524 U.S. 742, 761 (1998) In this case, the Court concludes that Mr. Igwe has failed in his burden to establish an adverse employment action. As noted previously, Plaintiff has failed to set forth specific facts regarding a promotion, transfer, bonus, or raise. Further, the Court finds that Mr. Igwe has not alleged specific facts to support a finding that Plaintiff experienced a significant change in his benefits Mr Igwe asserts he was placed on disciplinary probation, but does not offer evidence to show how this action significantly changed his benefits Further, it appears that, despite being on probation, Mr Igwe enjoyed the same compensation, benefits, and core job duties that he had as a Senior Research Engineer (D.I. 26 at A380, A560, A572)

Likewise, Mr. Igwe does not specify how his transfer to CIS significantly changed his benefits Instead, Mr. Igwe states in a conclusory fashion that "a limitation was placed on my ability, talent, professionalism, and my accomplishments dismissed It was like a nurse being transferred to a nurse aid assignment ... (D.I. 28, Ex. 2, at 2 ¶ 7) Such unsupported assertions do not constitute "specific facts" as required by Rule 56(e)

*4. Discrimination*

Mr. Igwe contends that similarly situated non-members of his class were treated more favorably He further contends that the circumstances surrounding DuPont's conduct towards him raise an inference of racial discrimination. In response, DuPont contends that Mr. Igwe has failed to support his contentions with specific facts

The Court finds that Plaintiff has failed to set forth specific facts sufficient to support the fourth element of the *McDonnell Douglas* prima facie test Mr. Igwe does not identify a person or group of persons that were similarly situated to him but more favorably treated. Further, Mr. Igwe does not allege circumstances raising an inference of racial discrimination Instead, Mr. Igwe asks the Court to assume that, because he was Nigerian and allegedly maltreated, he was a victim of race discrimination. Rule 56(e), however, requires "specific facts showing that there is a genuine issue for trial." Mr. Igwe has set forth no such facts and thus has failed to meet the fourth element of the prima facie test

**\*4** In sum, because Mr Igwe has not demonstrated that a genuine issue of material fact exists for elements two, three, and four of the *McDonnell Douglas* prima facie case, the Court will grant DuPont's motion on Mr. Igwe's racial and national origin discrimination claim.

B Claim Two: Retaliatory Demotion

Mr Igwe contends that DuPont subjected him to a retaliatory demotion in violation of 42 U.S.C. § 1981 by (1) incorrectly identifying him as an Information Scientist, rather than a Senior Information Scientist, on DuPont's website and (2) transferring him to CIS.

To establish a claim for retaliatory demotion, a plaintiff must first prove a prima facie case of retaliation by demonstrating that (1) he engaged in protected activity, (2) he suffered an adverse employment action, and (3) there is a causal link between the protected activiety and the adverse employment action. *Sarullo v. U.S. Postal Serv.,* 352 F.3d 789, 800 (3d Cir. 2003)

© 2005 Thomson/West No Claim to Orig. U.S. Govt. Works

Slip Copy                                                                                          Page 4

2005 WL 196577 (D.Del.)

**(Cite as: 2005 WL 196577 (D.Del.))**

The Court finds that Plaintiff has failed to establish that he was engaged in a protected activity. Further, as the Court discussed previously, Mr. Igwe's arguments in support of a finding of an adverse employment action are not supported by specific facts. Because Mr. Igwe has not established a protected activity or an adverse action, Mr. Igwe has failed to demonstrate a causal link between the two. For these reasons, the Court will grant DuPont's motion on Mr. Igwe's retaliatory demotion claim.

C. Claim Three: Thirteenth Amendment

By his Complaint, Plaintiff contends that DuPont violated his "rights and privileges as guaranteed by the Thirteenth Amendment to the United States Constitution." (D.I. 3 ¶ 43.)

The Thirteenth Amendment prohibits slavery and involuntary servitude. The Court finds that Mr. Igwe has failed to demonstrate with specific facts his allegation that DuPont violated the Thirteenth Amendment. For this reason, the Court will grant DuPont's motion on Mr. Igwe's Thirteenth Amendment claim.

D. Claim Four: Defamation or Libel

In support of his claim for libel, Mr. Igwe claims that DuPont's website "intentionally publicly designated [Mr. Igwe] as an Information Scientist instead of Senior Information Scientist." (D.I. 28, Ex. 1, at 6-7.) Mr. Igwe contends that the inaccurate designation "humiliated him" and "damaged his reputation and standing, causing him to be denied projects for Senior Information Scientist[s]." (D.I. 28, Ex. 1, at 7.)

It is undisputed that Delaware law controls this libel claim. Delaware defines libel as "a false and defamatory statement of fact concerning the plaintiff made in an unprivileged publication to a third party." *Ramunno v. Cawley,* 705 A.2d 1029, 1035 (Del.1998) (citing *Spence v. Funk,* 396 A.2d 967, 969 (Del.1978)). To be defamatory, a statement must "tend[ ] so to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him." *Ramunno,* 705 A.2d at 1035.

*5 The Court finds that Plaintiff has not demonstrated sufficient evidence regarding how his designation on the DuPont website as an "Information Scientist" lowered him in the estimation of the community or deterred people from associating with him. Mr. Igwe alleges in a conclusory fashion that the inaccurate designation "humiliated him" and "damaged his reputation and standing ..." (D.I. 28, Ex. 1, at 7.) Further, while Mr. Igwe contends that the misrepresentation caused him to be denied projects, he has not cited any specific projects which he was denied. For these reasons, the Court concludes that Summary Judgment on the issue of defamation and libel is appropriate.

CONCLUSION

For the reasons discussed, the Court will grant Defendant's Motion For Summary Judgment (D.I.23) in all respects.

An appropriate Order will be entered.

2005 WL 196577 (D.Del.)

**Motions, Pleadings and Filings (Back to top)**

• 1:03CV00839 (Docket)

(Aug. 27, 2003)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F Supp 2d

2001 WL 935621 (D.Del.)

**(Cite as: 2001 WL 935621 (D.Del.))**

Page 1

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available

United States District Court, D Delaware
Lt Mary KNOTT-ELLIS, Plaintiff,
v.
DELAWARE DEPARTMENT OF
CORRECTION; Stanley Taylor, Commissioner;
Paul Howard,
Chief of Adult Prisons; Noreen Renard, Bureau
Chief; Phillip Morgan, PCCC; St /
Lt Bruce Williamson; Lt James Pietschmann and
Sgt Wayne Wright, Defendants
**No. Civ.A. 00-826-SLR.**

Aug 3, 2001

Lt Mary Knott-Ellis, Newark, Delaware, Plaintiff,
pro se

Ophelia Michelle Waters, Deputy Attorney
General, Delaware Department of Justice,
Wilmington, Delaware, for Defendants

MEMORANDUM OPINION

ROBINSON, Chief J

I INTRODUCTION

**\*1** Plaintiff Lieutenant Mary Knott-Ellis filed this
action on September 11, 2000 against defendants
Delaware Department of Correction ("DOC"),
Commissioner Stanley Taylor, Chief of Adult
Prisons Paul Howard, Bureau Chief Noreen Renard,
Warden Philip Morgan, St /Lt Bruce Williamson,
Lt James Pietschmann, and Sgt Wayne Wright.
(D I 2) Plaintiff alleges discrimination based on her
race and sex under Title VII of the Civil Rights Act
of 1964, 42 U S C § 2000(e), *et seq*, ("Title VII")
The court has jurisdiction over plaintiff's claims

pursuant to 28 U S C § 1331 Currently before the
court is defendants' motion to dismiss plaintiff's
complaint (D I 14) For the following reasons,
defendants' motion is granted

II BACKGROUND

Plaintiff, an African-American female, began
employment with the DOC in April 1983 as a
prison counselor (D I 18) In 1996, in connection
with a class action suit filed by female correctional
officers against the DOC, she was promoted to
Lieutenant Correctional Officer at the Plummer
Community Correctional Center ("PCCC") (D I 16
at ¶ 2) On December 31, 1998, plaintiff and
defendant Sgt Wright, plaintiff's subordinate,
became involved in an altercation over whether to
give an inmate a soda. (*Id* at ¶ 3) There were no
witnesses to the incident, but plaintiff alleges that
Wright was verbally aggressive and physically
shook her After an investigation by the DOC, Sgt
Wright was issued a 10-day suspension and
transferred to the Gander Hill facility [FN1] (*Id*)
After the incident, plaintiff filed for worker's
compensation with the Delaware Department of
Labor ("DOL"), alleging that she sustained physical
and psychological injuries caused by her
confrontation with Sgt Wright (*Id* at ¶ 4) Based
on a DOL assessment of "total disability," plaintiff
received over $2,000 in worker's compensation
from January 9, 1999 to February 17, 1999
(D I 18) In February 1999, the DOC sent plaintiff a
letter requesting that she receive psychological
treatment to verify that she was fit to return to duty.
(D I 18) During a March 23, 1999 interview with
DOC officials concerning her confrontation with
Sgt Wright, plaintiff stated that she was unable to
return to work (*Id*) On May 5, 1999, plaintiff filed
a charge of discrimination with the EEOC, alleging
gender discrimination, a hostile work environment
and retaliation over the incident with Sgt Wright
and her promotion to Lieutenant (D I 18) The
EEOC dismissed plaintiff's claims and notified her

© 2005 Thomson/West No Claim to Orig U S Govt Works

Not Reported in F. Supp 2d

2001 WL 935621 (D Del.)

**(Cite as: 2001 WL 935621 (D.Del.))**

of her right to sue (D.I 2)

> FN1  Plaintiff also filed criminal charges against Sgt. Wright, but the record does not indicate the result of those charges (D.I.18) Plaintiff claims that her efforts to file the criminal charges were impeded by the DOC's refusal to release Sgt. Wright's home address and date of birth from his confidential personnel records (Id )

In September 1999, pursuant to the recommendation of plaintiff's physician, defendants assigned plaintiff to a part-time, light duty position at the Wilmington Probation and Parole Office [FN2] (D.I.15, Ex C) On her first day of work, defendants claim that plaintiff appeared to be heavily medicated and had difficulty following instructions (D.I 16 at ¶ 4) The next day, the DOC's human resources director sent plaintiff a letter stating that she was unable to perform "even routine and non-demanding job tasks" and should not return to work without medical documentation that she was able to do so (D.I 18) In a letter dated January 13, 2000, plaintiff's psychiatrist informed the DOC that plaintiff's "mental status has regressed" and that "she is not ready to return to work of any kind." (D.I 15, Ex D) After additional medical treatment, plaintiff was assigned to a prison counselor position at the Gander Hill facility with no loss of pay. (D.I 16 at ¶ 4) Plaintiff declined the assignment, and instead applied for a disability retirement pension, which she subsequently received [FN3] (D.I 16 at ¶ 5)

> FN2  At or around this time, plaintiff admitted to the DOC that an offender was residing at her home, in violation of DOC regulations (D I 18)

> FN3  This fact is based upon the representation by defendants' counsel that the DOC granted plaintiff's request for a disability pension. (D I 15) Plaintiff also states that she was "forced into disability retirement." (D I 18) Neither party has provided exhibits that attest to this fact

*2 On May 30, 2000, plaintiff filed another charge of discrimination with the EEOC, alleging retaliation by defendants for her prior claims of discrimination Plaintiff also alleged that defendants falsely informed an employment agency that plaintiff was on medical leave without pay from the DOC, which prevented her from being hired by the agency. [FN4] (D I 18)

> FN4  There is no indication of the outcome of this EEOC complaint in the record

### III. STANDARD OF REVIEW

Because the parties have referred to matters outside the pleadings, the court shall treat defendants' motion to dismiss as a motion for summary judgment See Fed.R Civ.P 12(b)(6) A court shall grant summary judgment only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R Civ P 56(c) The moving party bears the burden of proving that no genuine issue of material fact exists. See Matsushita Elec. Indus. Co v Zenith Radio Corp., 475 U.S 574, 586 n 10 (1986) "Facts that could alter the outcome are 'material,' and disputes are 'genuine' if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct." Horowitz v. Fed. Kemper Life Assurance Co., 57 F.3d 300, 302 n 1 (3d Cir 1995) (internal citations omitted) If the moving party has demonstrated an absence of material fact, the nonmoving party then "must come forward with 'specific facts showing that there is a genuine issue for trial.' " Matsushita, 475 U.S. at 587 (quoting Fed.R.Civ.P. 56(e)) The court will "view the underlying facts and all reasonable inferences therefrom in the light most favorable to the party opposing the motion." Pa. Coal Ass'n v. Babbitt, 63 F 3d 231, 236 (3d Cir 1995) The mere existence of some evidence in support of the nonmoving party, however, will not be sufficient for denial of a motion for summary judgment; there must be enough evidence to enable a jury reasonably to find

© 2005 Thomson/West. No Claim to Orig. U S Govt Works

Not Reported in F Supp 2d

2001 WL 935621 (D Del)

**(Cite as: 2001 WL 935621 (D.Del.))**

for the nonmoving party on that issue *See Anderson v. Liberty Lobby, Inc*, 477 U S 242, 249 (1986) If the nonmoving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the moving party is entitled to judgment as a matter of law *See Celotex Corp v. Catrett*, 477 U S 317, 322 (1986) With respect to summary judgment in discrimination cases, the court's role is "to determine whether, upon reviewing all the facts and inferences to be drawn therefrom in the light most favorable to the plaintiff, there exists sufficient evidence to create a genuine issue of material fact as to whether the employer intentionally discriminated against the plaintiff" *Revis v. Slocomb Indus*, 814 F Supp 1209, 1215 (D Del 1993) (quoting *Hankins v. Temple Univ*, 829 F 2d 437, 440 (3d Cir 1987))

IV DISCUSSION [FN5]

> FN5 Plaintiff filed a form complaint with the court, in which she alleged discrimination based on her race and sex by defendants' failure to employ her, failure to promote her, and "forc[ing] her into disability pension after 17 yrs of service" (D I 2) In her summary judgment brief, plaintiff makes additional allegations of discrimination, retaliation and a hostile work environment (D I 18) Where the plaintiff is a *pro se* litigant, the court has an obligation to construe the complaint liberally *See Haines v. Kerner*, 404 U S 519, 520 (1972) Moreover, the parameters of the resulting civil complaint that may follow a notice of a right to sue from the EEOC are "defined by the scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination" *Hicks v. ABT Assocs, Inc*, 572 F 2d 960, 966 (3d Cir 1978) To the extent that plaintiff's May 5, 1999 EEOC charge of discrimination encompasses plaintiff's later allegations, the court will consider them in addition to those in her complaint The court, therefore, finds that plaintiff has alleged a disparate treatment

claim, hostile work environment claim, and retaliation claim under Title VII

**\*3** As a preliminary matter, Congress did not intend to hold individual employees liable under Title VII *See Sheridan v. E I DuPont de Nemours & Co*, 100 F 3d 1061, 1078 (3d Cir 1996) Thus, plaintiff's claims against the individual defendants are dismissed

In her remaining claims against the DOC, plaintiff alleges that she was subject to discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964 [FN6] Claims brought pursuant to Title VII are analyzed under a burden-shifting framework; if plaintiff makes a prima facie showing of discrimination or retaliation, the burden shifts to defendants to establish a legitimate, nondiscriminatory reason for their actions *See McDonnell Douglas Corp v. Green*, 411 U S 792, 802 (1973) If defendants carry this burden, the presumption of discrimination drops from the case, and plaintiff must "cast sufficient doubt" upon defendants' proffered reasons to permit a reasonable factfinder to conclude that the reasons are fabricated *Sheridan v. E I DuPont de Nemours & Co*, 100 F 3d 1061, 1072 (3d Cir 1996) (en banc) In the case at bar, the court need not engage in an extensive burden shifting analysis because plaintiff has not presented facts sufficient to state a prima facie case on any of her Title VII claims

> FN6 The anti-discrimination provision of Title VII provides:
> It shall be an unlawful employment practice for an employer--(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or (2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee,

© 2005 Thomson/West No Claim to Orig U S Govt Works

Not Reported in F Supp 2d                                                    Page 4

2001 WL 935621 (D.Del.)

**(Cite as: 2001 WL 935621 (D.Del.))**

because of such individual's race, color, religion, sex, or national origin
42 U S C § 2000e-2(a).
The anti-retaliation section of Title VII provides:
It shall be an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment , because he has opposed any practice made an unlawful employment practice by this subchapter, or because he had made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter. 42 U S C § 2000e -3a

A. Disparate Treatment Claim

Generally, to state a disparate treatment in employment claim under Title VII, a plaintiff must offer evidence "adequate to create an inference that an employment decision was based on a discriminatory criterion illegal under the act " *EEOC v. Metal Serv. Co.*, 892 F 2d 341, 348 (3d Cir 1990). First, plaintiff must state a prima facie case of race or gender discrimination. *See McDonnell Douglas,* 411 U S. at 802. She can do so by showing by a preponderance of the evidence that: (1) she is a member of the protected class; (2) she suffered an adverse employment action; and (3) similarly situated members of the opposite sex were treated more favorably *See id*

In the present action, plaintiff fails to establish a prima facie case. Although plaintiff, an African-American female, is a member of a protected class, she has failed to demonstrate that she suffered an "adverse employment action." The Supreme Court has defined an "adverse employment action" as a "significant change in employment status, such as hiring, firing, failing to promote, reassignment, or a decision causing a significant change of benefits " *Burlington Indus. Inc. v. Ellerth,* 524 U S. 742, 749 (1998) Although the DOC reassigned plaintiff to different positions after she returned from disability leave, the reassignments occurred without loss of pay or

benefits, and were made to accommodate plaintiff's medical needs as demonstrated by her physicians Plaintiff first left her position at the DOC because of her poor physical condition She received worker's compensation for a period, and later was accommodated in a light duty position at the DOC on the recommendation of her physician. Plaintiff was unable to perform the tasks required, and then refused to accept a different position at the same rate of pay The court declines to characterize such medically required reassignments as "adverse " *See, e g., Sanchez v. Henderson,* 188 F 3d 740, 745 (7th Cir 1999) (expressing "serious doubt" that employer's action in transferring employee to accommodate employee's request for light duty work could be considered adverse employment action in absence of less pay, responsibility, prestige or opportunity for advancement)

*\*4 Furthermore, even if plaintiff's reassignments are considered "adverse," plaintiff does not demonstrate that similarly situated male or white employees were treated more favorably Plaintiff generally alleges that male correctional officers were not treated in the same manner as female correctional officers, but she fails to provide sufficient evidence for comparison of the treatment of similarly situated male and female employees At most, plaintiff states that the "DOC used PCQ's to upgrade males and to move around from going to the Register where qualified females were on the [R]egister" and that the "DOC has made special position[s] for other security staff to work while suffering from cancer, heart conditions, substance abuse[ ], etc " (D.I. 18 at ¶ 4) Neither of these allegations supports an adequate comparison between similarly situated male and female correctional officers The record also reflects no indication of disparate treatment based on race. Because the court finds that plaintiff did not suffer an adverse employment action and cannot infer any discriminatory intent by the DOC, plaintiff fails to state a prima facie case of race or gender discrimination.

B Hostile Work Environment Claim

To state a Title VII claim premised on a hostile

© 2005 Thomson/West No Claim to Orig U S. Govt Works

Not Reported in F Supp 2d

2001 WL 935621 (D Del )

**(Cite as: 2001 WL 935621 (D.Del.))**

work environment, plaintiff must show: (1) that she suffered intentional discrimination because of race or sex; (2) that the discrimination was pervasive and regular; (3) that the discrimination detrimentally affected plaintiff; (4) that the discrimination would detrimentally affect a reasonable person of the same race or sex in that position; and (5) the existence of respondeat superior liability. *See Aman v. Cort Furniture Rental Corp,* 85 F 3d 1074, 1081 (3d Cir 1996)

By stating only one act of discrimination, plaintiff fails to allege that she has been detrimentally affected by a hostile work environment. Plaintiff's isolated confrontation with Sgt Wright does not constitute a "pervasive and regular" atmosphere of discrimination. Moreover, plaintiff's other complaints cannot be construed as discriminatory, as the record reflects that plaintiff was unable to perform the tasks of even a light duty position. Therefore, based on the record presented, the court concludes that plaintiff fails to carry her burden of proving a prima facie case on her hostile work environment claim.

C Retaliation Claim

To establish a prima facie case of retaliation under Title VII, plaintiff must show: (1) that she engaged in protected activity; [FN7] (2) that defendants took adverse employment action against her; and (3) that a causal link exists between the protected activity and the adverse action. *See Kachmar v. Sungard Data Sys, Inc,* 109 F 3d 173, 177 (3d Cir 1999) "The timing of the alleged retaliatory action must be 'unusually suggestive' of retaliatory motive before a causal link will be inferred " *Krouse v. Am Sterilizer Co,* 126 F 3d 494, 503 (3d Cir 1997)

> FN7 Title VII defines a "protected activity" as an instance when an employee has "opposed any practice made an unlawful employment practice by this subchapter, or . has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter " 42 U S C §

2000e-3(a).

*5 Plaintiff did engage in the protected activities of participating in the class action suit filed against the DOC in 1996, and filing her first EEOC complaint. However, as stated above, plaintiff did not suffer an adverse employment action when the DOC reassigned her to light duty positions on account of her medical needs. Therefore, plaintiff fails to state a claim of retaliation under Title VII

V CONCLUSION

For the reasons stated, defendants' motion to dismiss is granted An appropriate order shall issue

ORDER
At Wilmington, this 3rd day of August, 2001, consistent with the memorandum opinion issued this same day;

IT IS ORDERED that defendants' motion to dismiss plaintiff's complaint (D I 14) is granted. The Clerk of Court is directed to enter judgment in favor of defendants and against plaintiff

2001 WL 935621 (D Del )

**Motions, Pleadings and Filings (Back to top)**

- 1:00CV00826  (Docket)

(Sep 11, 2000)

END OF DOCUMENT

© 2005 Thomson/West No Claim to Orig U S Govt Works



Not Reported in F Supp 2d

1998 WL 957259 (D Del )

**(Cite as: 1998 WL 957259 (D.Del.))**

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available

United States District Court, D  Delaware
James MORNING, Plaintiff,
v.
POLYTECH SCHOOL DISTRICT, Polytech
Board of Education, Dr  Jeff Adams,
individually, Dianne G  Sole, individually, and
Bruce O  Curry, Lt  Col ,
(Ret ) USAF, individually, Defendants
No. 97-313-SLR.

Dec 29, 1998

Stephen A  Hampton, Esquire of Grady &
Hampton, P A , Dover, Delaware  Counsel for
Plaintiff

Roger  D  Landon, Esquire and Mary Anne
McLane, Esquire of Murphy Spadaro & Landon,
Wilmington, Delaware  Catherine  T  Hickey,
Esquire of Schmittinger & Rodriguez, P A , Dover,
Delaware  Counsel for Defendants

MEMORANDUM OPINION

ROBINSON, District J

I  INTRODUCTION

*1 Plaintiff James Morning ("plaintiff") filed this
action on June 11, 1997 against defendants Polytech
School District ("School District"), Polytech School
Board ("School Board"), Superintendent Dr  Jeff
Adams ("Adams"), Dianne G  Sole ("Sole"), [FN1]
and Bruce O  Curry, Lt  Col , (Ret ) USAF
("Curry") (collectively "defendants")  Plaintiff, an
African-American male, alleges that defendants
unlawfully discriminated against him on the basis of
race  He asserts federal civil rights claims founded

on Title VII of the Civil Rights Act of 1964, 42
U S C  § 2000e-2 *et seq* , and on 42 U S C  §§ 1981
and 1983  Additionally, plaintiff asserts several
state common law claims against defendants

> FN1  In various documents submitted to
> the court, both parties have spelled
> defendant Sole's first name as either
> "Diane" or "Dianne "  The documentary
> evidence reveals that the proper spelling is
> "Dianne " (*See, e g ,* D I  69 at B71)  The
> court will correct the caption to reflect the
> correct spelling

Currently before the court is defendants' motion for
summary judgment  [FN2]  This court has
jurisdiction pursuant to 28 U S C  §§ 1331, 1343,
and 1367  For the reasons stated below, defendants'
motion for summary judgment shall be granted

> FN2  All defendants are represented by the
> same counsel  Counsel filed the motion for
> summary judgment on behalf of all
> defendants (D I 56)

II  BACKGROUND

This suit arises out of the School Board's
nonrenewal of plaintiff's teaching contract  Plaintiff
claims that the collective racism of defendants
caused the termination of his contract  Defendants
contend that plaintiff's alleged sexual harassment of
students prompted them to not renew plaintiff's
contract  The court has gleaned the following facts
from the affidavits, depositions, and briefs filed in
this matter

In September 1993, following his honorable
discharge from active duty with the United States
Air Force, plaintiff was hired as an Assistant
Aerospace Instructor ("AASI") in Polytech High
School's Air Force Junior Reserve Officer Training
Corps ("AFJROTC") (D I  57 at 1; D I  69 at B1,

© 2005 Thomson/West  No Claim to Orig  U S  Govt  Works

Not Reported in F. Supp 2d

1998 WL 957259 (D Del )

(Cite as: 1998 WL 957259 (D.Del.))

Page 2

B2) The AFJROTC is a "citizenship program," staffed by retired Air Force personnel and designed to inculcate civic and military virtues in high school students (D I. 58 at A88) The AFJROTC program at Polytech High School ("Polytech") was staffed entirely by plaintiff and his commanding officer, defendant Curry (D I 57 at 1) The United States Air Force sponsors the AFJROTC program at Polytech, and it promulgates regulations that control the certification of AASI instructors (D I. 74 at C20)

Although the Air Force regulated plaintiff's AASI certification, the School Board ultimately determined his salary as well as his employment status at Polytech (D I 69 at B2-4) During each of his three school years at Polytech, plaintiff had renewable, one-year employment contracts with the School Board. (See, e g, D I. 69 at B2-4) Had plaintiff completed three consecutive school years of instruction in the School District, plaintiff would have attained tenured status. See 14 Del Code Ann tit 14, § 1401 (1993); (D. I 69 at B5). Tenured teachers may only be terminated for statutorily prescribed reasons, see id. at § 1411, whereas the School Board may terminate nontenured teachers (such as plaintiff) for any lawful reason See id. at § 1410(b) (Supp 1996)

*2 According to defendants, the Air Force requires host school districts to follow certain Air Force procedures in evaluating AFJROTC instructors (D I. 74 at C20) The Air Force's contract with Polytech required defendant Sole to supervise Polytech's AFJROTC program (D I. 69 at B26-29) The contract also required the school to evaluate AFJROTC instructors according to a standard "Form 98" issued by the Air Force. [FN3] (D I. 58 at A89; D I. 74 at C20-21) The Air Force contract with Polytech required Curry to conduct plaintiff's annual Form 98 appraisal, subject to review and concurrence by Sole. (D I. 74 at C21) Plaintiff argues that at least one of his Form 98 reviews was tainted by Curry's racism

> FN3 Form 98 provides four ratings (poor, average, excellent, and outstanding) for fifteen categories of performance (e.g,

cooperation with faculty and students, empathy with students, organization, ability to control the classroom) (See, e g, D I. 69 at B19) Form 98 also allows reviewers to rate an instructor's overall performance as either satisfactory or unsatisfactory The form provides space for reviewers to add their own comments ( See D I. 69 at B19) Completed Form 98 reviews are forwarded to the Air Force, which determines whether or not to renew the instructor's AASI certification (D I 58 at A89)

A. Plaintiff's First Two Years at Polytech

During the 1993-94 school year, plaintiff received a positive Form 98 review. (D I. 69 at B13-14) He received "average" and "excellent" ratings in most categories and "outstanding" ratings in the categories of cooperation with school officials, adaptability to the high school environment, empathy with students, and use of educational materials. (D I. 69 at B13) He also received an overall "satisfactory" performance rating. On the Form 98, Curry wrote that plaintiff "played a significant role in the successful opening of this new [AFJROTC] unit." (D I. 69 at B13) Sole concurred without comment in Curry's findings. (D I. 69 at B14)

According to defendants, Curry began to notice problems with plaintiff's performance during the 1994-95 school year. These problems included alleged "tardiness, combativeness, lack of cooperation with other staff members, failure to finish tasks by the established deadlines, and failure to obey direct commands." (D I. 57 at 2) As a result, Curry drafted a marginally satisfactory Form 98 review of plaintiff on April 3, 1995 (D I. 69 at B19-20) Although Curry assessed plaintiff's overall performance as "satisfactory," he rated plaintiff's cooperation and planning skills as "poor" (D I. 69 at B19) The review also noted declines in other areas of performance. (D I. 69 at B19) Curry commented on the April 3 Form 98 that plaintiff
> needs to improve his interactions with school officials (administration and other teachers) ..

© 2005 Thomson/West. No Claim to Orig. U S. Govt. Works

Page 3

Specifically, he needs to insure that he complies with all school regulations including attending required meetings in a timely manner. Additionally, he needs to make a concerted effort to improve interpersonal relations with all coworkers and accomplish required reports ... [Plaintiff] must also improve his planning of class presentations and assume a more proactive role in the accomplishment of AFJROTC responsibilities. Specifically, he must receive a chain of command approval for activities which are not in the normal flow of everyday events. Additionally, he must avoid unilateral decisions which, though good by intention, may not allow a proper execution due to incomplete coordination. (D.I. 69 at B20) Both Curry and Sole signed the Form 98 review. In her concurrence with Curry's findings, Sole wrote that plaintiff "has done an excellent job of bringing in speakers from a number of organizations" but "[h]e does need to pay closer attention to school policies and rules and follow through on ROTC projects and activities." (D.I. 69 at B20)

*3 Before filing the April 3, 1995 Form 98 with the Air Force, Curry prepared an Individual Improvement Plan ("IIP") for plaintiff's review. [FN4] (D.I. 69 at B17-18) The IIP suggested, *inter alia*, that plaintiff "observe the chain of command" and "rededicate himself to supporting student activities both during the school day and at times other than the normal school hours." (D.I. 69 at B17) The IIP also outlined the hours Curry expected plaintiff to spend at the school. Curry concluded in the IIP that "the first year [plaintiff] displayed an attitude and effort far superior to the second year." (D.I. 69 at B18)

> FN4. Defendants explain that the Air Force's Form 98 merely identified performance deficiencies while offering little space for meaningful guidance from the reviewer. Even though the IIP was not required for evaluating an AFJROTC instructor, Curry and Sole decided to use the IIP as a counseling tool in their efforts to correct plaintiff's shortcomings. (D.I. 57 at 2; D.I. 73 at 7)

Curry reviewed the IIP with plaintiff and asked plaintiff to sign it. (D.I. 68 at 3) Plaintiff refused to sign the form, claiming that Curry had no authority to prepare the IIP. (D.I. 68 at 3) Curry ultimately did not file the original April 3, 1995 Form 98 with the Air Force. (D.I. 57 at 2) Instead, he drafted another Form 98 on April 27, 1995. This revised Form 98 contained no "poor" performance marks and none of the negative remarks present in the April 3, 1995 draft. (D.I. 69 at 21-22) Curry replaced the April 3 Form 98 with the more positive April 27 Form 98 in plaintiff's employment file and forwarded the April 27 Form 98 to the Air Force. (D.I. 57 at 3)

1. Alleged Racism of Curry

Plaintiff contends that Curry's alleged racism and hatred of plaintiff contributed to the nonrenewal of plaintiff's contract. (D.I. 68 at 2-5) As evidence of Curry's racism, plaintiff alleges that Curry made disparaging remarks about African-American military recruiters and criticized African-American guest speakers. (D.I. 68 at 2) Plaintiff also claims that Curry criticized a presentation by an African-American Drug Enforcement Administration ("DEA") Officer and refused to allow the African-American Mrs. Delaware Beauty Pageant winner to ride on a Polytech AFJROTC parade float. [FN5] (D.I. 69 at 2) Other than his own affidavit, plaintiff offers no other evidentiary support for these assertions. Plaintiff also contends that Curry

> FN5. Documentary evidence offered by defendants reveals that Curry, in a memo to Sole, praised the DEA presentation as "informative, amusing, disturbing, and extremely well-received." (D.I. 74 at C6) In affidavit testimony, Curry denies harboring any discriminatory animus for Mrs. Delaware. (D.I. 74 at C2) Instead, Curry insists that the AFJROTC float was not designed to carry "guest passengers." (D.I. 74 at C2)

• humiliated him by allowing students to question his judgment in a mock trial conducted in front of

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works

Not Reported in F Supp 2d

1998 WL 957259 (D Del )

**(Cite as: 1998 WL 957259 (D.Del.))**

Page 4

AFJROTC students; (D I 69 at B140)
• "censored" his mail and discarded mail relating to minority programs in the military rather than directing it to plaintiff; (D I 69 at B140)
• skipped sections of the AFJROTC textbook dealing with the role of African-American pilots in World War II; (D I 69 at B140)
• criticized a film on the Tuskegee Airmen; (D I 69 at B140)
• failed to invite him to Air Force Association meetings to which other commanding Aerospace Instructors invited their AASIs (D I 69 at B139)

Curry denies plaintiff's charges of racism In rebuttal, defendants offer an activities report from Curry to Sole in which Curry describes the "honor" of having "the Tuskegee Airmen Association provide multiple presentations on the role of the original Tuskegee Airmen in the history of the U S [ *sic* ] military " (D I 74 at C6) Defendants also explain that plaintiff was not invited to the Air Force Association meetings because plaintiff was not a member of that association, while other AASIs who attended those meetings were members (D I 73 at 3)

**\*4** The area JROTC commander and two Polytech teachers noticed tension between the plaintiff and Curry (D I 69 at B75, B129, B154, B164) According to these teachers, Curry allegedly did not welcome plaintiff's advice (D I 69 at B129) One teacher concluded, without supporting evidence, that Curry disliked plaintiff because plaintiff was African-American (D I 69 at B165)

In his answering brief, plaintiff also alleges "animus," although not racial animus, by Sole (D I 68 at 5-7) According to plaintiff, Sole refused to conduct the requisite number of Delaware Performance Appraisal System ("DPAS") reviews of plaintiff each year [FN6] and, instead, concurred in the negative and allegedly misleading Form 98 evaluations authored by Curry (D I 68 at 5-6) In deposition testimony, Sole claimed that she did not perform DPAS evaluations due to the Air Force's insistence that schools review AFJROTC instructors using Form 98 (*See* D I 74 at C20-22; *but see* D I 69 at B26-29) It appears from the record that Sole

did not conduct DPAS evaluations of either plaintiff or Curry [FN7] (D I 74 at C21-22)

> FN6 Nontenured teachers in the School District must receive three performance appraisals each year pursuant to the DPAS (D I 58 at A100; D I 69 at B5-6) The record reveals some confusion as to whether Sole was required to conduct three DPAS reviews of plaintiff in addition to the Form 98 reviews (*Compare* D I 58 at A100-02 *with* D I 69 at B28)

> FN7 Plaintiff also alleges a conspiracy among Curry, Sole, and Superintendent Adams to change the grades of Adams' daughter (a student at Polytech) so that she could graduate first in her class (D I 68 at 7-8) In his answering brief, plaintiff alleges, without factual support, that Adams "may well have been returning the favor to Curry when he allowed the Title IX officers to sabotage [plaintiff's] career " (D I 68 at 26) Because this allegation rests on pure speculation, the court will disregard it *See Pastore v. Bell Telephone Co., 24 F 3d 508, 511 (3d Cir 1994)*

B Plaintiff's Third Year at Polytech

It is undisputed that during the 1995-96 school year three sexual harassment complaints were filed against plaintiff--two by female Polytech students and another by a Polytech faculty member (D I 58 at A26-27; D I 69 at B47-50, B86-87) In the first complaint, filed in November 1995, a female student claimed that plaintiff kissed her on the cheek and tried to kiss her on the lips while she sat alone in the school's computer room (D I 69 at B47) The student promptly filed a Title IX complaint against plaintiff, and Polytech officials began a formal investigation of the incident [FN8]

> FN8 Polytech employs two full-time Title IX "coordinators" to investigate charges of sexual, racial, or religious harassment by or against students, faculty, and staff (D I 58 at A26) Charging parties lodge

© 2005 Thomson/West No Claim to Orig U S Govt Works

Not Reported in F Supp 2d

1998 WL 957259 (D Del )

**(Cite as: 1998 WL 957259 (D.Del.))**

Page 5

complaints by detailing the alleged harassment on a standard form provided by the school (D I 58 at A26)

The investigation lasted 34 days The investigators interviewed plaintiff, who was accompanied by a union representative, as well as the complaining student and various other students (D I 58 at A120-21) Because Title IX investigators observed plaintiff questioning students involved with the investigation, the investigators asked Curry to order plaintiff not to discuss the charges with students (D I 58 at A121, A143-44; D I 69 at B118) Soon thereafter, the Title IX investigators observed plaintiff questioning student witnesses and accused him of impeding the progress of the investigation (D I 58 at A109; D I 69 at B31, 35) At the urging of the Title IX investigators, Superintendent Adams suspended plaintiff with pay until the investigation concluded (D I 58 at A121, A145-46) Plaintiff claims that the investigation violated his due process rights (D I 1 ¶ 87) Specifically, he claims that he was not given an opportunity to confront witnesses or to present exculpatory evidence (D I 68 at 8)

In the end, the Title IX investigators "concluded that the information that they had been able to obtain during their investigation was inconclusive as to whether the complained about incident occurred " (D I 69 at B47) During the course of the investigation, however, various student witnesses volunteered other examples of inappropriate behavior by plaintiff (D I 68 at 47-48) Most troubling to the Title IX coordinators were allegations that plaintiff made sexually suggestive remarks to female students both in private and during AFJROTC classes [FN9] (D I 69 at B48) The investigators concluded that these incidents constituted separate Title IX offenses (D I 69 at B47) The investigators also uncovered other, less serious violations of school policy by plaintiff (D I 69 at B48) Plaintiff denies making any inappropriate comments to female students (D I 68 at 9)

FN9 The following statements attributed to plaintiff by defendants are offered

against a party-opponent and, therefore, are not excluded under the hearsay rule See Fed R Evid 801(d)(2)(A)

**\*5** The investigators reported their findings to Superintendent Adams (D I 69 at B47) In a letter to plaintiff, Adams conditioned plaintiff's return to Polytech upon satisfaction of a number of requirements including counseling, participation in a sexual harassment avoidance "workshop," and refraining from engaging in sexually explicit conversations with students (D I 69 at B49) Plaintiff characterizes these conditions as an unfair "take it or leave it offer" that afforded him no opportunity to rebut the harassment charges (D I 68 at 8) Plaintiff accepted the conditions and returned to work at Polytech on December 8, 1995 Adams sent the Title IX report to the Air Force The Air Force later notified plaintiff that his alleged conduct was "unacceptable," and it placed plaintiff's AASI certification on probation (D I 58 at A9)

The undisputed facts reveal that two additional sexual harassment complaints were filed against plaintiff in the spring semester of 1996 (D I 58 at A26- 27; D I 69 at B82) A female Polytech faculty member filed the first complaint after she allegedly heard plaintiff approach a female student in the library and say: "Lean close so you can feel my lips move when I tell you this " (D I 58 at A25; D I 69 at B86) The Title IX coordinators began an investigation on April 3, 1996 [FN10] (D I 69 at B82) During the course of the inquiry, [FN11] investigators interviewed a female student who claimed that, although plaintiff did not approach her in the library, she had been harassed by plaintiff on other occasions (D I 58 at A13, A26-27) This student, who was not enrolled in any of plaintiff's AFJROTC classes, complained that plaintiff made numerous sexually charged comments and advances that frightened and disturbed her (D I 58 at A26-27; D I 69 at B86-87)

FN10 A Title IX investigator testified that witnesses were asked only if "a male teacher" made certain statements to them If witnesses asked for the name of the teacher, the investigator would reply that

© 2005 Thomson/West No Claim to Orig U S Govt Works

Not Reported in F Supp 2d

1998 WL 957259 (D Del )

**(Cite as: 1998 WL 957259 (D.Del.))**

Page 6

"it was confidential " (D I 69 at B284)

> FN11 Plaintiff was not suspended with pay during the investigation (D I 69 at B105)

In her complaint, filed on April 4, 1996, she alleged that plaintiff pulled her aside in the school cafeteria and whispered, "I would like to inform you that you are the best looking thing in this cafeteria I don't know what's wrong with other people these days " (D I 58 at A13, A26-27) On another occasion, plaintiff stood at the student's locker and said, "My, you're beautiful, and I sure do love you, can I borrow a dollar?" (D I 58 at A13-14, A27) The student alleged that plaintiff made similar comments to her "practically everyday " (D I 58 at A13-14, A27) The student also claimed that when she failed to respond to plaintiff's remarks, plaintiff would confront her asking, "Can't you speak?" (D I 58 at A13-14, A27) The student allegedly altered her arrival times at Polytech in order to avoid plaintiff, and she claimed that she was afraid to come to school (D I 58 at A14) The Title IX investigators concluded that the student's, as well as the faculty member's, harassment charges had merit (D I 58 at A14)

Plaintiff denies both allegations. With respect to the student's harassment charge, plaintiff complains that the Title IX investigators did not apprise him of the name of the complaining student or of the times, dates, and places that plaintiff made the allegedly harassing statements to her (D I 68 at 10) Moreover, plaintiff contends that the investigators gave him no opportunity either to respond to the charges or to confront the complaining student to question her truthfulness (D I 68 at 10) Plaintiff also blames Adams and Sole for "permitt[ing] if not encourag[ing] the Title IX investigators to do a tremendously one-sided and unfair investigation " (D I 68 at 21)

**\*6** The investigation concluded on April 26, 1996 At that time, Superintendent Adams suspended plaintiff with pay for the remainder of the academic year (D I 58 at A14) Four days earlier, however, the School Board accepted Sole's and Adams'

recommendations to not renew plaintiff's contract upon its expiration on June 30, 1996 (D I 69 at B93) In a certified letter dated May 8, 1996, Adams notified plaintiff of his termination (D I 69 at B93)

Plaintiff claims that the School Board terminated him because Sole placed the "negative" April 1995 IIP form in his personnel file shortly before the School Board was to consider renewal of his contract [FN12] (D I 68 at 6) Defendants contend that the School Board did not renew his contract because it "did not wish to accept the risk that [plaintiff] might engage in improper, inappropriate and/or illegal conduct in the future " (D I 57 at 8)

> FN12 The evidentiary record suggests that Sole ordered a school employee to place the IIP form in plaintiff's file on March 26, 1996 (D I 69 at B83) In an April 4, 1996 letter written on behalf of plaintiff, a representative of the Delaware State Education Association requested that Sole remove the IIP plan from plaintiff's file (D I 69 at B83) The union argued that Curry had no authority to draft the IIP Sole complied, and the IIP was removed on May 1, 1996 (D I 58 at A23)

Plaintiff further contends that defendants treated him more harshly than similarly situated Caucasian teachers suspected of sexual harassment (D I 68 at 11-14) It is alleged that students complained to Curry in late 1995 about a Caucasian teacher's sexual advances, and Curry did not act on these complaints [FN13] (D I 68 at 11-12, 14) It is also alleged that defendants did not request formal written complaints from students in the case of the Caucasian teacher and that the Caucasian teacher was not suspended during the Title IX investigation of his actions [FN14] (D I 68 at 13)

> FN13. A Title IX investigator testified that Curry referred the student to the Title IX investigators and "followed up later" with the student The student, however, did not want to report the alleged sexual harassment by the Caucasian teacher (D I 69 at B171)

© 2005 Thomson/West No Claim to Orig U S Govt Works

Not Reported in F Supp 2d

1998 WL 957259 (D.Del.)

**(Cite as: 1998 WL 957259 (D.Del.))**

Page 7

> FN14 During his first Title IX investigation, plaintiff insinuated that another Caucasian teacher was sexually harassing students (D.I 69 at B171) The investigators inquired into plaintiff's assertions They questioned certain students, but none complained of any specific problem with the Caucasian teacher (D I 69 at B117, 273)

In rebuttal, defendants present affidavit testimony of the School District's Title IX coordinators (D I 58 at A28-33) Both Title IX coordinators testified that no Title IX complaints were filed against either Caucasian teacher named by plaintiff until 1996 (D I 58 at A28, 31) After the filing of a formal complaint against one Caucasian male teacher, that teacher was suspended with pay during the Title IX investigation (D I 58 at A29-30, A32; D I 69 at B108) Based on the findings of the investigation, the School District reported the Caucasian teacher to the Delaware State Police (D I 58 at A29-30; A32) One Title IX coordinator also stated that he investigated sexual harassment charges lodged against an African-American male teacher other than plaintiff, but that teacher was not suspended during the investigation and was eventually cleared of the charges (D I 69 at B121, B287-88)

On June 30, 1996, Curry filed his last Air Force Form 98 report on plaintiff's performance (D I 69 at B100-02) The evidentiary record reveals that the Air Force required him to file this report in order to explain the nonrenewal of plaintiff's employment contract (D I 69 at B102) Curry recorded plaintiff's overall performance as "unsatisfactory" and indicated that several areas of plaintiff's performance were "poor" (D I 69 at B100) Curry commented extensively on the alleged shortcomings in plaintiff's AASI performance Curry also noted the sexual harassment charges leveled against plaintiff and plaintiff's ultimate termination by the School Board (D.I 69 at B100-02) Plaintiff contends that Curry's comments on the Form 98 were highly misleading and motivated by bad faith and racial animus (D I 68 at 5, 14) Plaintiff asserts that this allegedly false and misleading Form 98 "effectively ended any chance that [plaintiff] would

have had to transfer to a different [J]ROTC unit even if his record would have been clean at Polytech " (D I 68 at 21)

*7 Plaintiff contends that the School District replaced him with a Caucasian male whose son teaches at Polytech (D I 68 at 5) According to plaintiff, the list of candidates for his former job included at least one qualified African-American male (D I 68 at 5) Plaintiff further asserts that Curry and Sole sat on the interview board that hired plaintiff's replacement, and that they specifically wanted to replace plaintiff with a Caucasian male (D I 1, ¶ 20; D I 68 at 5)

On May 22, 1996, plaintiff filed a complaint against the School District with the Delaware Department of Labor ("DDOL") alleging racial discrimination After an investigation, the DDOL found that plaintiff failed to establish that racial discrimination played a role in the nonrenewal of his contract (D I 58 at A37) The DDOL further found that the School District articulated a reasonable, non-discriminatory reason for not renewing plaintiff's contract (D I 58 at A37) Following the issuance of a "right to sue" letter by the Equal Employment Opportunity Commission, plaintiff filed the case at bar [FN15]

> FN15 In order to bring suit under Title VII, a party must receive a right to sue letter from the EEOC See 42 U.S.C §§ 2000e-5(e), 2000(e)-5(f) Although both parties acknowledge its existence, neither party provides the court with a copy of the right to sue letter Defendants claim that the letter granted a right to sue only Polytech School District and not the individual defendants in this case (D I 13, ¶ 95; D I 57 at 10) Lacking documentary support for this assertion, the court will proceed as if the EEOC issued a letter granting a right to sue all defendants because "procedural technicalities should not be used to prevent Title VII claims from being decided on the merits " *Gooding v. Warner-Lambert Co*, 744 F 2d 354, 358-59 (3d Cir 1984)

© 2005 Thomson/West No Claim to Orig U S Govt Works

Not Reported in F Supp 2d

1998 WL 957259 (D Del )

**(Cite as: 1998 WL 957259 (D.Del.))**

### III STANDARD OF REVIEW

A court shall grant summary judgment only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law " Fed R Civ P 56(c). The moving party bears the burden of proving that no genuine issue of material fact exists See *Matsushita Elec. Indus. Co. v. Zenith Radio Corp*, 475 U S 574, 586 n 10 (1986) "Facts that could alter the outcome are 'material,' and disputes are 'genuine' if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct." *Horowitz v. Federal Kemper Life Assurance Co*, 57 F 3d 300, 302 n 1 (3d Cir 1995) (internal citations omitted) If the moving party has demonstrated an absence of material fact, the nonmoving party then "must come forward with 'specific facts showing that there is a genuine issue for trial.' ' *Matsushita*, 475 U S at 587 (quoting Fed R Civ P 56(e)). The court will "view the underlying facts and all reasonable inferences therefrom in the light most favorable to the party opposing the motion " *Pennsylvania Coal Ass'n v. Babbitt*, 63 F 3d 231, 236 (3d Cir 1995). The mere existence of some evidence in support of the nonmoving party, however, will not be sufficient for denial of a motion for summary judgment; there must be enough evidence to enable a jury reasonably to find for the nonmoving party on that issue See *Anderson v. Liberty Lobby, Inc.*, 477 U S 242, 249 (1986). If the nonmoving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the moving party is entitled to judgment as a matter of law See *Celotex Corp v. Catrett*, 477 U S 317, 322 (1986)

*8 In the Title VII context, the defendant is entitled to summary judgment if it can demonstrate that: (1) the plaintiff is unable to establish a *prima facie* case of discrimination; or (2) if the plaintiff can establish a *prima facie* case, the plaintiff cannot produce sufficient evidence of pretext to rebut the defendant's legitimate, nondiscriminatory reason for

discharging the plaintiff See *Stinson v. Delaware River Port Auth*, 935 F Supp 531, 539 (D N J 1996). The court evaluates defendant's summary judgment motion as follows:

> The district court must determine whether the plaintiff has cast sufficient doubt upon the employer's proffered reasons to permit a reasonable factfinder to conclude that the reasons are incredible

*Sheridan v. E I. DuPont de Nemours & Co*, 100 F 3d 1061, 1072 (3d Cir 1996) (en banc) The plaintiff can demonstrate that there is "sufficient doubt" by showing " 'weaknesses, implausibilities, inconsistencies, incoherences, or contradictions in the employer's proffered legitimate reasons for its action [such] that a reasonable factfinder could rationally find them 'unworthy of credence " " *Id* (quoting *Fuentes v. Perskie*, 32 F 3d 759, 765 (3d Cir 1994) (citations omitted)) Alternatively, a Title VII plaintiff can defeat a motion for summary judgment by showing "that the reason for the employer's act was discrimination." *Bray v. Marriott Hotels*, 110 F 3d 986, 990 (3d Cir 1997).

### IV DISCUSSION

In its motion for summary judgment, defendants argue that plaintiff has failed to state a *prima facie* case of racial discrimination under Title VII or under 28 U S C §§ 1981 and 1983 Defendants also argue that they are entitled to summary judgment on plaintiff's due process claims as well as on plaintiff's claims arising under Delaware law The court will address each of these arguments in turn

### A Plaintiff's Title VII Claims [FN16]

> FN16 Title VII of the 1964 Civil Rights Act provides in pertinent part:
> (a) Employer practices It shall be an unlawful employment practice for an employer--(1) to fail or refuse to hire or to discharge any individual, or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or (2) to

© 2005 Thomson/West No Claim to Orig U S Govt Works

Not Reported in F Supp 2d

1998 WL 957259 (D Del.)

**(Cite as: 1998 WL 957259 (D.Del.))**

limit, segregate or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin

42 U.S.C. § 2000e-2(a)

Plaintiff, proceeding under a disparate treatment theory, alleges a Title VII claim against the School District and the School Board [FN17] (D.I. 1, ¶ 88; D.I. 68 at 18) According to plaintiff, defendants "had as their objective the goal of removing [plaintiff] as a teacher so that he could be replaced with a white male teacher." (D.I.1, ¶ 81) The United States Supreme Court articulated the analytical framework applicable to disparate treatment suits brought under Title VII in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). According to that framework, a plaintiff has the initial burden of establishing a *prima facie* case. To establish a *prima facie* case of unlawful racial discrimination based on disparate treatment, the plaintiff must show that: (1) he is a member of a protected group; (2) he suffered an adverse employment action; and (3) members outside the protected group received more favorable treatment *See Weldon v. Kraft, Inc.*, 896 F.2d 793, 796-97 (3d Cir.1990). Where, as here, a plaintiff asserts a disparate treatment theory of racial discrimination, the plaintiff may present either direct evidence of discriminatory intent, *see Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989), or indirect, pretextual evidence of discrimination, *see Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 252-55 (1981); *McDonnell Douglas*, 411 U.S. at 802.

FN17. In his answering brief to defendants' motion for summary judgment, plaintiff seems to allege a Title VII claim of "racial discrimination based on disparate treatment" against Curry, Sole, and Adams. (D.I. 68 at 19-23) Title VII, however, only imposes liability upon "employers" for unlawful racial

discrimination. *See* 42 U.S.C. § 2000e-2(a) An employer within the meaning of Title VII is "a person engaged in an industry affecting commerce who has fifteen or more employees and any agent of such a person." *Id* at § 2000e(b). It is undisputed that Curry, Sole, and Adams are individual employees of the School District, and the Third Circuit has declined to extend Title VII liability to individual employees. *See Sheridan*, 100 F.3d at 1077-78.

\*9 In the case at bar, plaintiff has presented only indirect evidence of racial discrimination None of plaintiff's evidence "proves [racial discrimination] without inference or presumption." *Nixon v. Runyon*, 856 F.Supp. 977, 983 (E.D.Pa 1994). If the plaintiff presents competent indirect evidence of discrimination, the burden of going forward shifts to the defendant who must then articulate a legitimate, nondiscriminatory reason for the challenged employment action. *See Burdine*, 450 U.S. at 252-55; *McDonnell Douglas*, 411 U.S. at 802 If the defendant is successful in meeting its burden of production, the presumption of discrimination created by the *prima facie* showing drops from the case, and the plaintiff must show by a preponderance of the evidence that the defendant's proffered reason for the employment decision was merely a pretext for discriminatory animus *See Burdine*, 450 U.S. at 256. The plaintiff can satisfy his burden of proof "either directly by persuading the [fact finder] that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Id.; see also Armbruster v. Unisys Corp.*, 32 F.3d 768, 783 (3d Cir.1994) At all times, the ultimate burden of persuading the trier of fact of the defendant's discriminatory intentions remains with the plaintiff *See St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 507 (1993)

1. Plaintiff Cannot State a *Prima Facie* Case

It is without dispute that plaintiff, as an African-American, is a member of a protected group. Further, defendants do not dispute that they took adverse employment action against defendant

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F Supp 2d

1998 WL 957259 (D Del )

**(Cite as: 1998 WL 957259 (D.Del.))**

by not renewing his contract and by filing a negative Form 98 performance evaluation of him. At issue, then, is whether defendants treated members of unprotected groups (e g, Caucasian teachers) more favorably than plaintiff

Plaintiff alleges that Caucasian teachers suspected of sexual harassment were treated more favorably by defendants. Plaintiff contends that defendants did not formally investigate two Caucasian teachers until the 1996-97 school year even though charges arose against these teachers much earlier. These assertions, however, are unsupported by the facts The facts reveal that students only filed formal complaints against these Caucasian teachers during the 1996-97 school year (D I. 69 at B110-115) Following the filing of those complaints, the Caucasian teachers were immediately investigated

Without factual support, plaintiff argues that defendants Adams and Sole "permitted if not encouraged the Title IX investigators to do a tremendously one-sided and unfair investigation that gave [plaintiff] no opportunity to defend himself." (D I 68 at 21-22) Plaintiff offers no evidence to support the inference that his Title IX investigation was unfair. Plaintiff, accompanied by a union representative, met with the Title IX investigators to defend himself The evidence shows that the investigators conducted month-long inquiries on each occasion and interviewed numerous witnesses--some more than once (D.I 69 at B267) Moreover, plaintiff has offered no evidence to suggest that Adams and Sole "permitted or encouraged" a "one-sided" investigation of plaintiff

**\*10** Nor can plaintiff demonstrate that Polytech's Title IX investigatory procedures were applied more harshly to him than to Caucasian teachers under investigation Plaintiff specifically complains that defendants forbade him from discussing the investigation with students and that, as a result, plaintiff could not call any witnesses on his behalf. (D I. 69 at B143) Plaintiff's own documentary evidence reveals, however, that defendants placed similar restrictions on a Caucasian teacher accused of sexual harassment (D I. 69 at B107) Like

plaintiff, the Title IX investigators did not inform the Caucasian teacher of the complaining students' names (D I 69 at B287) The Title IX investigators also asked Adams to suspend the Caucasian teacher during the investigation, and Adams complied. (D I. 69 at B108-09) Ultimately, defendants fired the Caucasian teacher, and reported him to the Delaware State Police. (D I 69 at B287)

In some ways, defendants treated plaintiff more leniently than the Caucasian teacher under investigation Following plaintiff's first Title IX investigation, Adams permitted him to resume teaching even though several students accused plaintiff of making sexually suggestive statements in class During his second round of Title IX investigations, Adams did not suspend plaintiff until the conclusion of the inquiry Moreover, defendants did not file charges against plaintiff with the Delaware State Police

Significantly, the facts also reveal that the School Board did not renew the contract of the Caucasian teacher accused of sexual harassment. Thus, plaintiff has offered no competent evidence to support an inference that defendants treated Caucasian teachers accused of sexual harassment more favorably. Consequently, plaintiff has failed to state a *prima facie* case of racial discrimination based on disparate treatment

Assuming, arguendo, that plaintiff could meet his *prima facie* case, defendants have established a "legitimate, nondiscriminatory reason" for terminating plaintiff's contract. *See McDonnell Douglas*, 411 U S at 802 Defendants have submitted investigatory reports and hand-written complaints describing plaintiff's alleged sexual harassment of students. These charges were made by different students on more than one occasion Plaintiff has responded to these charges only with general denials and conclusory allegations that the sexual harassment charges leveled against him were prompted by defendants' racist conspiracy to replace him with a Caucasian male (D I. 68 at 21-23) Plaintiff offers no facts to support these assertions and, in a motion for summary judgment, the nonmoving party "cannot rely upon conclusory

© 2005 Thomson/West No Claim to Orig U S Govt Works

Not Reported in F. Supp 2d

1998 WL 957259 (D Del )

**(Cite as: 1998 WL 957259 (D.Del.))**

Page 11

allegations in its pleadings or in memoranda and briefs to establish a genuine issue of material fact." *Pastore,* 24 F 3d at 511

Without more, plaintiff cannot show that defendants' proffered reason for not renewing his contract was a mere pretext for unlawful racial discrimination. *See Burdine,* 450 U S at 256; *Weldon,* 896 F 2d at 797. Accordingly, defendants' are entitled to summary judgment on plaintiff's Title VII complaint

B Plaintiff's § 1981 Claims [FN18]

> FN18 In his complaint, plaintiff alleges § 1981 claims only against Curry, Sole, and Adams (D I 1, ¶ 87(d)) In his answering brief, plaintiff appears to allege an additional § 1981 claim against the School Board (D I. 68 at 27) Plaintiff has not offered any evidence sufficient to raise an inference that the School Board or its members intentionally discriminated against him on the basis of his race. Accordingly, the School Board is entitled to summary judgment on plaintiff's § 1981 claim

*\*11* Section 1981, as amended by the Civil Rights Act of 1991, provides that

> [a]ll persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licences, and exactions of every kind, and to no other

42 U.S.C. § 1981(a). The coverage of the statute "includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." *Id* at § 1981(b) These rights are protected from encroachment by both private and state actors. *See id* at § 1981(c) Although § 1981 does not explicitly use the word "race," it has been construed to prohibit "racial"

discrimination in the making of private and public contracts. *See St. Francis College v Al-Khazraji,* 481 U S 604, 609 (1987)

Section 1981 claimants are required to prove intentional racial discrimination under the same burden-shifting framework utilized in Title VII discrimination cases. *See McDonnell Douglas,* 411 U.S. 792; *Stewart v. Rutgers, The State University,* 120 F 3d 426, 432 (3d Cir 1997); *Lewis v J.C Penney Co.,* 948 F Supp 367, 371 (D Del 1996) Therefore, plaintiff must first establish a *prima facie* case of discrimination by demonstrating that: (1) he is a member of a racial minority; (2) defendants intended to discriminate against plaintiff on the basis of race; and (3) the discrimination concerned one or more of the activities enumerated in § 1981. *See Lewis,* 948 F Supp. at 371. Upon a *prima facie* showing by plaintiff, the burden shifts to defendants to assert a "legitimate, nondiscriminatory" reason for their actions, which plaintiff may rebut with evidence of pretext. *See McDonnell Douglas,* 411 U S at 802

1. The *Prima Facie* Case

As a member of a racially cognizable group, plaintiff satisfies the first prong of the *prima facie* case. Defendants deny that they intentionally discriminated against plaintiff or that their alleged racial discrimination interfered with plaintiff's right to make and enforce contracts. Thus, defendants argue that plaintiff cannot satisfy the second and third prongs of his *prima facie* case

In order to show intentional racial discrimination, plaintiff "must point to facts of record which, if proved, would 'establish that defendants' actions were racially motivated and intentionally discriminatory,' or, at least, 'support an inference that defendants intentionally and purposefully discriminated' against [him] on the basis of [his] race." *Ackaa v Tommy Hilfiger Co.,* Civ. A No 96-8262, 1998 WL 136522, at \*3 (E D Pa. Mar. 24, 1998) (citations omitted)

*\*12* In the case at bar, plaintiff presents no evidence from which the court can infer that Adams

© 2005 Thomson/West. No Claim to Orig. U S. Govt. Works

Not Reported in F.Supp.2d

1998 WL 957259 (D.Del.)

**(Cite as: 1998 WL 957259 (D.Del.))**

discriminated against plaintiff on the basis of race. In his answering brief, plaintiff contends only that Adams "set up" a Title IX investigatory system that "provided no safeguards for accused teachers." (D.I. 68 at 27) The procedural adequacy of the Title IX investigations is not an issue in a § 1981 claim. Moreover, it is uncontroverted that Caucasian as well as African-American teachers were investigated in the same manner by this allegedly unfair Title IX investigatory body. Without more, plaintiff cannot raise an inference that Adams discriminated against him on the basis of race. Accordingly, defendants' motion for summary judgment is granted with respect to plaintiff's § 1981 claim against Adams.

Even assuming that plaintiff has alleged enough evidence to raise an inference of racial discrimination by Curry and Sole, plaintiff cannot show that this alleged racism interfered with plaintiff's right to make and enforce contracts. Plaintiff has presented no evidence that the School Board based its decision, in whole or in part, upon the allegedly negative IIP authored by Curry and concurred in by Sole. Indeed, plaintiff admitted in a deposition that he did not know how the School Board operates during nonrenewal considerations. (D.I. 69 at A131)

Moreover, the only Form 98 that rated plaintiff's performance as "unsatisfactory" or contained any "poor" performance marks was written by Curry after the School Board voted to not renew plaintiff's contract. (D.I. 69 at B100-01) Plaintiff claims that the allegedly misleading assertions contained in this Form 98 hindered his future employability as a AFJROTC instructor. Even if some of Curry's statements in the Form 98 were misleading, plaintiff provides no evidence from which to infer that these allegedly misleading statements made him any more unemployable than the findings of the Title IX investigators that Curry also reported in the Form 98. Consequently, plaintiff's allegations do not state a *prima facie* case under § 1981.

Assuming, arguendo, that plaintiff could establish a *prima facie* case, the court has found that plaintiff's alleged sexual harassment of students serves as a

legitimate, nondiscriminatory reason for Sole's and Adam's recommendations that the School Board not renew plaintiff's contract. Similarly, the sexual harassment charges lodged against plaintiff provided Curry with a nondiscriminatory reason for recommending that the Air Force not renew plaintiff's certification to teach high school AFJROTC programs. Plaintiff has offered no evidence from which a reasonable fact finder could infer that defendants' proffered justifications for recommending the termination of plaintiff's employment were pretextual. Accordingly, defendants are entitled to summary judgment on plaintiff's § 1981 claims.

C. Plaintiff's § 1983 Claim [FN19]

> FN19. In his complaint, plaintiff appears to seek relief pursuant to § 1983 for alleged constitutional violations. (D.I.1, ¶ 90) In his answering brief, however, plaintiff discusses the alleged due process and § 1983 violations separately. For greater clarity, the court will address the alleged due process violations as elements of plaintiff's § 1983 claim.

Plaintiff asserts a claim pursuant to 42 U.S.C. § 1983 against defendants. Section 1983 imposes liability on any person who, under color of state law, deprives another of any rights secured by the Constitution or the laws of the United States. *See id.* at § 1983. Specifically, plaintiff claims that Curry, Sole, and Adams took "unwarranted negative action" against plaintiff "to prevent him from obtaining a protected property right, such as tenure." (D.I. 68 at 24) Plaintiff claims that defendants' actions constituted violations of his Fourteenth Amendment substantive and procedural due process rights.

*13 The Supreme Court has held that, in order to prevail on a Fourteenth Amendment due process claim, a plaintiff must show that defendants deprived him of liberty or property. *See Board of Regents v. Roth*, 408 U.S. 574, 576 (1972). Thus, before reaching the question of whether Curry, Sole, and Adams violated plaintiff's Fourteenth

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F Supp 2d

1998 WL 957259 (D Del )

**(Cite as: 1998 WL 957259 (D.Del.))**

Amendment due process rights, the court must resolve the threshold question of whether plaintiff had a protected property interest in continued employment with the School District. *See New Castle- Gunning Bedford Educ. Ass'n v. Board of Educ.*, 421 F Supp. 960, 963 (D Del 1976)

To have a protectible property interest, a person must have a "legitimate claim of entitlement to it." *Roth*, 408 U.S. at 577. Legitimate claims of entitlement to "property" are not created by the Constitution; rather, they are created by state laws that "secure certain benefits and that support claims of entitlement to those benefits." *Id., see also Bishop v. Wood*, 426 U.S. 341, 344 (1976). The Court also has held that a "property" interest in employment can be created by an "implied contract" or by "mutually explicit understandings" of continued employment. *See Bishop*, 426 U.S. at 344; *accord Perry v. Sindermann*, 408 U.S. 593, 601 (1972). In the case at bar, plaintiff does not claim a property right to continued employment under an implied contract or understanding with the School District. Thus, the court must look to plaintiff's contract and to Delaware state law to evaluate plaintiff's claim of entitlement to continued employment

It is undisputed that plaintiff had a one-year contract with the School Board during the 1995-96 school year that expired on June 30, 1996. Plaintiff does not dispute that he was a nontenured teacher (D.I. 69 at B5) *See* 14 Del Code Ann tit 14, § 1401(2). Plaintiff's contract explicitly reserved the School Board's right to "terminate the Employee's services in accordance with Delaware law." (*See, e.g.,* D I 69 at B2) Delaware law permits a School Board to terminate a nontenured teacher for any lawful reason. *See* 14 Del Code. Ann tit 14, § 1410(b) (Supp 1996). Indeed, Delaware law only requires that a School Board provide, upon request, the reasons for its termination of the teacher's contract. *See id.* at § 1410(b) In the instant case, plaintiff never made such a request to the School Board.

Thus, neither plaintiff's contract nor Delaware law creates an entitlement to, or an expectation of,

continued employment with the School District. Both the contract and Delaware law reveal that the School Board had virtually unfettered discretion to not renew plaintiff's contract. Consequently, plaintiff does not have a protected property interest in continued employment with the School District Therefore, plaintiff's contention that his due process rights were violated by Curry, Sole, and Adams fails as a matter of law.

Although not alleged in his complaint, plaintiff claims in his answering brief that the School Board also violated his due process rights. Plaintiff argues that the School Board established a Title IX investigatory system that "confers ultimate authority in two untrained Title IX investigators, whose recommendations cannot be challenged in any meaningful way." (D.I. 68 at 27) While plaintiff's brief is not a model of clarity, plaintiff appears to argue that he had a property interest in a more fair Title IX investigatory process. Process, however, is not an end in itself. *See Olim v. Wakinekona*, 461 U.S. 249, 250 (1983). "Its constitutional purpose is to protect a substantive interest to which the individual has a legitimate claim of entitlement." *Id* The Supreme Court has noted that, in the absence of a substantive interest, the expectation of a certain kind of process is not an independent constitutionally protected interest. *See id.* at 250-51 & n 12; *see also United States v. Jiles*, 658 F 2d 194, 200 (3d Cir 1981). In the case at bar, plaintiff has no claim of entitlement to continued employment and, therefore, he cannot premise a due process claim solely upon the investigatory procedures that ultimately resulted in the discontinuance of his employment

**\*14** Consistent with the foregoing analysis, the court finds that plaintiff has failed to establish that defendants deprived him of any rights secured by the Constitution or laws of the United States. *See* 42 U S C. § 1983 Accordingly, defendants' motion for summary judgment shall be granted with respect to plaintiff's § 1983 claim

D Plaintiff's State Law Claims

Plaintiff alleges the following state law claims:

© 2005 Thomson/West. No Claim to Orig. U S Govt Works

Not Reported in F Supp 2d

Page 14

1998 WL 957259 (D Del )

**(Cite as: 1998 WL 957259 (D.Del.))**

tortious interference with contract; retaliation for exercising his union rights; breach of contract; and breach of implied warranty of good faith and fair dealing. Having granted summary judgment on all of plaintiff's federal claims, the court must consider whether, under 28 U S C § 1367(c), it should decline to decide plaintiff's state law claims Section 1367(c)(3) allows a federal district court to decline supplemental jurisdiction over pendent state law claims when it has dismissed all claims over which it had original jurisdiction. The Third Circuit has noted that, "where the claim over which the district court has original jurisdiction is dismissed before trial, the district court must decline to decide the pendent state claims unless considerations of judicial economy, convenience, and fairness to the parties provide an affirmative justification for doing so " *Borough of West Mifflin v Lancaster,* 45 F 3d 780, 788 (3d Cir 1995) (emphasis added) Plaintiff has not raised any facts that justify deviation from this general rule. Therefore, the court declines to exercise supplemental jurisdiction over plaintiff's state law claims

V CONCLUSION

For the foregoing reasons, the court grants defendants' motion for summary judgment and dismisses plaintiff's state law claims An order shall issue consistent with this memorandum opinion.

1998 WL 957259 (D Del )

**Motions, Pleadings and Filings (Back to top)**

• 1:97CV00313 (Docket)
                    (Jun 11, 1997)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig U S Govt Works.



Not Reported in F Supp 2d

2002 WL 187512 (D Del ), 27 Employee Benefits Cas 2404

**(Cite as: 2002 WL 187512 (D.Del.))**

Page 1

**Motions, Pleadings and Filings**

United States District Court, D  Delaware
Derek J  OATWAY, Plaintiff,
v
AMERICAN INT'L  GROUP, INC , Plan
Administrator of Stock Option Plan American
Int'l Group, Inc , a Delaware Corporation, and 1987
Employee Stock Option Plan
an Employee Welfare Benefit Plan Defendants
**No. Civ.A.01-033-GMS.**

Feb  5, 2002

*MEMORANDUM AND ORDER*

SLEET, J.

I  INTRODUCTION

**\*1** On January 17, 2001, the plaintiff, Derek J
Oatway ("Oatway"), filed a complaint in the
above-captioned action  He amended his complaint
on February 13, 2001  In his amended complaint, he
alleges that American International Group, Inc
("AIG") wrongfully denied him benefits under the
1987 Employee Stock Option Plan (the "Plan")  He
now seeks to recover those benefits pursuant to
section 502(a)(1)(B) of the Employee Retirement
Income Security Act of 1974 ("ERISA")  *See* 29
U S C  § 1132(a)(1)(B)  He further claims that AIG,
as the Plan administrator, breached its fiduciary
duties by failing to properly administer the Plan in
violation of 29 U S C  § 1133  Finally, Oatway
asserts state law claims against AIG based on
breach of contract and estoppel

Presently before the court are the defendants'
motion to dismiss Oatway's amended complaint on
the grounds that it fails to state a claim under
ERISA and Oatway's motion for summary

judgment  For the following reasons, the court will
grant the defendants' motion to dismiss

II  BACKGROUND

Oatway was employed by AIG until approximately
August 26, 1992  On various occasions from 1983
through 1990, AIG and Oatway entered into written
Incentive    Stock    Option    Agreements    (the
"Agreements")  These Agreements granted Oatway
the right to purchase certain numbers of shares of
AIG common stock at set exercise prices per share
Specifically, on January 18, 1990, AIG granted
Oatway an Incentive Stock Option to purchase 200
shares at $96 per share  On October 11, 1990, AIG
granted Oatway an Incentive Stock Option to
purchase 200 shares at $58 625 per share  [FN1]
These options were granted under the AIG Plan in
consideration of Oatway's performance as an
employee of AIG

> FN1  Oatway refers to the terms of the
> January 18, 1990 and October 11, 1990
> Incentive Stock Option Agreements and
> the 1987 Employee Stock Option Plan
> throughout his Amended Complaint  He
> has    therefore    incorporated    these
> documents by reference into his pleading
> The court may rely on such documents in
> deciding a motion to dismiss  *See In re
> Rockefeller Ctr  Properties, Inc  Securities
> Litig.,* 184 F 3d  280, 287 (3d Cir 1999)
> (noting that, on a motion to dismiss, "a
> court can consider a document integral to
> or    explicitly    relied    upon    in    the
> complaint.")  Neither party objects to the
> court relying on these documents

AIG's Plan provides selected employees of AIG,
including its parent or subsidiary corporations, with
the options to purchase shares of AIG common
stock  The purpose of the Plan is:
  [T]o    advance    the    interests    of    American

© 2005 Thomson/West  No Claim to Orig  U S  Govt  Works

Not Reported in F. Supp. 2d                                                                                      Page 2

2002 WL 187512 (D Del ), 27 Employee Benefits Cas. 2404

**(Cite as: 2002 WL 187512 (D.Del.))**

International Group, Inc ("AIG") by providing certain of the key employees of AIG and of any parent or subsidiary corporation of AIG, upon whose judgment, initiative and efforts the successful conduct of the business of AIG largely depends, with an additional incentive to continue their efforts on behalf of such corporations, as well as to attract to such corporations people of training, experience and ability

Options granted under the Plan may normally be exercised beginning one year after they are granted, in set installments AIG's board of directors determine the amount of the installments at the time of the grant. To the extent that an optionee does not purchase the maximum number of shares permitted under an option in any one year, he or she may purchase such shares in a subsequent year during the term of the option Each of the option grants at issue provided that it expired ten years from the date of its issuance Each of the option grants further specified that, in the event of termination of employment prior to the normal retirement age, the option must be exercised within three months after such termination

**\*2** On or about August 26, 1992, Oatway retired from AIG Since he retired prior to the normal retirement age, AIG advised him that he was required to exercise all his remaining stock options by November 1992 Oatway alleges that after he complained about being denied the ten-year period to exercise his options, AIG agreed to allow him to exercise the options over the ten-year period, rather than within three months of his retirement

On or about January 25, 2000, Oatway discovered that the option exercise date under the January 18, 1990 Incentive Stock Agreement had already expired. He claims that he immediately notified AIG via facsimile of his "intention and desire" to exercise this grant AIG refused to allow him to do so

On October 1, 2000, Oatway finally "exercised" the options under both the January 18, 1990 and October 11, 1990 Incentive Stock Option Agreements, but AIG refused to accept either

exercise He asserts that he appealed the denial to AIG as the "Plan Administrator " AIG rejected his appeal

Oatway subsequently filed this complaint on January 17, 2001 On March 13, 2001, the defendants filed a motion to dismiss Oatway's Amended Complaint On April 10, 2001, Oatway filed a motion for summary judgment

### III STANDARD OF REVIEW: MOTION TO DISMISS

A motion to dismiss pursuant to the provisions of Rule 12(b)(6) should not be granted unless, accepting all allegations in the complaint as true and viewing them in a light most favorable to the plaintiff, the court rules that the plaintiff is not entitled to relief as a matter of law. *In re Fruehauf Trailer Corp.*, 250 B R. 168, 183 (D. Del 2000) (citing *In re Burlington Coat Factory Sec. Litig.*, 114 F 3d 1410, 1420 (3d Cir 1997); *see also Trump Hotels & Casino Resorts, Inc. v. Mirage Resorts, Inc.*, 140 F 3d 478, 483 (3d Cir 1998) ("A complaint should be dismissed only if, after accepting as true all of the facts alleged in the complaint, and drawing all reasonable inferences in the plaintiff's favor, no relief could be granted under any set of facts consistent with the allegations of the complaint.") "The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims " *In re Burlington*, 114 F 3d at 1420.

### IV DISCUSSION

ERISA gives federal courts subject matter jurisdiction over claims brought pursuant to 29 U S.C. § 1132(a)(1)(B). This section authorizes a cause of action for benefits due under an employee benefit plan *See* 29 U.S.C. § 1132(a)(1)(B). Because an ERISA "plan" is necessary before ERISA's provisions apply, the court must first determine whether AIG's 1987 Plan is, in fact, an ERISA "employee welfare benefit plan." *See Long v. Excel Telecommunications Corp.*, 2000 WL 1562808, at \*2 (N D.Tex. Oct. 18, 2000) If the answer to this threshold question is no, then the

© 2005 Thomson/West No Claim to Orig U S Govt Works

Not Reported in F Supp 2d                                                                    Page 3

2002 WL 187512 (D Del ), 27 Employee Benefits Cas 2404

**(Cite as: 2002 WL 187512 (D.Del.))**

court may dismiss the plaintiff's claims that he is entitled to benefits under ERISA. *See Henglein v. Informal Plan for Plant Shutdown Benefits for Salaried Employees,* 974 F 2d 391, 395 (3d Cir 1992) (noting that a plaintiff's failure to prove the existence of an employee benefit plan, though it results in the dismissal of the claim, does not deprive the district court of subject matter jurisdiction to enter a judgment on the merits ")

A Is the 1987 Plan an Employee Welfare Benefit Plan Under ERISA?

**\*3** Oatway contends that the 1987 Plan is an "employee welfare benefit plan" under which he is entitled to benefits pursuant to 29 U S C § 1132(a)(1)(B). The court disagrees

ERISA defines an "employee welfare benefit plan" as:

[A]ny plan, fund, or program which was heretofore or is hereafter established or maintained by an employer or by an employee organization, or by both, to the extent that such plan, or program was established or is maintained for the purpose of providing for its participants or their beneficiaries, through the purchase of insurance or otherwise, (A) medical, surgical, or hospital care, or benefits, or benefits in the event of sickness, accident, disability, death or unemployment, or vacation benefits, apprenticeship or other training programs, or day care centers, scholarship funds, or prepaid legal services or (B) any benefit described in section 186(c) of this title (other than pensions on retirement or death, and insurance to provide such pensions) [FN2]

> FN2 Section 186(c) includes within the definition of "employee welfare plan" those plans which provide holiday and severance benefits, and benefits which are similar *See* 29 C F R § 2510 3-1(a)(3)

*See* 29 U S C § 1002(1)

To constitute an employee welfare plan, a plan "must be designed specifically to provide

employees with medical, unemployment, disability, death, vacation, or other specified benefits or to provide income following retirement in order to come within the purview of ERISA " *Long,* 2000 WL 1562808, at \*4; *see also* 29 U S C § 1002(1) (requiring that an ERISA plan be "established or maintained .. for the purpose of providing" the benefits listed in the statute ) The statutory definition does not embrace plans that may incidentally result in payment of benefits after retirement, death or disability *See Long,* 2000 WL 1562808, at \*2; *Hagel v. United Land Co.,* 759 F Supp 1199, 1203 (E D Va 1991) Thus, merely because a plan "may in some circumstances continue to pay ... proceeds after an employee's death or disability does not make it a welfare benefit plan " *Murphy v. Inexco Oil Co.,* 611 F 2d 570, 574 (5th Cir 1980)

Furthermore, these holdings are consistent with congressional findings and the declaration of policy that supported ERISA's enactment In enacting ERISA, Congress did not intend "to control every aspect of the employer-employee relationship or every promise made to employees " *Murphy,* 611 F 2d at 574 Rather, Congress "intended to protect employees with many years of service who were losing anticipated retirement benefits because of inadequate vesting provisions, lack of funding, or other problems." *Long,* 2000 WL 1562808,\*2 Because Congress "sought only to deal with those types of plans that had created the problems it sought to remedy .. by its terms, ERISA applies only to "an employee welfare benefit plan or to an employee pension benefit plan or a plan which is both." *See Murphy,* 611 F 2d at 574 (quoting 29 U S C § 1002(3))

Although the Third Circuit has not addressed the issue of whether an incentive stock option plan is an employee benefit plan within the meaning of ERISA, other courts that have considered the question have uniformly held that it is not *See Long,* 2000 WL 1562808, at \*3-4; *Hahn v National Westminster Bank, N.A.,* 99 F Supp 2d 275, 279-280 (E D N Y 2000); *Goodrich v CML Fiberoptics, Inc .,* 990 F Supp 48, 49-50 (D Mass 1998). In *Long,* a former employee

© 2005 Thomson/West No Claim to Orig U S Govt Works

Not Reported in F Supp 2d                                                                                        Page 4

2002 WL 187512 (D Del ), 27 Employee Benefits Cas 2404

**(Cite as: 2002 WL 187512 (D.Del.))**

claimed that his employer terminated him for the purpose of depriving him of benefits under the company's stock option plan in violation of ERISA 2000 WL 1562808, at *2 The court granted the former employer's motion for summary judgment, holding that the company's stock plan was not a benefit plan under ERISA *See id* at *3-4 In its holding, the court examined the purpose of the company's stock option plan, which was:

*4 [t]o provide a means by which selected Employees of and Consultants to the Company and its Affiliates may be given an opportunity to purchase stock of the Company The Company, by means of the Plan, seeks to retain the services of the persons who are now Employees of or Consultants to the Company and its Affiliates, to secure and retain the services of new Employees and Consultants, and to provide incentives for such persons to exert maximum efforts for the success of the Company and its Affiliates

*See id* at *3. The court further noted that, "[n]owhere does [the company's] Stock Option Plan indicate that its purpose is to defer compensation In fact, the plan itself indicated that it was intended to operate as an incentive and bonus program *See id*

Finally, the Department of Labor, which is the agency charged with interpreting and enforcing ERISA, has also recognized that stock option plans are not necessarily employee welfare benefit plans *See U.S. Dep't of Labor Opinion Letter* 79-80A, 1979 WL 7016 (Nov 13, 1979) (stating that stock option plans were not employee welfare benefit plans within the meaning of ERISA § 3(1) because they were not established or maintained for the purpose of providing any of the benefits listed in § 3(1) or 302(c) of the Labor Management Relations Act, 1947)

The court finds that the Plan at issue here does not meet the statutory definition of an employee welfare benefit plan The Plan was not created for the purpose of providing retirement income Rather, the stated purpose of the 1987 Plan is:

to advance the interests of American International Group, Inc ("AIG") by providing certain of the key employees of AIG and of any parent or subsidiary corporation of AIG, upon whose

judgment, initiative and efforts the successful conduct of the business of AIG largely depends, with an additional incentive to continue their efforts on behalf of such corporations, as well as to attract to such corporations people of training, experience and ability

Therefore, under the plain language of the Plan, its purpose is not to provide severance, retirement, death or disability benefits. Instead, its purpose is to provide a financial incentive for employees to remain with AIG and to improve their performance at AIG Although the Plan provided that upon retirement, death, or disability, the option could still be exercised, subject to time restrictions, any payment of benefits at that time were merely incidental Furthermore, it is clear that "plans that might incidentally result in payment of benefits after retirement, death or disability only fall under ERISA if they were established or maintained for the express purpose of doing so " *Long*, 2000 WL 1562808, at *2 (citing *Murphy*, 611 F 2d at 574-75)

Accordingly, because the Plan itself is clearly an incentive plan, it is not an employee welfare benefit plan within the meaning of ERISA

B Is the 1987 Plan an Employee Pension Benefit Plan Under ERISA?

*5 Oatway suggests that the Plan "can also be characterized under ERISA as a pension plan or an employee pension benefit plan " ERISA pension plans include any plan established or maintained by an employer that, by its express terms "results in a deferral of income by employees for periods extending to the termination of covered employment or beyond, regardless of the method of calculating the contributions made to the plan, the method of calculating the benefits under the plan or the method of distributing benefits from the plan " 29 U.S.C § 1002(2)(A)(ii)

The Department of Labor has interpreted ERISA pension plans to exclude bonuses for work performed, unless such bonuses are "systematically deferred to termination of covered employment or

© 2005 Thomson/West No Claim to Orig U.S. Govt Works

Not Reported in F Supp 2d

Page 5

2002 WL 187512 (D Del ), 27 Employee Benefits Cas 2404

**(Cite as: 2002 WL 187512 (D.Del.))**

beyond, or so as to provide retirement income to employees " 29 C F R § 2510.3-2(c) By the express purpose of the Plan itself, it is clear that this is a bonus plan. Although Oatway alleges that his ability to exercise his options continued after his retirement from AIG, this does not transform the bonus plan into "one whose payments are systematically deferred to the termination of employment or one whose purpose is to provide retirement income" *See Hahn v National Westminster Bank, N.A.,* 99 F Supp 2d 275, 276 (E D N Y 2000) Rather, this is a plan were "post-retirement payments [are] only incidental to the goal of providing current compensation." *See Hahn,* 99 F Supp 2d at 279 Thus, the court recognizes that, while Oatway may have been individually permitted to exercise his options subsequent to retirement, the primary purpose of the Plan as a whole was to provide additional benefits to employees during the course of their employment *See Lafian v. Electronic Data Systems Corp.,* 856 F Supp. 339, 345 (E D Mich 1994)

Accordingly, the court finds that the Plan at issue here is not an employee pension benefit plan within the meaning of ERISA

C Does the Plan Administrator Owe Oatway a Fiduciary Duty Under ERISA?

Oatway next alleges that AIG, as the Plan's administrator, breached its fiduciary duties under ERISA § 503 *See* 29 U S C § 1133 The basis for this claim is that AIG failed to set forth adequate factual reasons why it denied his benefits appeal Oatway further claims that AIG failed to advise him of what further information he needed to meet options pay status requirements under the Plan

As the court discussed at some length above, the Plan does not fall within the definition of a qualified ERISA plan Therefore, the court finds that AIG could not owe Oatway any ERISA fiduciary duties under the Plan

D State Law Claims

Oatway next asserts state law claims for breach of

contract and estoppel He notes that, "[i]f the [c]ourt were to determine that there is an ERISA plan, then this [c]ourt's supplemental jurisdiction over Count III is appropriate " However, because this Plan is not covered by ERISA, there is no federal question jurisdiction under ERISA Moreover, the court has merely focused on the jurisdictional issues presented by these claims, and has not devoted any resources to the merits of the claims *See Voege v. The Magnavox, Co.,* 439 F Supp 935, 943 (D Del 1977) The court, therefore, declines to exercise supplemental jurisdiction over Oatway's remaining state law claims *See* 28 U S C § 1367(c)(3) Accordingly, the court will dismiss them for lack of subject matter jurisdiction

V CONCLUSION

**\*6** For the foregoing reasons, IT IS HEREBY ORDERED that:

1 The Defendants' Motion to Dismiss (D I 7) is GRANTED; and

2 Oatway's Motion for Summary Judgment (D I 10) is declared MOOT

2002 WL 187512 (D Del ), 27 Employee Benefits Cas 2404

**Motions, Pleadings and Filings (Back to top)**

• 1:01CV00033 (Docket)

(Jan 17, 2001)

END OF DOCUMENT

© 2005 Thomson/West No Claim to Orig U S Govt Works