© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
1991 WL 126000 (D.D.C.)
**(Cite as: 1991 WL 126000 (D.D.C.))**
<KeyCite History>

Motions, Pleadings and Filings

Only the Westlaw citation is currently available.

United States District Court, District of Columbia.
Tyrone R. AIKEN, Plaintiff,
v.
William K. REILLY, Administrator, U.S. Enviromental Protection Agency, Defendant.
Civ. a. No. 90-0987-LFO.

June 26, 1991.

*MEMORANDUM*

ORBERDORFER, District Judge.

**\*1** Currently before the Court are cross-motions for summary judgment. At a hearing on June 24, 1991, it became apparent that more information concerning selective placement factors was necessary to resolve those motions. Accordingly, the accompanying order will retain the cross-motions for summary judgment under advisement and allow the parties to submit further briefing on this issue.

I.

Plaintiff Aiken is a chemist currently employed by defendant EPA in its registration division. *See* Aiken Affidavit ¶ 3. In this capacity, Aiken reviews information submitted by companies producing pesticides, herbicides, fungicides, and paints and also determines whether manufacturing methods and processes comply with the relevant federal regulations. *See id.*

In 1985, Aiken filed two internal discrimination complaints. In the first complaint, he alleged that he had been denied an appropriate monetary award for a suggestion submitted to the EPA pursuant to its employee suggestion program because he is black and because he identified waste and mismanagement in the Office of Pesticides Programs (OPP). *See* Defendant's Motion for Summary Judgment, Exhibit 1. In the second complaint, Aiken alleged that his application for the position of supervisory biologist was denied due to his race and his sex. *See* Defendant's Motion for Summary Judgment, Exhibit 2.

The preliminary investigation by the EPA's Office of Civil Rights found no merit in either complaint. *See* Proposed Disposition, *In the Matter of Tyrone Aiken,* EPA File No. 85-0031-HQ and 85-0032-HQ (Defendant's Motion for Summary Judgment, Exhibit 4). According to that investigation, Aiken suggested that the OPP use microcomputers in its product chemistry reviews. *See id.* at 3. This suggestion was accepted into the awards program, and Aiken eventually received a $500 interim award. *See id.* at 16. Later, however, observing that Aiken had not suggested an unusual application for the use of a microcomputer, the OPP made the interim award final. *See id.* at 18-19. The Office of Civil Rights found that Aiken had failed to make a *prima facie* case of discrimination, that the OPP's rationale for its decision was legitimate and nondiscriminatory, and that Aiken had failed to produce any evidence of racial animus on the part of the decisionmaking official, who is also black. *See id.* at 27-32.

The Office of Civil Rights also found Aiken's second complaint to be without foundation. In that complaint Aiken protested the rejection of an application for a supervisory biologist position. The Office of Civil Rights found, however, that Aiken failed to meet the minimum qualification standards for such positions set forth in the X-118 Qualification Standards Handbook. *See id.* at 22. Accordingly, it determined that in the second complaint as well Aiken had not established a *prima facie* case of discrimination, that the EPA's rationale for denying his application was legitimate and nondiscrimination, and that Aiken had failed to produce any evidence of racial animus. *See id.* at 32-27.

**\*2** Despite the Office of Civil Rights' findings, when Aiken appealed his complaint to the Equal Employment Opportunity Commission, the agency entered into settlement negotiations with Aiken and his union representative, Marc Turgeon. *See* Aiken Affidavit ¶ 6; Bryant Affidavit ¶ 2. On December 2, 1987, Aiken agreed to withdraw his complaints and waive all future claims arising out of the

incidents described in the complaints if the EPA agreed to:

a. provide Mr. Aiken priority consideration for a GM-14 Section Head Chemist position in the Office of Pesticides Program for which he is qualified. (Qualified means Mr. Aiken meets Office of Personnel Management's X-118 Standards and any EPA selective placement standards);

b. provide $1,000 within 45 days; and

c. ensure that EPA Form 3130-4 is completed and placed in Mr. Aiken's Official Personnel Folder.

Settlement Agreement (Defendant's Motion for Summary Judgment, Exhibit 6).

On December 9, 1987, EPA officials placed a Form 3130-4, a certification of approval for payment of suggestion award, in Aiken's personnel folder. *See* Defendant's Statement of Material Facts not in Genuine Issue ¶ 6. Less than two weeks later, the agency processed a payment of $1,000 for Aiken. *See* Memorandum from Bruce M. Feldman to William D. Stewart, December 22, 1987 (Defendant's Motion for Summary Judgment, Exhibit 9). The EPA was not so diligent in satisfying its final obligation under the settlement agreement. Accordingly, on August 12, 1988, Aiken wrote to Douglas Campt, Director of OPP, to request that he "be granted priority consideration for any one of the [five listed] positions for which I qualify...." Memorandum from Tyrone Aiken to Douglas Campt, August 12, 1988 (Defendant's Motion for Summary Judgment, Exhibit 11). Campt responded that three of the positions listed by Aiken were not covered by the settlement agreement and one was already filled, but he did inform Aiken that a position in the Environmental Chemistry Review Section in the Environmental Fate and Effects Division was open. *See* Memorandum from Douglas Campt to Tyrone Aiken, September 7, 1988 (Defendant's Motion for Summary Judgment, Exhibit 12).

The Environmental Fate And Effects Division analyzes the fate of insecticides, fungicides, and the like after they have been used and released into the environment. The supervisory position in that division required at a minimum an applicant satisfying the X-118 standards for a GS-1320 Chemist position. *See* Northern Affidavit ¶ 3 (Defendant's Motion for Summary Judgment, Exhibit 16). The division also indicated that it would prefer candidates with knowledge of the metabolism, field dissipation, and accumulation of pesticides in soils, water, and plants; an ability to provide the "final and authoritative quality control" analysis of environmental fate assessments; and an ability to prepare environmental fate assessments. *See* Staffing Requisition, (Defendant's Opposition, Exhibit 5). Such knowledge and skills were not, however, deemed mandatory. *See id.*

**\*3** EPA personnel officials found Aiken qualified under the X-118 standard and referred him to the Environmental Fate Division for further consideration. *See* Northern Affidavit ¶ 3. On January 4, 1988, three members of that division interviewed Aiken. *See* Schuda Affidavit ¶ 4. They questioned Aiken about his knowledge of quality control for Environmental Fate analysis and his supervisory experience and ability. *See* Barton Affidavit ¶ 6; Schuda Affidavit ¶ 6. They found Aiken's answers to the questions about environmental fate analysis inadequate and determined that he would be unable "to contribute to, evaluate, amend, or criticize someone else's Environmental Fate Assessment Review." Memorandum from Paul F. Schuda to Charlotte Northern, January 30, 1989 (Defendant's Motion for Summary Judgment, Exhibit 13). Concluding "that Mr. Aiken clearly does not possess the necessary knowledge and background required for the position," the panel rejected Aiken's application. *See id.*

Aiken now contends that the panel's decision breached the settlement agreement by failing to provide him with *bona fide* priority consideration.

II.

Before determining whether the EPA's actions breached the settlement agreement, it is first necessary to consider whether Aiken properly exhausted his administrative remedies. EEOC regulations provide that if a "complainant believes that the agency has failed to comply with the terms of a settlement agreement, the complainant shall notify the Director of the Equal Employment Opportunity, in writing, of the alleged noncompliance with the settlement agreement within 30 days of when the complainant knew of should have known of the alleged noncompliance." 29 C.F.R. § 1613.217(b) (1991). The EPA observes that Aiken knew that his application had been denied by February 7, 1989, and that his complaint was not filed until May 22, 1989. *Compare* Memorandum from Tyrone R. Aiken to Paul F. Schuda, February 9, 1989 (Defendant's Opposition, Exhibit 3) *with* Letter from Tyrone R. Aiken to Director, Office of Civil Rights, May 22,

1989 (Defendant's Motion for Summary Judgment, Exhibit 14). It therefore argues that Aiken's complaint should be dismissed for failure to comply with the 30-day filing deadline. *See, e.g., Robles v. United States of America,* 54 Empl.Prac.Dec. ¶ 40,913 (D.D.C.1990); *Curtis v. Mosbacher,* 52 F.E.P. 1141 (D.D.C.1990). Aiken is not, however, appealing his rejection for the position in the Environmental Fate Division. He readily admits that he was not qualified for it. Instead, he argues that the EPA failed to satisfy its duty to give him priority consideration for a job for which he was qualified. Aiken did not receive a final indication that the EPA considered this duty fulfilled until May 24, 1989. *See* Letter from Rich Lemley to Tyrone Aiken, May 24, 1989 (Plaintiff's Cross-Motion for Summary Judgment, Exhibit 1). As a consequence, Aiken's May 22, 1989, letter to the EEOC notifying them that the EPA had breached the settlement agreement was timely filed.

### III.

**\*4** The EPA satisfied its duty under the settlement agreement to provide him with priority consideration. The phrase "priority consideration" suggests separate and special consideration. The EPA merit promotions manual indicates a slightly more specialized usage. It defines priority consideration as "referral of a candidate to a selecting official before candidates under a merit promotion action are considered." EPA Merit Promotion Manual at 3-4 (Defendant's Motion for Summary Judgment, Exhibit 20; *see also* Bryant Affidavit ¶ 4 (noting that EPA attorneys "advised Mr. Aiken prior to entering the settlement agreement that 'priority consideration' meant that he would be considered before other candidates were considered for a single GM-14 Section Head Chemist position"). Since Aiken was indisputably considered for the Environmental Fate position before that position was competitively offered, he received the priority consideration under both the technical and the normal meaning of the phrase.

Aiken contends that one priority consideration which he was entitled by the agreement was not *bona fide* because he was not really qualified for the Environmental Fate position for which he was considered. If "qualified" were interpreted according to its normal usage, this contention would be persuasive. A person who does not have the "necessary knowledge and background required for the position" would not normally be considered qualified. Aiken, his union representative, and the EPA lawyers, however, used the term priority consideration in its technical sense, and it is likely that they used the term "qualified" in the same manner. The EPA's merit promotion manual lists three types of qualified candidates: best qualified, highly qualified, and qualified. *See* Merit Promotion Plan at 2-2. The last category is defined in the promotion manual as those candidates "who meet the minimum qualification standards and possess all appropriate selective placement factors for a particular position." *Id.* In the settlement agreement, "qualified" is defined in almost exactly the same way: "Qualified means Mr. Aiken meets Office of Personnel Management's X-118 Standards and any EPA selective placement factors." Settlement Agreement. Thus, the parties appeared to use the phrase "priority consideration" in the same manner as the merit promotion manual. As a consequence, because Aiken met the minimum standards in the X-118 Manual and because there were no selective placement factors, he was "qualified" under the settlement agreement.

According to Aiken, when he entered into the agreement, he thought that he would be considered for a position for which he was well qualified. *See* Aiken Affidavit ¶ 6. The contract's language is, however, quite specific. It does not require that he be considered for a position for which he was "highly qualified." It only requires that the position be one for which he is merely "qualified," which means meeting the minimum standards for a position of that type and any additional minimum requirement for the particular position. Moreover, Aiken did represent to Campt that he was qualified for the Environmental Fate position. *See* Memorandum from Tyrone Aiken to Douglas Campt. In any event, the fact that he was represented by a union vice-president dispels any notion that he did not understand the technical manner in which "qualified" was being used.

**\*5** Aiken also argues that he would not have withdrawn his complaints and waived claims arising out of the transactions described in those claims had he known he would only get priority consideration for positions for which he was minimally qualified. In short, he argues that it is unreasonable to think that he would have waived his claims for so little. The record does not, however, suggest that the claims in his two complaints were very strong. The Office of Civil Rights did not even find that he made out a *prima facie* case of discrimination. *See supra* 2--3. Aiken nonetheless asserts that the ALJ thought he had a strong claim in his first complaint. *See* Aiken Affidavit ¶ 5. Be that as it may, the settlement agreement was a reasonable one. The proposed

disposition found that in 1985 the highest award under the EPA's employee suggestion program was $1390. Aiken received $1000 in cash in addition to the $500 interim award he had already received. *See* Proposed Disposition at 20. Thus, he was generously compensated for withdrawing his first complaint. Any further compensation he might have received for withdrawing his second claim was sufficient in light of the undisputed frivolousness of it.

### III.

Finally, Aiken contends that the EPA failed to satisfy the settlement agreement because selective placement factors should have been used for the Environmental Fate position, and he should therefore not have been considered for that position.

The Federal Personnel Manual defines selective factors as "knowledges, skills or abilities essential for satisfactory performance on the job [that] represent an addition to the basic standard for a position." Federal Personnel Manual at 335-3 (Plaintiff's Cross-Motion for Summary Judgment, Exhibit 6). The EPA Merit Promotion Manual similarly defines selective placement factors as knowledge or abilities "essential" to the performance of a particular job. EPA Merit Promotion Manual at 3--5. Such factors are essential only if they "cannot readily be acquired after promotion." Federal Personnel Manual at 335-3.

Aiken observes that the Environmental Fate division panel found him unqualified because he lacked the "necessary knowledge and background required for the position." Shuda Memorandum, January 30, 1989. Moreover, the candidate eventually chosen for the position had such experience, *see id.* ¶ 9, and the EPA's affidavit notably fails to assert that any candidate without specific experience would have been chosen for the position. Aiken therefore concludes that such knowledge and abilities were essential to the position and selective placement factors should have been used. The EPA responds that other candidates besides Aiken possessed no special experience with Environmental Fate assessments yet displayed a better knowledge of such assessments than Aiken. *See* Barton Affidavit ¶ 8. Furthermore, the EPA argues, the use of selective placement factors is entirely discretionary.

Given the current state of the record, it is impossible to resolve these claims. In the first place, it is unclear whether the EPA violated any regulations or practices by not using selective placement factors in offering the Environmental Fate Division position. The parties have not cited any such regulations or documented any practices, and the EPA Merit Promotion Manual does not indicate when, or indeed whether, the agency is required to use such factors. Moreover, even if the EPA had discretion to use or not use selective placement factors, the EPA has not explained why it chose to exercise that discretion not to use selective placement factors. The EPA has certainly chosen to do so before in filling analogous vacancies. *See* Plaintiff's Cross-Motion for Summary Judgment, Exhibits 7 & 8. In sum, it is not clear from the current record whether the EPA improperly failed to include a selective placement factor or decided not to do so arbitrarily.

### IV.

**\*6** Accordingly, the cross-motions for summary judgment will remain under advisement, and the accompanying order will schedule further briefings on this