© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
1996 WL 528890 (E.D.Pa.)
**(Cite as: 1996 WL 528890 (E.D.Pa.))**
<YELLOW FLAG>

Motions, Pleadings and Filings

Only the Westlaw citation is currently available.

United States District Court, E.D. Pennsylvania.
Karen E. DICKS, Plaintiff
v.
INFORMATION TECHNOLOGISTS, INC.,
Defendant
No. CIV.A. 95-103.

Aug. 29, 1996.

*MEMORANDUM AND ORDER*

YOHN, J.

**\*1** Karen E. Dicks ("plaintiff" or "Dicks") has sued her former employer, Information Technologists, Inc. ("defendant" or "ITI"), for breach of contract, for intentional infliction of emotional distress, and for age and sex discrimination in violation of the Age Discrimination in Employment Act ("ADEA") and Title VII. ITI has moved for summary judgment on all claims. The court will grant ITI's motion in part and deny it in part.

The following facts are undisputed. In October 1992, at the age of forty-three, Dicks accepted the position of Director of Technology at ITI, then a company of approximately forty employees. She was one of ITI's oldest employees at that time. Before Dicks began work, Dicks and the shareholders of ITI, Thomas Behlau ("Behlau") and Charles Murray ("Murray"), negotiated certain issues surrounding Dicks' employment, annotating and initialing a now-lost offer letter. Although the offer letter referred to a twelve-month period, Dicks understood both that she could leave at any time and that she could be fired at any time, for any reason. During the negotiations, Dicks expressed interest in acquiring equity in the company. The parties agreed to discuss her options when she had been with ITI for one year.

According to her June 1994 resume, printed on ITI letterhead, Dicks eventually managed a technical staff of seventy-five employees. Dicks was responsible for providing senior management with strategic business and information systems planning, for charting ITI's technical direction, for developing ITI's methodologies, and for managing ITI's relationship with its largest corporate partner, Microsoft Corporation.

After assuming her post, Dicks asked for an assistant. ITI hired Scott Good ("Good") ten months after Dicks, in the summer of 1993. Although he is younger than Dicks and has less education and experience, Good started at a salary higher than Dicks'. Good was given all the same duties as Dicks except for management of ITI's relationship with Microsoft Corporation. Behlau told Dicks that Good would report to her. However, Good told others at ITI that he had been instructed to report only to Behlau.

In July 1994, Behlau and Murray, along with then-Chief Financial Officer Michael Conway and John Connolly, an equity holder in a companion firm, confronted Dicks about her conversations with other employees about leaving ITI to start a competing venture. (Two ITI employees have testified that Dicks approached them about leaving to join her; Dicks claims that she was not serious.) Dicks believed that discriminatory intent lay behind the confrontation. Shortly thereafter, she filed a complaint with the Pennsylvania Human Relations Commission ("PHRC"), alleging age and sex discrimination. The complaint was apparently referred to the Equal Employment Opportunity Commission ("EEOC") for the purpose of a dual filing.

In the fall of 1994, Dicks learned that ITI intended to hire Ruth Allen ("Allen"), who is ten years older than Dicks, as Director of Vendor Relations. Dicks objected, believing that ITI was retaliating against her for filing a PHRC complaint. In January 1995, Allen effectively replaced Dicks as ITI's liaison with Microsoft Corporation. That same month, Dicks filed suit in this court.

**\*2** In August 1995, ITI instituted a new organizational structure that Dicks characterizes as an attempt to demote her. Previously, ITI's organizational chart showed a hierarchy under which

the technical staff reported to Good, who reported to Dicks, who reported to Behlau. [FN1] After the restructuring, Dicks became one of five "Team Directors" reporting to Behlau. Furthermore, in October 1995, when it gave Dicks her first negative performance evaluation from a prepared script containing admittedly false accusations, ITI informed Dicks that it was adopting a base salary cap of $90,000, her salary at that time. Only Dicks was immediately affected by this cap.

> FN1. Pl.'s Ex. W. The court notes that ITI objects to the term "reported to." It claims to have a corporate philosophy that "discourages hierarchical thinking and rigid organizational structures, in favor of a team environment." (Answer to Am. Compl., ¶ 9) Similarly, ITI insists that Dicks "mentored" Good but did not "train" him. (Murray Dep., p. II-64)

Dicks now alleges that ITI breached her employment contract by unilaterally changing her terms and conditions of employment and by refusing to discuss selling her a partnership interest. In the alternative, Dicks claims that ITI breached a duty of good faith and induced her detrimental reliance on promises made. Next, Dick alleges that ITI purposefully inflicted emotional distress on her during her employment. Finally, she argues that ITI discriminated against her, took retaliatory actions when she complained, and subjected her to sexual harassment through a hostile work environment.

For the reasons that follow, the court will grant ITI's summary judgment motion with respect to Dicks' contractual, quasi-contractual, and tort claims. The court will deny summary judgment on all of Dicks' claims of discrimination.

*I. Plaintiff's contractual and "quasi-contractual" claims*

*A. The terms of plaintiff's at-will employment*

The court concludes that, because she was an at-will employee, Dicks has no contractual or quasi-contractual claims concerning the complained-of changes in her job responsibilities. The court also concludes that Dicks has no claim concerning equity or partnership in ITI.

The long-standing but much critiqued doctrine of at-will employment survives in Pennsylvania. This doctrine has been summarized as follows: "[I]t is presumed that either party may end an employment relationship at any time, for any or no cause." *Murray v. Commercial Union Ins. Co.,* 782 F.2d 432, 435 (3rd Cir.1986). Moreover, "the Pennsylvania Supreme Court has consistently taken a dim view of any exceptions to the at-will doctrine." *Tiscornia v. Sysco Corp.,* 1995 WL 574334, at *2 (E.D.Pa. Sept. 26, 1995).

An employee may rebut the presumption of at-will employment with evidence of an express contract establishing a "specific and definite" period of employment. *Borrell v. Weinstein Supply Corp.,* 1995 WL 156205, at *2 (E.D. Pa. April 10, 1995). Dicks has testified, however, that her employment agreement did not contain such a term. (Dicks Dep., pp. II-62) An employee may also rebut the presumption through evidence showing that she has given consideration beyond those services for which she was hired. *Gorwara v. AEL Indus., Inc.,* 784 F.Supp. 239, 243 (E.D.Pa.1992). However, Dicks has proffered no such evidence. Therefore, the court finds that Dicks was an at-will employee while at ITI.

**\*3** The power to discharge an employee must subsume the power to change, prospectively, the terms of employment. Otherwise stated, "The undoubted right to terminate an at-will contract necessarily includes the right to insist upon changes in the compensation arrangements as a condition of continued employment." *Green v. Edward J. Bettinger Co.,* 608 F.Supp. 35, 41-42 (E.D.Pa.1984), *aff'd,* 791 F.2d 917 (3rd Cir.1986), *cert. denied,* 479 U.S. 1069 (1987). *See also Borrell v. Weinstein Supply Corp.,* 1995 WL 156205, at *5 (employer may unilaterally change sick policy). Thus, Dicks has no contractual claim concerning her position in the company relative to others with technical skill or concerning the change in ITI's commission structure.

The court also notes that "[t]he doctrine of equitable estoppel is not an exception to the employment at-will doctrine." *Paul v. Lankenau Hosp.,* 569 A.2d 346, 348 (Pa.1990); *Stumpp v. Stroudberg Mun. Auth.,* 658 A.2d 333 (Pa.1995). Moreover, the Third Circuit has rejected the argument that a Pennsylvania employer may discharge an at-will employee only in good faith and with good cause. *Wolk v. Saks Fifth Ave., Inc.,* 728 F.2d 221 (3rd Cir.1984). Thus, "[t]here is no claim under Pennsylvania law for breach of a duty of good faith and fair dealing where the employment relationship is at-will." *Engstrom v. John Nuveen & Co.,* 668 F.Supp. 953, 958 (E.D.Pa.1987).

Finally, the court rejects Dicks' argument that her claims fall within a public policy exception to the at-will doctrine. The Third Circuit has concluded "that the Pennsylvania courts would not hold that termination of an at-will employee on the basis of age gives rise to an independent common law cause of action for breach of contract in addition to [PHRA] statutory remedies." *Bonham v. Dresser Indus., Inc.,* 569 F.2d 187, 195 (3rd Cir.1977), *cert. denied,* 439 U.S. 821 (1978). Assuming that the Third Circuit would apply the same logic to claims of sex discrimination, the court holds that Dicks has no contractual or quasi-contractual claims for changes in her responsibilities or compensation arrangement.

### B. Plaintiff's partnership claim

The alleged agreement about the sale of ITI stock may be considered distinct from the other terms of employment that were discussed when Dicks accepted her position at ITI.

An agreement to negotiate in good faith can be enforced under Pennsylvania law if it otherwise meets the requisites of a contract. *Channel Home Ctrs. v. Grossman,* 795 F.2d 291 (3rd Cir.1986). [FN2] However, in the case that established this proposition, the letter agreement at issue contained "an unequivocal promise" by the defendant to withdraw a store from the rental market and to negotiate a proposed leasing transaction with the plaintiff to completion. *Id.* at 299. Furthermore, the parties clearly exhibited their intention of being bound by the agreement. The prospective lessee developed marketing and delivery plans for the location, purchased necessary equipment, and submitted zoning applications to the local authority, and the prospective lessor prepared a draft lease. The parties also exchanged consideration of substantial value expressly based on the agreement to negotiate. Significantly, the prospective lessor used the letter agreement to obtain financing for purchase of the site.

> FN2. The court notes the long-standing position of the Pennsylvania Supreme Court that "an agreement to agree is incapable of enforcement." *Onyx Oil & Resin Inc. v. Moss,* 80 A.2d 815, 816 (Pa.1951). *See also Jennison v. Jennison,* 499 A.2d 302, 306 (Pa.Super.1985).

**\*4** By contrast, Dicks makes only the following allegations concerning her potential partnership: (1) Behlau and Murray assured her that "she would be eligible for a potential partnership interest in the company after one year" (Am.Compl., ¶ 15), (2) After one year of employment, plaintiff requested a meeting with Behlau and Murray "to discuss ITI's business situation and the possibility of Plaintiff becoming a partner in ITI" (Am.Compl., ¶ 30), and (3) "Despite Plaintiff's requests, Behlau has refused to hold such a meeting or discuss the matter of Plaintiff becoming a partner in ITI" (Am.Compl., ¶ 32). Moreover, at her deposition, Dicks testified as follows:

> It was my understanding that we were to have a meaningful discussion relative to that [partnership] that would outline in more detail the options available to me. (Dicks Dep., p. II-73);
> 
> I remember that--the agreement to discuss it. (Dicks Dep., p. II-76);
> 
> I think that they were saying they weren't making a specific promise at that time because we didn't know one another, we hadn't worked together. (Dicks Dep., p. II-77).

Thus, the court finds that Dicks' situation differs significantly from the facts underlying the Third Circuit's holding in *Channel Home Centers.* Dicks does not allege that she had an agreement to negotiate in good faith toward a defined outcome.

Plaintiff's related equitable claims must also fail. First, her claim that defendants' refusal to negotiate a partnership agreement breached an implied covenant of good faith merges with the contractual issues just discussed. [FN3]

> FN3. As noted in *Channel Home Centers v. Grossman,* "Good faith in the bargaining or formation stages of the contracting process is distinguishable from the common law duty to perform in good faith." 795 F.2d at 299 n. 8.

> There may be an express or implied covenant of good faith and fair dealing in any contract between the parties, but if so, its breach is a breach of contract rather than an independent breach of a duty of good faith and fair dealing.

*Engstrom v. John Nuveen & Co.,* 668 F.Supp. at 958. *See also, Murray v. Commercial Union Ins. Co.,* 782 F.2d 432, 436 (3rd Cir.1986) (rejecting bad faith claim as an attempt to transform contract action into tort action for the purpose of collecting punitive damages). Second, the fact that Dicks gave up other employment opportunities to go to ITI (and to stay with ITI) because of its promise to discuss a partnership does not entitle her to purchase securities now from ITI under the doctrine of detrimental

reliance or promissory estoppel. "The difficulty with this argument is, of course, that whatever 'promises' appellant relied upon are in any event too indefinite to enforce." *Jennison v. Jennison,* 499 A.2d 302, 306 n. 4 (Pa.Super.1985).

*II. Intentional infliction of emotional distress*

In her complaint, plaintiff alleges that ITI intentionally inflicted emotional distress on her "in the course of her daily duties while an employee of ITI." (Am.Compl., ¶ 175) [FN4] Although she does not elaborate on this allegation, plaintiff does incorporate all of her allegations of discrimination into this count. (Am.Compl., ¶ 174) She further states that ITI took actions calculated to cause her to fail, so that ITI could eventually fire her. (Am.Compl., ¶ 176) Finally, she alleges that ITI inflicted distress on her by refusing to honor promises made at the time of her hiring and throughout her employment and, thus, by exploiting her expertise and experience. (Am.Compl., ¶ 177)

> FN4. Although Pennsylvania courts have not clearly addressed the issue, ITI does not dispute that the tort of intentional infliction of emotional distress is cognizable. The Third Circuit has regarded this tort as a valid cause of action in Pennsylvania. *See Clark v. Township of Falls,* 890 F.2d 611, 623 (3rd Cir.1989).

**\*5** At deposition and in an affidavit, plaintiff elaborated on these allegations. She explained that Behlau stopped speaking to her and lied to her about Good's position and the prospect of a partnership. (Dicks Dep., p. IV-126) Murray, she said, publicly accused her of recommending a competitor to a client and made other unspecified false accusations against her. (Dicks Aff.) According to plaintiff, Connolly refused her requests for new computer equipment and excluded her from presentations. As a company, according to plaintiff, ITI discouraged other employees from supporting her and denied her information about events involving clients with whom she had relationships. In plaintiff's brief, counsel focuses primarily on Murray's public accusations.

In response, ITI argues that the exclusivity provision of the Pennsylvania Worker's Compensation Act ("WCA") bars Dicks' claim. In the alternative, ITI argues that the conduct of which Dicks complains is not extreme and outrageous enough to be characterized as intentional infliction of emotional distress.

The WCA is the exclusive source of an employer's liability to an employee for any injury arising in the course of his or her employment. 77 Pa. Cons.Stat. Ann. § 481 (West 1992). [FN5] Most of the actions that Dicks identifies as causing her emotional distress involved access to business information, equipment, and staff support. The WCA clearly preempts these claims. On the other hand, the WCA's definition of "injury arising in the course of his employment" excludes an "injury caused by an act of a third person intended to injure the employe because of reasons personal to him, and not directed against him as an employe or because of his employment." 77 Pa. Cons.Stat. Ann. § 411 (West Supp.1995). Attempts to humiliate Dicks through public, orchestrated attacks, if personally motivated and based on wholly fabricated accusations, may fall within this exception to the WCA's exclusivity. *See, e.g., Schweitzer v. Rockwell Int'l,* 586 A.2d 383, 389 (Pa.Super.1990), *appeal denied,* 600 A.2d 954 (Pa.1991); *Gruver v. Ezon Prods., Inc.,* 763 F.Supp. 772, 776 (M.D.Pa.1991). The court need not decide the issue here, though, as none of ITI's alleged actions constitutes intentional infliction of emotional distress as defined in this circuit.

> FN5. § 481(a) provides, "The liability of an employer under this act shall be exclusive and in place of any and all other liability to such employes ... on account of any injury or death as defined in [this act]."

The standard for stating a claim for intentional infliction of emotional distress is very high. The Third Circuit has predicted that the Pennsylvania Supreme Court would adopt the "black letter rule of § 46 of the Restatement [ (Second) of Torts (1965) ], along with the interpretive comments." *Chuy v. Philadelphia Eagles Football Club,* 595 F.2d 1265, 1274 (3rd Cir.1979)(en banc). *See also, Clark v. Township of Falls,* 890 F.2d 611, 622-23 (3rd Cir.1989). Section 46(1) defines the tort as follows: "One who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it, for such bodily harm." The Third Circuit has observed that it is "extremely rare to find conduct in the employment context that will rise to the level of outrageousness necessary to provide a basis for recovery." *Cox v. Keystone Carbon Co.,* 861 F.2d 390, 394-96 (3rd Cir.1988). To satisfy the legal standard for intentional infliction of emotional

distress, the conduct complained of must "go beyond all possible bounds of decency, and ... be regarded as atrocious, and utterly intolerable in a civilized society." *Id.* at 395 (citation omitted).

**\*6** Most of Dicks' claims are not of the unusual sort that pass the high threshold of "extreme and outrageous" conduct. As stated by the Third Circuit,

> as a general rule, sexual harassment alone does not rise to the level of outrageousness necessary to make out a cause of action for intentional infliction of emotional distress ... The extra factor that is generally required is retaliation for turning down sexual propositions.

*Andrews v. City of Philadelphia,* 895 F.2d 1469, 1487 (3rd Cir.1990). Moreover, claims based on facts very similar to those recited in Dicks' complaint have been deemed inadequate in other "intentional infliction" cases. For example, in *Kinnally v. Bell of Pennsylvania,* 748 F.Supp. 1136, 1145 (E.D.Pa.1990), the plaintiff alleged that she had suffered a mental breakdown because of what the court called a "regime of derision and intimidation." However, the court found that the misogynistic, disturbing conduct was not sufficient to state a claim. Furthermore, in *Sherman v. Prudential-Bache Sec. Inc.,* 732 F.Supp. 541, 552 (E.D.Pa.1989), the plaintiff alleged that his employer engaged in a premeditated plan to force his resignation. The court found, as a matter of law, that such conduct was not sufficiently outrageous to sustain an intentional infliction of emotional distress claim. Finally, in *Cautilli v. GAF Corp.,* 531 F.Supp. 71 (E.D.Pa.1982), the plaintiff alleged that his employer had induced him to forego other career options, knowing that, to keep his job, the plaintiff would have to move his home after the company was sold. The court found that deceit of this sort is not sufficiently outrageous, either.

On the other hand, the embarrassing public confrontations that Dicks endured at ITI might have been the foundation for a claim had Dicks substantiated her allegation that Behlau and Murray knew of and purposefully aggravated her respiratory and emotional problems with those encounters. Comment (f) to section 46 of the Restatement (Second) of Torts [FN6] provides:

> FN6. Although it has found no Pennsylvania case relying on comment (f), the court sees no reason to except this provision from the Third Circuit's prediction that the Pennsylvania Supreme Court would adopt the Restatement and its comments.

> The extreme and outrageous character of the conduct may arise from the actor's knowledge that the other is peculiarly susceptible to emotional distress, by reason of some physical or mental condition or peculiarity. The conduct may become heartless, flagrant, and outrageous when the actor proceeds in the face of such knowledge, where it would not be so if he did not know ...

However, Dicks has not presented any evidence that Behlau and Murray even knew of Dicks' conditions, let alone that they acted intentionally to aggravate them.

The court does not dismiss plaintiff's allegations lightly. [FN7] However, because of the very high standard applied to intentional infliction of emotional distress claims, the court feels bound to grant defendant's motion for summary judgment on this count.

> FN7. ITI's counsel has likened Dicks' emotional distress claim to the complaint of "a petulant child who doesn't get the pony she wants at Christmas." (Def.'s Br., p. 19) The court finds this analogy both inapposite and offensive.

### III. Discrimination

#### A. Disparate treatment

##### 1. Age discrimination [FN8]

> FN8. The ADEA's general prohibition against discrimination on the basis of age provides: It shall be unlawful for an employer--
> (1) to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age;
> (2) to limit, segregate, or classify his employees in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's age; or
> (3) to reduce the wage rate of any employee in order to comply with this chapter.
> 29 U.S.C.A. § 623(a) (West 1985).

In her complaint, Dicks alleges that her job

responsibilities "were given to a less qualified, less educated, less experienced individual" who was "under the age of forty and ten years younger than Plaintiff." [FN9] Defendant argues that plaintiff has not presented a prima facie case under the Age Discrimination in Employment Act ("ADEA"). [FN10] The key requirement of a prima facie case is that it encompass adequate evidence from which an inference of discrimination can be drawn. *O'Connor v. Consolidated Coin Caterers Corp.,* 116 S.Ct. 1307, 1310 (1996). The proof required for a prima facie case depends on the factual context. *McDonnell Douglas Corp. v. Green,* 411 U.S. at 802 n. 13. Here, plaintiff must show that she (1) was in a protected class, (2) was qualified for her job, and (3) was subject to adverse employment action while (4) younger employees were treated more favorably. *See McDonnell Douglas v. Green,* 411 U.S. at 802 (establishing general structure of prima facie; elements of race-based failure-to-hire claim); *O'Connor v. Consolidated Coin Caterers Corp.,* 116 S.Ct. at 1310 (replacement by substantially younger person is probative of age discrimination).

> FN9. A comparison of Good's and Dicks' resumes shows that Dicks had longer and broader experience than did Good and had received more recognition in her field. Before arriving at ITI, Dicks had worked in all phases of project and systems management, business systems analysis, client/server development, network integration, and systems development. Good had developed, maintained, and managed cooperative-processing and mainframe-based applications and databases.
>
> FN10. The Third Circuit has applied the procedural framework for analyzing Title VII disparate treatment cases, first enunciated in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973), to ADEA claims. *Armbruster v. Unisys Corp.,* 32 F.3d 768, 777 n. 10 (3rd Cir.1994); *Seman v. Coplay Cement Co.,* 26 F.3d 428, 432 n. 7 (3rd Cir.1994). Under this framework, "once the employee establishes a *prima facie* case creating a presumption of unlawful discrimination, the burden of production shifts to the employer to provide a legitimate nondiscriminatory explanation for the employer's adverse employment action." *Id.* at 432. If the employer satisfies this burden, then the employee must demonstrate that the proffered explanation is pretextual; however, the ultimate burden of proving discriminatory intent always remains with the employee. *St. Mary's Honor Center v. Hicks,* 113 S.Ct. 2742, 2747 (1993).

Defendant does not request summary judgment on the basis of an unrebuttable or unrebutted legitimate business justification for its treatment of Dicks. In fact, defendant has not squarely presented the court with any such business justification at this time.

**\*7** ITI offers two grounds for finding that Dicks has not established a prima facie case. ITI argues that the decision to have Good share most of Dicks' responsibilities does not constitute an employment action adverse to Dicks. ITI also contends that Dicks' case must fail because she has not pointed to a similarly situated younger employee who was treated better than she. In the words of defendant's counsel, "there is no one to whom Dicks can compare herself. Without a 'comparator,' she has no discrimination claim." (Def.'s Br., p. 26)

The court finds that a genuine question of fact remains as to whether ITI took adverse employment action against Dicks. Dicks has testified that, with Good's arrival, she lost responsibility, authority, and prestige. In the words of the statute, these may be "terms, conditions, and privileges of employment." *See Crady v. Liberty Nat'l Bank & Trust Co.,* 993 F.2d 132, 136 (7th Cir.1993)(significantly diminished material responsibilities may indicate materially adverse change in conditions of employment); *Schneider v. NBC News Bureaus, Inc.,* 801 F.Supp. 621 (S.D.Fla.1991)(giving fewer and less attractive foreign and domestic assignments to female sound technician than to male counterpart constitutes adverse employment action), *aff'd,* 979 F.2d 212 (11th Cir.1992). The court also rejects ITI's argument that Dicks must show that "similarly situated" employees were treated better than she. As recently observed by the Third Circuit, defendant's argument "would seriously undermine legal protections against discrimination. Under [its] scheme, any employee whose employer can for some reason or other classify him or her as 'unique' would no longer be allowed to demonstrate discrimination inferentially ..." *Marzano v. Computer Science Corp.,* Slip Op. 95-5629 (filed July 31, 1996), at p. 25.

Therefore, the court finds that Dicks has presented a prima facie case that she was treated unfairly because

of her age.

2. *Sex discrimination* [FN11]

> FN11. In the provision on which the ADEA's general prohibition was based, Title VII makes it "an unlawful employment practice for an employer ... to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1) (West 1994).

In her complaint, Dicks lists twenty actions that ITI allegedly took against her because of sex-based animus (or, as discussed in the following section, to retaliate against her for filing a PHRC complaint). These actions range from requiring plaintiff to hold business meetings after work on Friday evenings and treating her with disrespect in front of other employees to demoting her and restructuring ITI's compensation system to her detriment. [FN12] Many relate to the transfer of responsibility from Dicks to Good and other men younger than she at ITI.

> FN12. The full list, paraphrased by the court, is as follows: (1) business meetings on Friday evenings and holiday eves; (2) exclusion from decisions concerning "technical directions of the company"; (3) exclusion from the interview process for new employees and from decisions concerning placement of technical personnel on consulting projects; (4) exclusion from decisions concerning training for technical personnel; (5) false promises concerning job responsibilities related to Microsoft; (6) diminishment of responsibilities/demotion; (7) broken promises concerning bonus and commissions; (8) undermining of Dicks' effectiveness with technical consultants; (9) removal of Dicks' name from Microsoft mailing list as contact person/ failure to provide Dicks with information concerning Microsoft functions and developments; (10) undermining of ITI's Microsoft relationship; (11) placement of Good on ITI's new operations committee, which makes major business decisions for the company; (12) assigning seminar on ITI's methodology to Good rather than Dicks; (13) hiring of management consultant to validate discriminatory actions; (14) disrespectful treatment in front of other employees; (15) removal from positions of authority; (16) refusal to provide technical equipment necessary to perform job functions; (17) failure to assign new projects and accounts to Dicks; (18) commission program under which younger males receive most commissions; (19) allowing Good to treat Dicks with disdain in front of others at ITI; (20) threats against filing suit.

Defendant again argues that plaintiff has not suffered adverse employment action. According to ITI, Dicks complains of the success of others rather than any actual harm to herself and of "the minutiae of day-to-day business decisions" (Def.'s Br., pp. 23-24). [FN13] However, job titles, compensation structures, onthe-job supervisory authority, the tools needed to perform one's job, and opportunities for recognition within a professional community are hardly minutiae. Therefore, summary judgment is not appropriate on the basis of the record before the court. Presented with persuasive contextual evidence, a jury could conclude that ITI demoted Dicks by changing her title, treating her as a professional peer of those whom she had formerly supervised, preventing her from performing functions that were once within her exclusive domain, and denying her (and only her) increases in salary. [FN14] Moreover, as long as she claims that ITI doled out the benefits in a discriminatory fashion, Dicks may complain of the loss of benefits that ITI was under no obligation to provide. *DiBiase v. SmithKline Beecham Corp.,* 48 F.3d 719, 725 (3rd Cir.1995), *cert. denied,* 116 S.Ct. 306 (1995).

> FN13. ITI's counsel writes that, "When viewed through [Dicks'] eyes, all her problems and disappointments can be traced to the fact that she is a woman, and 'they' are all men. Perhaps Dicks thinks that the world would be a better place without men ..." (Def.'s Reply Br., p. 15) In addition to lacking foundation, this statement smacks of sexism. Counsel's stylistic choices are particularly ironic in a case such as this. Moreover, to the extent that counsel refer to a previous action in which Dicks was involved, the court merely notes that a woman could conceivably be the victim of discrimination more than once in her professional career.

> FN14. The cases cited by defendant do not establish that Dicks' allegations cannot

constitute discriminatory conditions of employment. Three of the cases cited by defendant for the proposition that reassignments and changes in duties do not constitute adverse employment actions actually focused on whether those changes rendered working conditions so intolerable as to constitute constructive discharges: *Pena v. Brattleboro Retreat,* 702 F.2d 322, 325 (2nd Cir.1983); *DiRenzo v. General Elec. Co.,* 1993 WL 534227 (E.D.Pa. Dec. 23, 1993); *Churchill v. International Business Machines, Inc.,* 759 F.Supp. 1089, 1107 (D.N.J.1991). In the remaining case, *Battaglio v. General Elec. Co.,* 1995 WL 11980 (E.D.Pa. Jan. 5, 1995), plaintiff complained of a reorganization that did not affect her title or her salary and only marginally altered her responsibilities.

**\*8** As in the ADEA context, defendant also argues that Dicks has failed to compare her treatment to that afforded a similarly situated male. In light of the Third Circuit's recent opinion in *Marzano v. Computer Science Corp.,* this position has no merit if plaintiff's position at ITI was unique.

### C. Retaliation [FN15]

> FN15. Title VII provides,
> It shall be an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment ... because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.
> 42 U.S.C.A. § 2000e-3 (West 1994). The parallel ADEA provision is found at 29 U.S.C.A. § 623(d) (West 1985).
> The *McDonnell Douglas* procedural framework applies to retaliation claims. *See Barber v. CSX Distribution Servs.,* 68 F.3d 694, 701 (3rd Cir.1995).

#### 1. Administrative exhaustion

Plaintiff filed a discrimination complaint with the PHRC that was referred to the EEOC for the purpose of a dual filing. Defendant argues that, because this administrative complaint did not include charges of retaliation, plaintiff's retaliation claim is now barred from consideration in federal court. The court disagrees.

As stated by the Third Circuit in *Ostapowicz v. Johnson Bronze Co.,* 541 F.2d 394, 398 (3rd Cir.1976), *cert. denied,* 429 U.S. 1041 (1977):
> Courts have generally determined that the parameters of the civil action in the district court are defined by the scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination, including new acts which occurred during the pendency of proceedings before the Commission.

(citations omitted) Furthermore, "[a]lthough EEOC must be given the opportunity, it is not necessary that it actually investigate and conciliate a charge before a right to sue letter is issued." *Id.* at 398 n. 6. *See also Howze v. Jones & Laughlin Steel Corp.,* 750 F.2d 1208, 1212 (3rd Cir.1984) (citing *Ostapowicz* ).

Here, plaintiff complains of allegedly retaliatory acts that took place after her administrative filing but before the PHRC issued a right-to-sue letter. Furthermore, she made the PHRC aware of her allegations of retaliation as they arose, both by letter and by telephone--as defendant well knew. (Wright-Bey Aff., ¶¶ 4-6) The PHRC representative assigned to Dicks' case even participated in a conference call about the retaliation claims with both parties' counsel. Therefore, plaintiff's claims of retaliation were within the scope of the administrative investigation that one would have expected to take place. In fact, the PHRC representative based her decision that the matter could not be resolved through conciliation, in part, on this conference call during which retaliation was discussed. *Id.*

#### 2. Plaintiff's prima facie case

The sex discrimination and retaliation counts of plaintiff's complaint allege identical conduct, and the analysis from the preceding section allows Dicks to proceed under either or both theories. [FN16] However, at deposition and in her brief, plaintiff highlighted the hiring of Ruth Allen as an example of the retaliatory conduct that followed Dicks' PHRC complaint. This hire allegedly affected Dicks' detrimentally, as Allen replaced Dicks as ITI's primary contact with Microsoft. Therefore, the court discusses that hiring decision here.

> FN16. Dicks' PHRC complaint alleged both age and sex discrimination, and both Title VII and the ADEA prohibit retaliatory conduct.

"[A] plaintiff establishes a retaliation claim if she shows that she had a reasonable belief that her employer was engaged in an unlawful employment practice and that the employer retaliated against her for protesting against that practice." *Drinkwater v. Union Carbide Corp.,* 904 F.2d 853, 865 (3rd Cir.1990). Thus, the elements of a prima facie case of retaliation are: (1) a protected activity/reasonable protest of an employment policy, (2) an adverse employer action, and (3) a causal link between the two. *Jalil v. Avdel Corp.,* 873 F.2d 701, 708 (3rd Cir.1989), *cert. denied,* 493 U.S. 1023 (1990). ITI disputes only the second and third elements.

**\*9** The definition of an adverse action for purposes of establishing a prima facie case of retaliation is not limited to cognizable employment actions such as discharge, transfer, or demotion. *Passer v. American Chem. Soc.,* 935 F.2d 322, 331 (D.C.Cir.1991)(interpreting ADEA as parallel to Title VII); *Cohen v. S.U.P.A., Inc.,* 814 F.Supp. 251, 260-61 (N.D.N.Y.1993). For instance, in *Passer,* the D.C. Circuit held that an employer's eleventh-hour cancellation of a public seminar intended to honor the plaintiff had an adverse impact on the employee and thus was covered by Title VII's anti-retaliation provision. Here, plaintiff claims that her displacement as Microsoft liaison (and the manner in which it occurred) affected her reputation with colleagues in the computer industry. If proved, this claim would qualify as a retaliatory action. Moreover, for purposes of Dicks' *retaliation* claim, Allen's sex and age are immaterial.

*D. Sexual harassment*

"[A] plaintiff may establish a violation of Title VII by proving that discrimination based on sex has created a hostile or abusive work environment," *Meritor Sav. Bank v. Vinson,* 477 U.S. 57, 66 (1986), for a discriminatory environment is a "term or condition of employment," *Drinkwater v. Union Carbide Corp.,* 904 F.2d at 859-60.

In addition to the tangible problems it may create for employees, a hostile or abusive work environment "offends Title VII's broad rule of workplace equality." *Harris v. Forklift Sys., Inc.,* 114 S.Ct. 367, 371 (1993). Therefore, the United States Supreme Court has taken "a middle path between making actionable any conduct that is merely offensive and requiring the conduct to cause a tangible psychological injury." *Id.* at 370. Harassment is actionable when "the environment would reasonably be perceived, and is perceived, as hostile or abusive." *Id.* at 371.

In addition to the actual and reasonable perception of hostility or abuse, the elements of a claim of a sexually hostile work environment are:
(1) [T]he employees suffered intentional discrimination because of their sex;
(2) [T]he discrimination was pervasive and regular; [FN17] and

> FN17. The court notes that the Supreme Court standard under *Meritor* is "severe or pervasive."

(3) [T]he existence of respondeat superior liability. *Andrews v. City of Philadelphia,* 895 F.2d 1469, 1482 (3rd Cir.1990). [FN18] "Harassment is pervasive when 'incidents of harassment occur either in concert or with regularity.' " *Id.* at 1484 (citation omitted). Perhaps most importantly, " 'Intimidation and hostility toward women because they are women can obviously result from conduct other than explicit sexual advances.' " *Id.* at 1485 (quoting *Hall v. Gus Constr. Co.,* 842 F.2d 1010, 1014 (8th Cir.1988)).

> FN18. *Andrews* stated that a hostile working environment was actionable only if so abusive as to affect the employee's psychological stability. The Supreme Court rejected this position in *Harris.* Thus, two prongs of the original *Andrews* test no longer apply; plaintiff need not prove that the discrimination detrimentally affected her and would detrimentally affect a reasonable person of the same sex in that position. *Andrews v. City of Philadelphia,* 895 F.2d at 1482. Rather, the actual and reasonable perception of hostility or abuse now substitutes for these prongs of the *Andrews* test.

In *Andrews,* a hostile work environment case brought by two police officers, the Third Circuit held, "To constitute impermissible discrimination, the offensive conduct is not necessarily required to include sexual overtones in every instance or that each incident be sufficiently severe to detrimentally affect a female employee." *Id.* at 1485. Therefore, in reversing the district court's Title VII findings and remanding the officers' claims of harassment, the court noted as follows:
**\*10** The evidence in this case includes not only name calling, pornography, displaying sexual objects on desks, but also the recurrent

disappearance of plaintiff's case files and work product, anonymous phone calls, and destruction of property. The court should view this evidence in its totality ...

*Id.* at 1486. It went on to add, "The court needs to do more than make findings with respect to each incident; an examination of the totality of the circumstances requires a determination of whether the incidents were happening to these female officers, and why to no one else." *Id.* at 1485. Therefore, in evaluating Dicks' harassment claims, this court must consider Dicks' allegations of both offensive, sexually oriented conduct in the workplace and hostile but asexual actions directed against her because she is a woman.

Dicks has come forward with evidence that ITI employees used offensive language at work, frequented a topless bar with vendor representatives on ITI's dime, and ignored complaints of improper sexual conduct. She has also presented evidence of at least three questionable individual incidents: (1) An ITI employee, during a sales meeting, "grabbed himself through the front of his trousers and said, 'I'll give you muffins' "; (2) An ITI employee circulated, during work, a crude invitation to a Halloween party; (3) An ITI employee left a "memo" on Dicks' desk that described a program to "Retire Aged Personnel Early (RAPE)" and used HERPES, SCREW, SHAFT, and AIDS as acronyms for other terms.

Combined with the many other indignities of which Dicks has testified, including public accusations of misconduct, denial of appropriate equipment, and exclusion from the circulation list for office policy memoranda, these practices and incidents could adequately support a claim of hostile work environment. Thus, although it is a close question, the court finds that, were it to credit all of plaintiff's allegations, a reasonable jury could find that Dicks was subjected to intentional, pervasive conduct that affected her ability to perform and would similarly have affected another woman in her position.

*IV. Conclusion*

The court will grant ITI's motion for summary judgment on Dicks' contractual, quasi-contractual, and tort law claims. It will deny summary judgment on Dicks' claims of disparate treatment, retaliatory conduct, and sexual harassment. An order follows.

*ORDER*

And now, this ____ day of June, 1996, it is hereby ORDERED that Defendant's Motion for Summary Judgment on All Counts is GRANTED IN PART and DENIED IN PART and Defendant's Amended Motion for Summary Judgment is DENIED.

Summary judgment is GRANTED in favor of defendant on Count V (Intentional Infliction of Emotional Distress), Count VI (Tortious Breach of Duty of Good Faith and Fair Dealing Arising Out of Contract), Count VII (Breach of Contract), Count VIII (Detrimental Reliance), and Count IX (Breach of Contract--Specific Performance) of Plaintiff's Amended Complaint.

**\*11** Summary judgment is DENIED on Count I (Age Discrimination), Count II (Retaliation), Count III (Sex Discrimination), and Count IV (Hostile Work Environment) of Plaintiff's Amended Complaint.

*ORDER*

And now, this ___ day of June, 1996, it is hereby ORDERED that Defendant's Motion to Strike Exhibit "U" from Plaintiff's Exhibits in Support of Her Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment is DENIED.

1996 WL 528890 (E.D.Pa.)

Motions, Pleadings and Filings (Back to top)

. 2:95CV00103 (Docket) (Jan. 09, 1995)

END OF DOCUMENT