© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
2004 WL 2451416 (D.Del.)
**(Cite as: 2004 WL 2451416 (D.Del.))**

Motions, Pleadings and Filings

Only the Westlaw citation is currently available.

United States District Court,
D. Delaware.
James C. BELL, Plaintiff,
v.
WASTE MANAGEMENT, INC., a Delaware corporation, Defendant.
No. Civ.A. 03-992-KAJ.

Oct. 29, 2004.

William D. Fletcher, Jr., Noel E. Primos, Schmittinger & Rodriguez, Dover, Delaware, for Plaintiff.

Barry M. Willoughby, Young, Conaway, Stargatt & Taylor, LLP, Wilmington, Delaware, for Defendant.

MEMORANDUM OPINION

JORDAN, J.

I. INTRODUCTION

***1** This is an employment discrimination action brought pursuant to Title VII of the Civil Rights Act of 1964, Americans with Disabilities Act of 1990, 42 U.S.C. § 12101 *et seq;* with certain state law claims also being alleged. Presently before me is a Motion for Summary Judgment (Docket Item ["D.I."] 58) and Motion to Dismiss Plaintiff's Lost Earning Claims (D.I.59) filed by the defendant, Waste Management, Inc. ("Waste Management" or "Defendant"). Jurisdiction is proper under 28 U.S.C. §§ 1331, 1367. For the reasons set forth, the Motion for Summary Judgment will be granted and the Motion to Dismiss Plaintiff's Lost Earnings Claims will be denied as moot.

II. BACKGROUND

The plaintiff, James C. Bell ("Bell"), is a black male who began working for Waste Management in August of 2002, when he was 34 years old. (D.I. 61 at A2.) Waste Management is in the business of waste removal and Bell was hired to work as a refuse truck driver. (D.I. 2 at § 8.) Bell worked as an active employee for Waste Management for approximately three months, until November 4, 2002. (D.I. 61 at A13, A27-29, A138.)

Bell alleges that, while he worked at Waste Management, white co-workers were given favored treatment over black co-workers. (*See* D.I. 75 at B27-28, B41, B76.) Bell states, for example, that during work hours a white co-worker was permitted to stop and pick up his personal vehicle. (*Id.* at B27-28.) Bell admits, however, that he knows of no similar instance where a black employee was not given the same opportunity. (*Id.*) A white co-worker was permitted to use a company owned truck to take his Commercial Driver's License exam, while a black co-worker was not permitted the same opportunity. (*Id.* at B41.) Additionally, when Bell and another black employee went to help a white co-worker complete his route, that white co-worker left the route to "goof off" by conversing with his supervisor while still on the company's time. (*Id.* at B76; D.I. 61 at A33.) Bell alleges that there was an occasion when a black co-worker injured his knee and, despite several calls by Bell, none of the managers came to investigate. (D.I. 61 at A34.) As a result of his co-worker's injury, Bell was forced to complete the refuse collection route by himself. (*Id.*)

Bell also contends he was unfairly disciplined based on his race. On one occasion during his three months on the job, his immediate supervisor, Chris Weller ("Weller"), followed him throughout his route in a vehicle with its flashers on. (D.I. 75 at B29-30.) Bell admits that he does not know if this is standard practice. (*Id.* at B77-78.) On another occasion, Bell alleges that his truck was not operating properly, so he called headquarters to alert them of his problem and was told to wait for someone to come help him. (*Id.* at B36-37.) He was eventually ordered to return to base and was, he claims, wrongly disciplined. (*Id.*) Bell also contends that he was given a warning for missing a scheduled trash pick-up, despite the fact that the customer had not placed the trash outside before the scheduled pick-up. (*Id.* at B32.) He says that he was given a written warning for failing to attend a required safety meeting, even though a white employee was allowed to miss a safety meeting without being disciplined. (*Id.* at B37.) Bell believes

that the reason the white employee was not disciplined was that he is the cousin of his supervisor. (*Id.* at B37.)

**\*2** Shortly after Bell was hired, he requested a permanent route but instead that route was given to an even newer employee who is white. (D.I. 61 at A33.) Bell had previously worked that route prior to Waste Management's assigning it to the white employee. However, Bell admits that the reason that the route was assigned to the white employee was not racially motivated, but, rather, a conscious decision to have a younger, more physically fit employee complete the route alone, instead of using two people on the route, as had been the case when Bell worked it. (*Id.* at 163-64.)

Bell accuses Waste Management of not giving him proper training for his job. (*Id.* at B73; D.I. 61 at 73.) Bell also testified, though, that he trained with Hank Thompson ("Thompson") for three weeks. (D.I. 61 at A182.) For the first week, Thompson showed Bell the route and how to operate the truck. (*Id.* at A184-86.) For the remaining time, Thompson rode with Bell and assisted him with his route. (*Id.*) In addition to the on the job training Bell received, he was also required to watch a number of videos and attended orientation meetings. (*Id.* at A106-11.)

Bell also complains that after he mentioned the difficulty of his route to one of Weller's supervisors, Ray Moore ("Moore") (*id.* at B37-38), Weller called Bell on the radio and asked if he got the "monkey off [his] back," regarding his unhappiness with his route. (*Id.* at B37-38.)

In October, 2002, there was a meeting of the employees and senior management to discuss job performance issues involving Weller and Shane McCarty ("McCarty"), Weller's supervisor. (*Id.* at A35.) In his complaint, Bell alleges that this meeting was in response the harassment of black drivers by those individuals. (*Id.* at A34-35 .) Moore, however, says that the meeting was called at the behest of a white employee to deal with general employee concerns about Weller and McCarty's management style. (*Id.* at A192-94.) Bell himself admits that the substance of the meeting dealt with issues relevant to all employees. (*Id.* at A121.)

On Bell's last week as an active employee at Waste Management, a particularly serious incident is alleged to have occurred. (*Id.* at B31, 61.) On October 29, Bell was informed that he needed to be back at the company's headquarters by 4:30 pm because he was approaching the 60 hour maximum work-hour limit set by the Department of Transportation ("DOT"). (D.I. 61 at A125.) DOT mandates that commercial drivers may not drive more than 60 hours in any seven day period. (*Id.* at A3.) On the day in question, Bell returned with his truck at approximately 4:35 pm. (*Id.* at A102-03.) Upon arriving, Weller confronted him about his tardiness. (*Id.* at A25-26, A102-03.) The two exchanged words, and Bell alleges that Weller angrily called him "nigger." (Id.)

The following day, Bell returned to work. After work, McCarty, called Bell into his office and told him that he was suspending him for one day because of the disrespect he showed toward Weller. (*Id* . at A71, A127-28.) Bell admits that he did not inform McCarty that Weller had used a racial epithet. (*Id.* at A21, A165.) On Friday, November 1, Bell returned to work after his one day suspension. (*Id.* at A153.) After work he called his doctor, a lawyer, and the Delaware Department of Labor. (*Id.* at A132-34.) Bell later visited a doctor for treatment of his alleged disability and was given medication, although the exact type is not identified. (*Id.* at A140.) The doctor gave him a referral to a psychiatrist. (*Id.*) Bell visited that psychiatrist within one or two days and was given additional medication, although he cannot recall what medication he was given. (*Id.*) As a result of his encounter with Weller, Bell now claims that he is permanently disabled and cannot work as a driver. (*Id.* at A143.)

**\*3** On either November 1 or 2, 2002, Bell called Moore, a manager who routinely handled employee complaints, and left a message detailing the events of October 29, 2002. (*Id.* at A129-30, A195.) Upon returning from vacation on Monday, November 4, Moore contacted Bell and asked him to come down to the office so they could get to the bottom of what happened. (*Id.* at A135-36.) Despite agreeing to meet with Moore, Bell did not go to meet him. (D.I. 75 at B48.) Bell testified that he could not meet with Moore because he was on medication. (*Id.*) Moore tried to contact Bell after Bell did not appear for the appointment. (D.I. 61 at A143.) After several attempts, Moore finally reached him, and Bell reportedly said, "Why are you harassing me? I mean, what can I do? I mean, you all hurt me enough. What can I do? Why do you keep calling me?" (*Id.*) Moore responded by saying that he was sorry and that when Bell felt belter he should come back to work. (*Id.*)

After the call with Bell, Moore continued his investigation into the incident. (*Id.* at A196-99.)

Moore interviewed Weller, who denied that he had used the epithet. (*Id.* at A199.) Moore then interviewed other drivers and found that none were aware of the incident. (*Id.*) It appears that Moore did not interview an employee who was with Bell at the time of the alleged incident. (*Id.* at A198.) Moore stated that the employee in question had little ability to speak English, making communication very difficult. (*Id.* at A198.)

In his complaint, Bell alleges that Moore informed him that he was going to fire Weller, demote McCarty, and transfer the dispatcher. (*Id.* at A36.) Moore testified that those employment decisions were based on poor job performance. (*Id.* at A201-06.)

On Monday, November 4, 2002, Bell faxed to Waste Management a doctor's note titled "Permission to Return to Work," written by the first doctor he visited. (*Id.* at A18.) The note stated that Bell had been under this Doctor's care from June 04, 2002. (*Id.*) Bell admits that the "illness or injury" section and the "able to return to work" section in the note, as faxed to Waste Management, were illegible. (*Id.* at A18, A139-40.) Moore testified that he thinks someone at Waste Management once tried to follow up with the doctor to clarify the contents of the note. (*Id.* at A200.)

Bell testified that, approximately two months after he stopped working, he received a letter stating that he had been terminated. (D.I. 75 at B49.) Waste Management claims its records indicate that the termination letter was sent in November of 2003, one year after Bell stopped actively working at the company; however, it has not produced those records. (D.I. 61 at A200.) After stopping work for Waste Management and filing this law suit, Bell worked as a contract worker for Tilcon, driving his personal truck, until his license was suspended. (*Id.* at A74-75, A87-90.) After that, Bell went to work as a custodian. (*Id.* at A75-77.) Bell alleges that he stopped working as a custodian because of the "racial incident, the hostile, the environment, what happened at Waste Management, I just couldn't concentrate." (D.I. 75 at B17.) Consequently, he says, his doctor had to take him out of work. (*Id.*)

III. STANDARD OF REVIEW

**\*4** Pursuant to Federal Rule of Civil Procedure 56(c), a party is entitled to summary judgment if a court determines from its examination of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," that there are no genuine issues of material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c) (2004). In determining whether there is a triable dispute of material fact, a court must review the evidence and construe all inferences in the light most favorable to the non-moving party. *Goodman v. Mead Johnson & Co.,* 534 F.2d 566, 573 (3d Cir.1976). However, a court should not make credibility determinations or weigh the evidence. *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 150 (2000).

To defeat a motion for summary judgment, Rule 56(c) requires that the non-moving party "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586-87 (1986) (internal citation omitted). The non-moving party "must set forth specific facts showing that there is a genuine issue for trial ." Fed.R.Civ.P. 56(c) (2004). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita Elec. Inds. Co., Ltd.,* 475 U.S. at 587 (internal citation omitted). Accordingly, a mere scintilla of evidence in support of the non-moving party is insufficient for a court to deny summary judgment. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252 (1986).

IV. DISCUSSION

Bell has asserted four claims against Waste Management: disparate treatment, hostile work environment, violation of the Americans with Disabilities Act; and intentional infliction of emotional distress. (D.I. 61 at A31-47.) None of these claims bear scrutiny and, consequently, Waste Management's Motion for summary judgment will be granted.

A. *Disparate Treatment*

The United States Supreme Court in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802 (1973), set forth a three-step burden shifting analysis for Title VII employment discrimination claims. First, the plaintiff has the initial burden of establishing a *prima facie* case of discrimination. *See McDonnell Douglas Corp .,* 411 U.S. at 802. This is done by showing that the plaintiff: 1) is a member of a protected class; 2) was qualified for the position; 3) suffered an adverse job action; and 4) was treated differently than employees who are not members of

his protected class. The Supreme Court has defined an adverse employment action as a "significant change in employment status, such as hiring, firing, failing to promote, reassignment, or a decision causing a significant change in benefits." *Burlington Indus. Inc. v. Ellerth,* 524 U.S. 742, 749 (1998). Whether the plaintiff has established a *prima facie* case of employment discrimination is a question of law for the court. *Sarullo v. United States Postal Service,* 352 F.3d 789, 797 (3d Cir.2003).

**\*5** If the plaintiff establishes a *prima facie* case of discrimination, the burden shifts to the defendant-employer to articulate a legitimate, nondiscriminatory reason for the employment decision. *McDonnell Douglas Corp.,* 411 U.S. at 802. "The employer satisfies its burden of production by introducing evidence which, taken as true, would permit the conclusion that there was a nondiscriminatory reason for the unfavorable employment decision." *Fuentes v. Perskie,* 32 F.3d 759, 763 (3d Cir.1994). If the employer meets its "relatively light" burden by articulating a legitimate reason for the employment decision, the burden shifts back to the plaintiff to show "by a preponderance of the evidence" that the nondiscriminatory reason offered by the employer was a mere pretext for racial discrimination. *Id.*

In the instant action, the two main questions with respect to creating a prima facie case of disparate treatment are: 1) did Bell suffer an adverse job action; and 2) was Bell treated differently than employees who are not members of his protected class. The only action that can be seen as materially affecting Bell's terms of employment is the termination letter he received. [FN1] The question thus becomes whether, with regard to his termination, Bell was treated differently than employees outside of his protected class. That question must be answered in the context of the specific factual background of the alleged adverse employment action. *See, e.g., Hotchkins v. Fleet Delivery Serv.,* 25 F.Supp.2d 1141, 1147 (D.Or.1998) (holding that failure to show that other employees who failed to report for work were treated more leniently than plaintiff resulted in failure to establish a *prima facie* case of discrimination).

> FN1. The reprimands Bell received prior to being fired (D.I. 74 at B35-38) did not create a significant change in employment status, and, consequently, were not adverse employment actions. *See Weston v. Pennsylvania,* 251 F.3d 420, 430-431 (3d Cir.2001) (holding two written reprimands, temporary in nature and not affecting duties, hours, pay, or status, are not adverse employment actions). The bar for showing an adverse employment action requires a "significant change in employment status, such as hiring, firing, failing to promote, reassignment, or a decision causing a significant change in benefits," which, aside from his termination letter, Bell has failed to show. *Burlington Indus.,* 524 U.S. at 749;.

In this case, Bell failed to return to work after an alleged racial incident with his immediate supervisor. (D.I. 61 at A135-37.) He faxed a note from his doctor to Waste Management with two sections illegible, namely the "able to return to work" and "illness or injury" sections. (*Id.* at A18, A139-40.) Additionally, when contacted by a Waste Management supervisor to determine what had transpired between Bell and his immediate supervisor, Bell insisted that Waste Management not contact him again. (*Id.* at A143.)

Bell proffers no evidence that, following these events, he was treated differently than other employees under even remotely similar circumstances. It strains credulity to argue that a white employee engaging in the same conduct would not also have been terminated. Although pertinent to his hostile work environment claim, the factors that Bell says motivated him to stop reporting for work do not support his disparate treatment claim. Because he has failed to provide any evidence of a difference in the way he was treated and the way in which white employees would be treated if they refused to report for work and refused to even discuss why they refused to report for work, Bell's disparate treatment claim cannot stand.

B. *Hostile Work Environment*

**\*6** "In order to establish a claim for employment discrimination due to an intimidating or offensive work environment, a plaintiff must establish, by the totality of the circumstances, the existence of a hostile or abusive environment which is severe enough to affect the psychological stability of a minority employee. *Aman v. Cort Furniture Rental Corp.,* 85 F.3d 1074, 1081 (3d Cir.1996) (internal citations omitted). To establish the existence of such an environment, Plaintiff must show: "(1) that he or she suffered intentional discrimination because of race; (2) the discrimination was pervasive and regular; (3) the discrimination detrimentally affected the plaintiff; (4) the discrimination would

detrimentally affect a reasonable person of the same race in that position; and (5) the existence of respondeat superior liability." *Id.* (internal citations omitted).

The Supreme Court has stated that "whether an environment is 'hostile' or 'abusive' can be determined only by looking at the circumstances. These may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris v. Forklift Systems, Inc.,* 510 U.S. 17, 23 (1993).

Plaintiff lists several complaints against Waste Management to show a hostile work environment. *See supra* at 2-3. Looking at his allegations singly or collectively, however, only one of them can fairly be said to be in the range of something severe enough to affect a reasonable person of the Plaintiff's race. That is the incident when Weller allegedly directed a virulent racial epithet at Bell. [FN2] "Nigger" is a word so fraught with an infamous history of racial animus and abuse as to be unacceptable in civilized discourse, including discourse in the work place. The question before me, however, is not whether that epithet is morally repugnant. It is whether the conduct of Waste Management's employees created an abusive environment so pervasive as to violate Title VII. *See Aman,* 85 F.3d at 1081.

> FN2. Aside from that incident, Bell has not even produced evidence that any of the incidents he described to the court was racially motivated. *See Seabrook v. Gadow,* 2003 U.S. Dist. LEXIS 10096 at *24-25 (D. Del. June 10, 2003). Bell argued that the use of the phrase "get the monkey off your back" is racially charged (B37-38); however, the Ninth Circuit has held, and I agree, that the word "monkey" in such a context, is not a racial epithet, but rather refers to passing responsibilities to others. *Gregory v. Widnall,* 153 F.3d 1071, 1074-1075 (9th Cir.1998) (holding that a "single drawing of a monkey on a memo circulated to senior NCOs, accompanied by the verbal explanation that it was intended to remind officers not to "get the monkey off their back" by passing their responsibilities to others, is not sufficient to raise a jury question"). Even if the tone or context were such as to give credence to the Plaintiff's allegation that the comment was meant as a slur, the total number of incidents which can be characterized as racially motivated, given the evidence, would then be two, which is not pervasive.

The case law makes it clear that the single use of a racial epithet, no matter how egregious, is not pervasive and therefore does not, in isolation, create a hostile work environment. *See, e.g., Hibbler v. Reg'l Med.Ctr. at Memphis,* 2001 U.S.App. LEXIS 13323 at *4-5 (6th Cir. June 12, 2001) (holding that supervisor's single use of a racial epithet did not create a hostile work environment as defined under Title VII); *Daso v. Grafton Sch., Inc .,* 181 F.Supp.2d 485, 493 (D.Md.2002) (holding that although "no single act can more quickly alter the conditions of employment and create an abusive working environment than the use of an unambiguously racial epithet ... [a single] use of this language by the supervisor is not sufficient to satisfy the hostile work environment test because it is not sufficiently pervasive"); *Cf. Paris v. Christiana Care Visiting Nurse Ass'n,* 197 F.Supp.2d 111, 118 (D.Del.2002) (holding that "[i]n order to be actionable, harassment must be so severe or pervasive as to alter the conditions of the victim's employment and create an abusive working environment).

**\*7** Because Bell has cited only a single circumstance when he was subjected to a racial epithet, and because the other matters he complains of do not constitute a hostile work environment, his hostile work environment claim fails as a matter of law.

C. *Americans with Disabilities Act*

The Americans with Disabilities Act (the "ADA") does not cover people who are totally disabled and thus unable to work. *See, e.g., Weyer v. Twentieth Century Fox Film Corp.,* 198 F.3d 1104, 1108-09 (9th Cir.2000). Bell asserts that he is totally disabled and unable to work. (D.I. 74 at 16.) Consequently he is not a qualified individual under the ADA. Further, Bell has not requested any accommodations as is required under the ADA. *Jones v. UPS,* 214 F.3d 402, 408 (3d Cir.2000).

D. *Intentional Infliction of Emotional Distress*

Bell has conceded that he cannot pursue a claim for intentional infliction of emotional distress based upon Waste Management's hostile work environment. (D.I. 74 at 20.) Therefore, that claim too cannot stand.

V. CONCLUSION

Accordingly, the Defendant's Motion for Summary Judgment (D.I.58) will be granted, and its Motions to Dismiss (D.I.59) and to Strike Disclosure of Experts (D.I.62) will be denied as moot. Plaintiff's Motion to Consolidate Cases (D.I.48) will be denied as moot. An appropriate order will issue.

2004 WL 2451416 (D.Del.)

Motions, Pleadings and Filings (Back to top)

.                1:03CV00992              (Docket) (Oct. 29, 2003)

END OF DOCUMENT